## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

WESLEY LOUCKA,

      Plaintiff

v.

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

      Defendant

Case No. 1:17-CV-01375-TNM

### DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

Robert R. Niccolini, D.C. Bar No. 1000251
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
1909 K Street, N.W., Suite 1000
Washington, D.C. 20006
Tel: (202) 887-0855
Fax: (202) 887-0866
robert.niccolini@ogletree.com

-and-

Byrne J. Decker (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
477 Congress Street, 5th Floor
Portland, ME 04101
Tel: (207) 387-2963
Fax: (207) 387-2986
byrne.decker@ogletree.com

**Table of Contents**

Table of Authorities .................................................................................................................. ii

Introduction ............................................................................................................................. 1

Argument ................................................................................................................................. 2

   I.   ERISA's deferential, arbitrary and capricious standard of review applies, and Plaintiff at all times bore the burden of proving the "cause" of his disability. ...................................... 2

   II.   Lincoln's determination that Plaintiff has CFS, but not Lyme disease, was correct, let alone reasonable. .................................................................................................................. 5

      A.   The medical evidence in the record does not prove that Plaintiff ever had Lyme disease. ......................................................................................................................... 5

      B.   Medical literature is not proof. ................................................................................... 8

      C.   Lincoln properly relied on independent medical reviewers. ..................................... 10

      D.   In the circumstances of this case, there was no reason for Lincoln to request an in-person physical examination. ......................................................................................... 15

      E.   The vocational and functional-capacity evidence in the record, including lay witness statements and the award of Social Security disability benefits, are all irrelevant to the question of Plaintiff's alleged Lyme diagnosis. ......................................................... 17

   III.   So-called "structural conflict" is not an important factor in this case, and Plaintiff has not shown that bias influenced Lincoln's determination in any way. ..................................... 18

      A.   Plaintiff has made no showing that Lincoln's alleged "bonus structure," if any, violates ERISA regulations. ......................................................................................... 20

      B.   Lincoln's use of multiple independent medical reviews is a procedural safeguard which comports with ERISA regulations.  It is not "sandbagging." ........................... 22

      C.   Plaintiff's other scattered and generic attacks on Lincoln and the insurance industry are meritless and irrelevant. ........................................................................................ 23

Conclusion .............................................................................................................................. 24

# Table of Authorities

**Cases**

Becker v. Weinberg Group, Inc. Pension Trust,
   473 F. Supp. 2d 48 (D.D.C. 2007) ........................................................................... 19

* Black & Decker Disability Plan v. Nord,
   538 U.S. 822 (2003) ............................................................................... 3, 10, 14

Block v. Pitney Bowes, Inc.,
   952 F.2d 1450 (D.C. Cir. 1992) .................................................................... 3

Brown v. Federal Express Corp.,
   62 F. Supp. 3d 681 (W.D. Tenn. 2014), *aff'd*, 610 Fed. App'x 498 (6th Cir. 2015) ............... 14

* Brown v. Hartford Life & Accident Ins. Co.,
   12 F. Supp. 3d 88 (D.D.C. 2014) ........................................................... 3, 5, 19, 20

Burke v. Gould,
   286 F.3d 513 (D.C. Cir. 2002) ....................................................................... 9

Calvert v. Firstar Fin., Inc.,
   409 F.3d 286 (6th Cir. 2005) ........................................................................ 15

* Champion v. Black & Decker (U.S.) Inc.,
   550 F.3d 353 (4th Cir. 2008) ............................................................ 19, 20, 23

Davis v. Unum Life Ins. Co.,
   444 F.3d 569 (7th Cir. 2006) ........................................................................ 16

* Dawson v. Pension Plan for Office Employees of Intern. Bro. of Elec. Workers,
   107 F. Supp. 3d 15 (D.D.C. 2015) ............................................................... 10, 13

* Dutkewych v. Standard Ins. Co.,
   2014 WL 1334169 (D. Mass. Mar. 29, 2014), *aff'd*, 781 F.3d 623 (1st Cir. 2015) ............... 14

* Firestone Tire & Rubber Co. v. Bruch,
   489 U.S. 101 (1989) .................................................................................. 1

* Fitts v. Unum Life Ins. Co.,
   2007 WL 1334974 (D.D.C. May 7, 2007) ............................................................ 5

* Gent v. CUNA Mutual Ins. Soc'y,
   611 F.3d 79 (1st Cir. 2010) ..................................................................... 4, 5, 14

Guthrie v. National Rural Elec. Coop. Ass'n LTD Plan,
    509 F.3d 644 (4th Cir. 2007) ............................................................................. 16

* Heimeshoff v. Hartford Life & Accident Ins. Co.,
    571 U.S. 99 (2013).............................................................................................. 4

* Heller v. Fortis Benefits Ins. Co.,
    142 F.3d 487 (D.C. Cir. 1998)............................................................................. 5

* Hobson v. Metropolitan Life Ins. Co.,
    574 F.3d 75 (2d Cir. 2009)........................................................................... 15, 16

Irgon v. Lincoln Nat'l Corp.,
    2014 WL 12718984 (D.N.J. Oct. 23, 2014)....................................................... 21

Jemsek v. North Carolina Med. Bd.,
    2017 WL 696721 (E.D.N.C. Feb. 21, 2017),
    aff'd, 697 Fed. App'x 234 (4th Cir. 20017)....................................................... 14

Jones v. Unum Life Ins. Co.,
    Case No. 1:16-cv-01273, hearing tr. at 76–79 (D. Md. June 28, 2017), aff'd, Appeal No.
    17-1933 (4th Cir. July 11, 2018)(unpublished) ..................................................... 24

Killen v. Reliance Standard Life Ins. Co.,
    776 F.3d 303 (5th Cir. 2015) ............................................................................. 15

Laser v. Provident Life & Accident Ins. Co.,
    211 F. Supp. 2d 645 (D. Md. 2002).................................................................... 17

* Maniatty v. Unumprovident Corp.,
    218 F. Supp. 2d 500 (S.D.N.Y. 2002), aff'd, 62 Fed. App'x 413 (2d Cir. 2003) ..................... 8

* Marcin v. Reliance Standard Life Ins. Co.,
    861 F.3d 254 (D.C. Cir. 2017) ..................................................................... 10, 13

McDonnell v. First Unum Life Ins. Co.,
    2013 WL 2975941 (S.D.N.Y. Aug. 5, 2013)...................................................... 13

* Metropolitan Life Ins. Co. v. Glenn,
    554 U.S. 105 (2008).................................................................................... 16, 19

Mobley v. Continental Casualty Co.,
    405 F. Supp. 2d 42 (D.D.C. 2005)....................................................................... 3

* Moore v. Blue Cross & Blue Shield,
    70 F. Supp. 2d (D.D.C. 1999) ........................................................................ 3, 4

Nicula v. First Unum Life Ins. Co.,
  23 Fed. App'x 805 (9th Cir. 2001) ..................................................................... 15

* Pettaway v. Teachers Ins. & Annuity Ass'n,
  644 F.3d 427 (D.C. Cir. 2011) ................................................................... 10, 13

* Pettaway v. Teachers Ins. & Annuity Ass'n,
  699 F. Supp. 2d 185 (D.D.C. 2010), aff'd, 644 F.3d 427 (D.C. Cir. 2011) ............................ 19

Piepenhagen v. Old Dominion Freight Line, Inc. Employee Benefit Plan,
  640 F. Supp. 2d 778 (W.D. Va. 2009), aff'd, 395 Fed. App'x 950 (4th Cir. 2010) ................ 16

* Price v. UNUM Life Ins. Co.,
  2018 WL 1352965 (D. Md. Mar. 14, 2018).................................................. 9, 12, 24

Robertson v. American Airlines, Inc.,
  239 F. Supp. 2d 5 (D.D.C. 2002) ..................................................................... 9

Rutledge v. Liberty Life Assurance Co.,
  481 F.3d 655 (8th Cir. 2007) ......................................................................... 15

Stup v. Unum Life Ins. Co.,
  390 F.3d. 301 (4th Cir. 2004) ........................................................................ 17

Williams v. Aetna Life Ins. Co.,
  509 F.3d 317 (7th Cir. 2007) ......................................................................... 15

Williams v. Metropolitan Life Ins. Co.,
  609 F.3d 622 (4th Cir. 2010) ......................................................................... 16

Young v. American Intern. Life Assurance Co.,
  357 Fed. App'x 464 (3d Cir. 2009)................................................................... 7

**Statutes**

29 C.F.R. § 2560.503-1(b)(7) ...................................................................... 20, 21

29 C.F.R. § 2560.503-1(h)(3)(iii) ................................................................. 10, 23

29 U.S.C. § 2560.503-1(h)(3)(ii) ...................................................................... 22

29 U.S.C. § 2560.503-1(p)(3) ........................................................................... 21

29 U.S.C. § 2560.503-1(h)(3)(v) ....................................................................... 23

**Introduction**

In the sweep of some forty-five pages, Plaintiff raises a plethora of issues and arguments, mostly irrelevant and erroneous, in hopes that the Court will focus on something—anything—other than the narrow legal question that is actually before the Court.  The Court should not allow itself to be distracted.

As explained in Lincoln's opening memorandum, which it incorporates by reference, the dispositive issue here is whether Lincoln acted in accordance with its considerable discretion as claim administrator when it determined, after a thorough review and appeal process, that Plaintiff did not meet his burden to prove that his claimed disability is caused by Lyme disease.  *See* Lincoln's Memo. in Supp. at 3–7 (ECF Doc. #17-1)(citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), among other authorities).

The medical evidence in the record points overwhelmingly to the conclusion that the Plaintiff's condition, and any impairment, was due to CFS and not Lyme.  Plaintiff never reported a tick attachment or an occurrence of the red circular rash typical of Lyme disease.  Neither the progression of Plaintiff's illness nor its clinical manifestations matched Lyme disease, though they did match CFS.  Plaintiff never underwent the two-stage Lyme testing, described in the CDC's diagnostic criteria, and multiple rounds of incomplete testing—which omitted the first-stage EIA/ELISA or IFA tests and included only the second-stage Western blot tests—repeatedly came back negative or inconclusive.  Even a liver-tissue test, un-validated by the FDA but nevertheless employed by the Plaintiff's treating physicians, was negative for Lyme.  Plaintiff never had a positive result for Lyme.  Moreover, Plaintiff's treating physicians even agreed that he met the diagnostic criteria for CFS.  Yet, despite all of this, Plaintiff's physicians eschewed the CDC's guidelines and treated him with multiple rounds of antibiotics—including intravenous

antibiotics—as if he had Lyme.   The fact that such treatments failed to improve Plaintiff's symptoms further undercuts any suggestion that Lyme disease caused his disability.   All five of the independent consulting physicians that reviewed the record came to the same conclusion: Plaintiff suffers from CFS but not Lyme disease.

In light of the actual state of the medical evidence, there is no other conclusion that Lincoln could have reached in reviewing his claim.   Plaintiff's disability, if any, was caused by CFS, and accordingly, his disability benefits exhausted under the terms of the plan after twenty-four months.

## Argument

I.   **ERISA's deferential, arbitrary and capricious standard of review applies, and Plaintiff at all times bore the burden of proving the "cause" of his disability.**

Plaintiff asserts that *de novo* review applies here because the plan lacks a discretionary clause.   *See* Pl.'s Memo. in Supp. at 28 (ECF Doc. #16-1).   Plainly, this is not so.   The Group Policy explicitly states that Lincoln has discretionary authority to make determinations under the plan:

> **COMPANY'S DISCRETIONARY AUTHORITY.**   Except for the functions that this Policy clearly reserves to the Policyholder or Employer, the Company has the authority to manage this Policy, interpret its provisions, administer claims and resolve questions arising under it.   The Company's authority includes (but is not limited to) the right to:
>
> 1.   establish administrative procedures, determine eligibility and resolve claims questions;
>
> 2.   determine what information the Company reasonably requires to make such decisions; and
>
> 3.   resolve all matters when an internal claim review is requested.
>
> Any decision the Company makes in the exercise of its authority shall be conclusive and binding; subject to the Insured Employee's rights to request a state insurance department review or to bring legal action.

LIN00141.  Plaintiff neither mentions this clear policy language nor asserts any purported basis for the Court to ignore it.  Plaintiff's position is meritless, and frankly inexplicable.

Plaintiff also asserts that it is Lincoln's burden to prove policy exclusions apply.  *See* <u>Pl.'s Memo. in Supp.</u> at 30–31 (ECF Doc. #16-1).  While in many contexts, insurers do bear the burden of proving a claim falls within an exclusion from coverage, *see*, *e.g*., <u>Moore v. Blue Cross & Blue Shield</u>, 70 F. Supp. 2d 9, 25 (D.D.C. 1999), Plaintiff's arguments are misplaced in the context of this case, and thus fail, for at least two reasons.

First, as discussed above, Plaintiff erroneously believes this case is subject to *de novo* review.  The allocation of proof that the Plaintiff urges is simply incompatible with the discretionary standard of review that applies here.  "Under this standard, a reviewing court may not overturn a reasonable decision to terminate benefits, even if it believes the opposite outcome also might have been reasonable."  <u>Brown v. Hartford Life & Accident Ins. Co.</u>, 12 F. Supp. 3d 88, 95 (D.D.C. 2014)(citing <u>Block v. Pitney Bowes, Inc.</u>, 952 F.2d 1450, 1452 (D.C. Cir. 1992)).  Whether called "arbitrary and capricious" or "abuse of discretion," the standard requires the Plaintiff to prove, based on the administrative record, that the administrator's determination was unreasonable or unsupported.  *See*, *e.g*., <u>*id.*</u> at 95–96; <u>Mobley v. Continental Casualty Co.</u>, 405 F. Supp. 2d 42, 48 (D.D.C. 2005).

> [A] deferential standard of review allows the plan administrator to reach a conclusion that may technically be incorrect so long as it is reasonably supported by the administrative record.  Put another way, if the medical evidence is close and supports both conclusions, then judicial deference would support the plan administrator's decision to deny the plaintiff's benefits.  The ability to choose among conflicting evidence is, essentially, a natural outgrowth of the discretion that the plan affords to the plan administrator.

<u>Mobley</u>, 405 F. Supp. 2d at 48 (citing <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003), and distinguishing the deferential standard from cases where the administrator's

determination is reviewed *de novo*).  There is just no place in this analytical framework for the kind of burden-shifting that Plaintiff here seeks, especially where, as here, the burdens he seeks to shift relate to underlying aspects of his disability claim (properly to be decided by Lincoln) and not the overarching reasonableness of Lincoln's ultimate determination.

Second, even if *de novo* review applied, which it does not, Plaintiff must contort the meaning of the term "exclusion" to bring the Group Policy's twenty-four month limitation for disabilities caused by CFS within the rule of cases like Moore, 70 F. Supp. 2d at 9, which the Plaintiff cites.  The Court in Gent v. CUNA Mutual Ins. Soc'y, 611 F.3d 79 (1st Cir. 2010), recognized that such limitations provisions "might appear to operate much like an exclusion," but it is no less reasonable to "argue that these provisions put the burden on [plaintiff] to establish the physical or organic etiology of [his] disability in order for [him] to be eligible to continue receiving benefits after two years." *Id.* at 83.  While the Court in Gent did not decide the question, the latter position—*i.e.*, treating etiology as an element of coverage regarding which the plaintiff bears the burden of proof, rather than as an exclusion—is most consistent with the express policy language. *See*, *e.g.*, Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013)(recognizing "the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims").

Here, the Group Policy's proof-of-claim provision clearly states that the Plaintiff must provide proof at his expense, and that proof "must show the date the Disability began, ***its cause*** and degree."  LIN00141 (emphasis added).  Thus, in order to obtain benefits, the Plaintiff must prove the cause of his disability whether that cause is Lyme, CFS, or any other condition.  The fact that the Group Policy provides differing periods of benefits depending upon the specific cause proven does not alter Plaintiff's proof-of-cause obligation.  Moreover, this construction of the policy language comports with the well-settled legal rule that in ERISA disability cases such as

this, "the burden of proof is upon the insured as to questions of coverage and disability." Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 494 (D.C. Cir. 1998); *see also*, *e.g.*, Brown v. Hartford Life & Accident Ins. Co., 12 F. Supp. 3d 88, 97 (D.D.C. 2014)("[I]t was plaintiff's burden to substantiate [his] claim for benefits."); Fitts v. Unum Life Ins. Co., 2007 WL 1334974 at *21 (D.D.C. May 7, 2007)("The burden rests on the plaintiff to prove that [he] suffers from a disease that is covered by the applicable policy, and that [he] is disabled within the meaning of the applicable policy.").

In any event, the question of who bears the ultimate burden of proving the etiology of Plaintiff's illness—whether Lyme disease or CFS—only becomes material where evidence on that point is in "perfect equipoise." *See* Gent, 611 F.3d at 83. That is clearly not the case here. The record evidence overwhelmingly shows that Plaintiff has CFS and does not have Lyme.

## II.    Lincoln's determination that Plaintiff has CFS, but not Lyme disease, was correct, let alone reasonable.

### A.    The medical evidence in the record does not prove that Plaintiff ever had Lyme disease.

Plaintiff devotes all of two-and-a-half pages of his Memorandum to discussion of the actual medical evidence concerning his specific condition. *See* Pl.'s Memo. at 4–6.  And much of what he says about that medical evidence is simply wrong.

Plaintiff asserts that IgM genetic testing on November 8, 2013 "revealed two positive bands demonstrating the presence of Lyme disease" and cites LIN005157 in support. *See* Pl.'s Memo. at 4.  However, the document in question, clearly states that a positive IgM score requires "2 or more" positive bands, and Plaintiff's result scored only "+1." LIN05157.  It states that a positive IgG score requires "5 or more" positive bands, and Plaintiff's result scored only "+2." *Id*.  In case there was any doubt about how to interpret these unambiguous results, the document helpfully states at the bottom in bold print:

> IgG: Negative (Normal)
> IgM: Negative (Normal)

*Id*. Plaintiff's Memorandum even misstates the date of the test. *Id*. (sample collected "11/18/2013").

Plaintiff cites LIN01589 as evidence of "[i]ncreased bacterial involvement," Pl.'s Memo. at 4–5, but as that document explains, "[t]he reference interval . . . is intended as a baseline only," and thus elevated levels "need to be confirmed either by a positive IgM result" or further additional testing.   LIN01589.   Plaintiff also gets the date of this test wrong.   *See id*. (report issued "11/08/16").

Plaintiff contends that Dr. Kissi's June 16, 2014 summary "confirmed [him] to have Lyme disease," but that summary does nothing of the sort.  Rather, it states, "[Plaintiff] sought treatment from his primary care physician, and was later tested for Lyme disease, which came back negative."  LIN04802.  The summary goes on to mention a subsequent round of Lyme Western blot testing that was "positive for IgG 41 and IgM 39"—*i.e.*, positive for only one band on each— which is another negative result regardless of the standard applied.  *Id*.

Indeed, the second round of Western blot testing mentioned in Dr. Kissi's summary, though she's not clear, is presumably the IGeneX testing undertaken in February 2014.  Those test results, found in the record at LIN07246–47, clearly state that notwithstanding the positive result as to the indicated bands, the overall results were indeterminate for IgG and "NEGATIVE" for IgM, even by IGeneX's own lowered standards.  *Id*.  When measured against the CDC's prevailing standards, the overall results were "NEGATIVE" for both IgM and IgG.  *Id*.  Moreover, the IGeneX results nowhere indicate that the necessary first stage tests, the EIA/ELISA or IFA tests, were ever completed.  *Id*.  Absent such tests, there can be no "confirmation" of Lyme disease.  *See, e.g.*,

LIN00241 (Dr. Marwah's discussion of the CDC's "widely accepted" diagnostic criteria, including the two-tier testing procedure that Plaintiff never completed).

Nor does Dr. Jemsek's June 13, 2014 report "confirm[] the presence of Lyme disease." Pl.'s Memo. at 5.  Rather, it mentions Plaintiff's request to have a liver tissue test for Lyme performed by IGeneX and confirms that the test "did come back negative." LIN05200.  The liver tissue test results themselves are also in the record at LIN07244, and they are also unambiguous:

> Genomic, B. burgdorferi   NEGATIVE
> Plasmid, B. burgdorferi   NEGATIVE

*Id*.

Dr. Jemsek's office notes of April 10, 2014, and September 16, 2014, simply make reference to the February 2014 IGeneX Western blot testing discussed above.  *See* LIN05202–03; LIN05198–99.  They do not support Plaintiff's assertion of "positive Western blot testing," Pl.'s Memo. at 5, except to the extent that Plaintiff tested "positive" to fewer IgG and IgM bands than are necessary reach a positive Lyme result.  *Compare* LIN05202–03 and LIN05198–99 *with* LIN07246–47.

What Plaintiff characterizes as "Dr. Jemsek's report," dated August 6, 2016, is actually a form, apparently prepared by Plaintiff's lawyer, on which Dr. Jemsek or his physician assistant simply checked a box marked "YES" in response to the question "Is Lyme disease primarily responsible for the claimant's condition?"  *See* Pl.'s Memo. at 6; LIN04786.  The form is merely advocacy; it is not medical evidence.  *See*, *e.g*., Young v. American Intern. Life Assurance Co., 357 Fed. App'x 464, 469 (3d Cir. 2009) (treating doctor's advocacy statement that claimant could not return to work due to risk of heart attack was "seriously undermined" by doctor's "own [treatment] records" which indicated "normal stress tests and EKGs and no physical abnormalities); Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002),

*aff'd*, 62 Fed. App'x 413 (2d Cir. 2003)("[I]t was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnosis was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator.")

The balance of Plaintiff's discussion of the medical evidence, to the extent it accurately reflects anything in the actual record, addresses only Plaintiff's subjective symptoms and alleged limitations—including fatigue, joint pain, muscle stiffness, and gastrointestinal tenderness. Here, however, the question of Plaintiff's alleged impairment is not in dispute. The dispositive question here is the cause of his disability. Thus, reports of symptoms and complaints that are wholly consistent with CFS, among other disorders, do not materially advance Plaintiff's contention that he suffers from Lyme rather than CFS.

Finally, Plaintiff's discussion of his continued, and even worsening, symptoms despite treatment with multiple rounds of antibiotics, actually undercuts his contentions. As explained, for example, by the board certified physicians who reviewed the file for Lincoln, if Plaintiff actually had Lyme disease, rather than CFS, it most likely would have responded to such treatments. *See*, *e.g*., LIN01472 ("[B]esides the lack of positive serologic testing, the claimant has no response to IV antibiotic therapy . . .").

### B.    Medical literature is not proof.

Plaintiff devotes nearly ten pages of his Memorandum to characterizing, in his counsel's own words, thousands of pages medical literature describing diagnostic criteria for Lyme disease and for CFS, criticizing so-called "disability duration guidelines," questioning insurers' use of independent medical evaluations, and emphasizing the importance of functional capacity exams. *See* Pl.'s Memo. at 7–16. Plaintiff's counsel is not a physician, and his short-hand summaries of thousands of pages of detailed and highly-technical medical treatises, journal articles, professional

association reports, research studies, and other publications scattered throughout the sprawling record is dubious, at best.  It is especially suspect when, as here, Plaintiff neglected to provide record citations for each proposition, making it virtually impossible to verify the accuracy of his assertions.  *See*, *e.g.*, Robertson v. American Airlines, Inc., 239 F. Supp. 2d 5, 9 (D.D.C. 2002)(striking motion for summary judgment because movant's local rule statement of facts, which did not contain citations to the record and "liberally mixe[d] facts with argument," failed to "provide the non-movant 'an opportunity fairly to contest the movant's case.'")(quoting Burke v. Gould, 286 F.3d 513, 519 (D.C. Cir. 2002)).

More to the point, however, none of these voluminous materials constitute proof that Plaintiff has Lyme and not CFS.  All are general, sometimes polemical, articles meant to inform or sway medical and insurance professionals or members of the public.  None of the articles say, or purport to say, anything about whether this Plaintiff has Lyme disease.  The fact that the Plaintiff felt compelled to provide such a lengthy discussion of medical literature only further emphasizes that the medical evidence he actually submitted—in the form of examination records, treatment notes, and test results—does not support his claim for benefits beyond the limitation.  *See*, *e.g.*, Price v. UNUM Life Ins. Co., 2018 WL 1352965 at *12 n.16 (D. Md. Mar. 14, 2018) (criticizing 400-page supplement submitted by Attorney Elkind for being "wholly unconnected to the substantive conclusions reached by [the administrator]" because it consisted almost entirely of "general medical literature and repeating attacks on the credibility of [consulting physicians]").

Plaintiff's apparent purpose is to draw the Court into innumerable and irrelevant side-disputes, including, perhaps, one about whether CDC's current Lyme disease guidelines ought to be modified or revised so as to be more to the liking of Plaintiff's treating physicians.  These are not debates that this Court can or should wade into.

**C.    Lincoln properly relied on independent medical reviewers.**

A large volume of the record materials submitted by Plaintiff, and a large portion of his Memorandum, boils down to nothing more than a contention that it was somehow improper for Lincoln to rely on, or give any weight at all to, the multiple board-certified physicians who independently reviewed Plaintiff's medical evidence without physically examining him.  *See*, *e.g.*, Pl.'s Memo. at 12–14, 25–28, and 35–36.  Plaintiff also alleges Lincoln undertook a "selective review" by placing greater weight on what he dismissively calls "paper reviews."  *See Id.* at 32–33.  Plaintiff's contentions are legally erroneous and factually incorrect.

Under ERISA, claim administrators like Lincoln are required to seek advice from physicians in the course of administering disability claims.  *See* 29 C.F.R. § 2560.503-1(h)(3)(iii). In Black & Decker Disability Plan v. Nord, 538 U.S. 822, 835 (2003), the Supreme Court held, "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physicians' evaluation."  *See also*, *e.g.*, Pettaway v. Teachers Ins. & Annuity Ass'n, 644 F.3d 427, 435 (D.C. Cir. 2011)("Faced with contradicting opinions and with no requirement to prefer one opinion over another, we cannot conclude that [the administrator] acted unreasonably when it valued the opinion of its own personnel over that of [claimant's] surgeon.").  Indeed, the rule in this Circuit is that an administrator may properly weigh any medical opinion—treating physician or not—provided the opinion is "reasonably derived from the medical evidence in the administrative record."  *Id.*, 644 F.3d at 435; *see also*, *e.g.*, Marcin v. Reliance Standard Life Ins. Co., 861 F.3d 254, 264–65 (D.C. Cir. 2017)(observing that a medical opinion is "reliable" where it is "rationally related to the medical evidence"); Dawson v. Pension Plan for Office Employees of Intern. Bro. of Elec. Workers, 107 F. Supp. 3d 15, 20 (D.D.C. 2015)(claimant failed to meet her burden to show that

administrator's reliance on consulting physicians was unreasonable where "in nearly ten pages she provides virtually no citations to any evidence or support that would tend to show the doctors' conclusions were incorrect.").

Here, Lincoln's consulting physicians evaluated all of the medical evidence, including test reports, examination results, treatment records, and Plaintiff's own self-reported history and symptoms as documented in the record.  This is clear on the face of their respective reports.  For example, in addition to serologic test results, Dr. Greenhood specifically noted his review of "the claimant's continual reports of symptoms to multiple medical providers."  *See* LIN00014; LIN 00017.  Dr. Crossley, an infectious disease specialist, also considered Plaintiff's self-reported medical history and symptoms—not just the negative test results—before concluding that Plaintiff has CFS and not Lyme disease.  *See* LIN02298–2301 ("When first seen in Dr. Jemsek's office . . . the claimant reported he had extensive exposure to ticks but had not had a tick attachment . . . .").

Likewise, Drs. Wessolossky, Marwah, and Vinetz all thoroughly discussed the Plaintiff's history, reported tick exposures, evolution of symptoms, and treatment regime as part of their respective reports.  *See*, *e.g*., LIN08473–76 ("Based on extensive review of this claimant's records, which consistently report a variety of complaints ranging from chronic fatigue, body ache, sleep disturbances, memory and cognitive impairment, along with anxiety and depression, I am under the impression that the claimant suffers from chronic fatigue syndrome (CFS) associated with anxiety and depression."); LIN01458–67 ("To recapitulate, Mr. Loucka never had a tick attached to his body, never saw a physician in the early stages of Lyme disease, never had a typical rash of Lyme disease, . . . ."); LIN01468–73 ("In this case, besides the lack of positive serologic testing, the claimant has no response to IV antibiotic therapy and does not have evidence of Lyme disease

11

in terms of clinical manifestations.  The diagnosis of Lyme disease is not supported by clinical or laboratory data provided in the documentation reviewed.").

None of the consulting physicians based their opinions exclusively on the Plaintiff's test results.  Moreover, they made repeated efforts to speak directly with Plaintiff's treating physicians, but Dr. Jemsek refused to speak with them.  *See*, *e.g.*, LIN02300 (three phone calls and a letter); LIN08473 (three phone calls); LIN1459 (three phone calls; the physician assistant called back, but not Dr. Jemsek); LIN01469 (three phone calls; the physician assistant called back, but not Dr. Jemsek).

During the administrative process, Lincoln afforded Plaintiff the opportunity to review and rebut the consulting physicians' opinions and submit additional materials, which in turn, the consulting physicians and Lincoln considered prior to the final determination.  On December 13, 2017, for example, Ms. Tedford wrote to Plaintiff's counsel:

> As part of your client's second level appeal review, your client's medical information was reviewed by two independent Board Certified physicians: Dr. Rajendra Marwah, who is Board Certified in Rheumatology and Internal Medicine and Dr. Joseph Vinetz, who is Internal Medicine and Infectious Disease.  We are enclosing a copies of the reports with this letter for your client to review prior to the completion of our appeal decision.

LIN01456.  On December 19, 2017, Plaintiff's counsel wrote back: "I have reviewed the reports from Drs. Marwah and Vinetz and am including the following appeal materials in response on behalf of Claimant, Westly Loucka."  LIN01404.  With that letter, Plaintiff's counsel submitted extensive argument and hundreds of pages of medical literature and other materials attacking the consulting physicians.  *See* LIN01404–28; *see also*, *e.g.*, Price, 2018 WL 1352965 at *12 n.16 (criticizing such submissions as "wholly unconnected" to the issues before the administrator). Despite the dubious relevance of the materials submitted, Drs. Marwah and Vinetz prepared supplemental reports based on counsel's response and the additional materials, *see* LIN00238–43

*and* LIN00244–47, and Ms. Tedford also considered such materials in upholding Lincoln's prior determination.  *See* LIN00206–20.

Plaintiff urges the Court to overlook Plaintiff's repeatedly negative test results and cites the case of <u>McDonnell v. First Unum Life Ins. Co.</u>, 2013 WL 2975941 (S.D.N.Y. Aug. 5, 2013), for the proposition that a Lyme diagnosis must be obtained from "patient history and symptoms . . . and not primarily through laboratory tests."  *See* <u>PL.'s Memo.</u> at 33.  But in fact, <u>McDonnell</u> actually supports the approach taken by Lincoln's reviewing physicians.  In that case, the claimant asserted that Unum's consulting physicians gave inappropriate weight to negative test results where, as here, the claimant never underwent the first-stage EIA/ELISA or IFA testing and repeatedly tested negative by CDC standards on the second-stage Western blot tests.  *See* <u>McDonnell</u>, 2013 WL 2975941 at *19.  In light of the consulting physicians' review of all of the clinical evidence, the Court flatly rejected the contention Plaintiff urges here: "Contrary to McDonnell's arguments . . . , her laboratory test results weigh against [a Lyme] diagnosis.").

Thus, Lincoln's reliance on the opinions of the consulting physicians was entirely proper. In evaluating the Plaintiff's claim, Lincoln was entitled to consider the opinions of the consulting physicians (along with the opinions of Plaintiff's treating physician) and give each opinion such weight as it merited based on the substantive reasoning and analysis it contained.  *See* <u>Marcin</u>, 861 F.3d at 264–65; <u>Pettaway</u>, 644 F.3d at 435; <u>Dawson</u>, 107 F. Supp. 3d at 20.  That is exactly what Lincoln did.

The Supreme Court's reasoning in <u>Nord</u>, reflects both the underlying policy and cost-containment goals of the ERISA statute and the recognition that a treating physician may well be biased and "may favor a finding of 'disabled.'"  *Id*. 538, U.S. at 831–32.  This latter point is particularly apt here, where Dr. Jemsek's Lyme diagnosis must be viewed not only in light of the

clinical evidence, including repeatedly negative serologic testing, but also in light of his unorthodox diagnostic and treatment practices, including his rejection of established CDC criteria. *See*, *e.g*., Jemsek v. North Carolina Med. Bd., 2017 WL 696721 at *2 (E.D.N.C. Feb. 21, 2017), *aff'd*, 697 Fed. App'x 234 (4th Cir. 20017)(describing Dr. Jemsek's being formally sanctioned based upon a finding that his "diagnosis and treatment practices constituted unprofessional conduct by failing to adhere to acceptable and prevailing standards of medical practice," specifically in connection with long-term use of antibiotics for Lyme disease).

Moreover, courts have repeatedly upheld administrators' decisions to rely on the established CDC guidelines when a Lyme diagnosis is at issue; it thus cannot be an abuse of discretion to credit the opinions of physicians who follow those guidelines.  *See*, *e.g*., Gent, 611 F.3d at 86 (observing that the CDC describes validated tests as "very helpful" and affirming the administrator's decision where "the laboratory data lines up almost uniformly against [a Lyme] diagnosis"); Dutkewych v. Standard Ins. Co., 2014 WL 1334167 at *8 (D. Mass. Mar. 29, 2014)(administrator reasonably relied on medical reviewers who followed CDC guidelines and criticized treating physicians' "chronic Lyme disease" theory), *aff'd*, 781 F.3d 623 (1st Cir. 2015); Brown v. Federal Express Corp., 62 F. Supp. 3d 681, 686–87 (W.D. Tenn. 2014)(upholding administrator's denial of benefits where claimant's Lyme disease blood tests were negative under the CDC's two-step testing guidelines), *aff'd*, 610 Fed. App'x 498 (6th Cir. 2015).

Lincoln fully and fairly reviewed the medical evidence in the administrative record.  That evidence, and the unanimous opinions of five board-certified physician consultants, overwhelmingly shows that Plaintiff has CFS, but not Lyme disease.  The entrenched opinions of Dr. Jemsek notwithstanding, Lincoln's determination was correct, let alone reasonable.

**D.    In the circumstances of this case, there was no reason for Lincoln to request an in-person physical examination.**

Another theme of Plaintiff's Memorandum is that Lincoln should have requested a physical examination of Mr. Loucka, as it had the right (but not the obligation) to do under the terms of the Group Policy.  *See*, *e.g*., Pl.'s Memo. at 15–18, 33–35, and 36–39.  This line of argument is flawed in a variety of ways.

First, it is well-established that an ERISA administrator, such as Lincoln, "may elect not to conduct an [in-person exam], particularly where the claimant's medical evidence on its face fails to establish that she is disabled."  Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 91 (2d Cir. 2009); *see also*, *e.g.*, Killen v. Reliance Standard Life Ins. Co., 776 F.3d 303, 308 n.3 (5th Cir. 2015)("ERISA does not mandate an independent medical examination prior to a denial."); Williams v. Aetna Life Ins. Co., 509 F.3d 317, 325 (7th Cir. 2007)(finding reasonable a denial of benefits where the administrator refused to order an in-person review and there was a lack of "objective support" regarding the claimant's "functional abilities"); Rutledge v. Liberty Life Assurance Co., 481 F.3d 655, 661 (8th Cir. 2007)("An ERISA plan administrator need not order an [in-person exam] when the insured's evidence supporting a disability claim is facially insufficient."); Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005)( "Although th[e plan] provision *allows* Liberty to commission a physical examination of a claimant, there is nothing in the plan language that expressly *bars* a file review by a physician in lieu of such a physical exam.")(emphasis in original); Nicula v. First Unum Life Ins. Co., 23 Fed. App'x 805, 807 (9th Cir. 2001)(finding no need for a physical exam where no "conflicting medical evidence" rebutted the treating physician's report); Piepenhagen v. Old Dominion Freight Line, Inc. Employee Benefit Plan, 640 F. Supp. 2d 778, 792 (W.D. Va. 2009), *aff'd*, 395 Fed. App'x 950 (4th Cir.

2010)("[T]here is no *per se* rule in the law requiring that a plan administrator must conduct an independent medical examination before denying benefits.")

Indeed, in following other Circuits that have addressed this issue, the Court in <u>Hobson</u> explained, "We share the Seventh Circuit's concern that requiring the plan administrator to order an [in-person exam], despite the absence of objective evidence supporting the applicant's claim for benefits, risks casting doubt upon, and inhibiting, 'the commonplace practice of doctors arriving at professional opinions after reviewing medical files,' which reduces the 'financial burden of conducting repetitive tests and examinations.'" *Id.*, 574 F.3d at 91 (quoting <u>Davis v. Unum Life Ins. Co.</u>, 444 F.3d 569, 577 (7th Cir. 2006)).

Against this mountain of authority, Plaintiff cites <u>Guthrie v. National Rural Elec. Coop. Ass'n LTD Plan</u>, 509 F.3d 644 (4th Cir. 2007), for the blanket proposition "that it is arbitrary and capricious for an insurer to fail to perform a physical examination." *See* <u>Pl.'s Memo.</u> at 33. However, <u>Guthrie</u> plainly does not say that.  Instead, the case involved an insurer's unreasonable decision to consider a claimant's impairments only from the perspective of a reviewing pulmonologist, thereby failing to consider the claimant's other claimed non-pulmonary conditions which included osteoarthritis, dermatitis, esophageal disease, hyperlipidemia, and hypertension. "Under the circumstances," reasoned the Court, "[the insurer] should have [also] referred Guthrie's appeal to an internist or primary care physician to assess her other ailments." <u>Guthrie</u>, 509 F.3d at 652.  Moreover, even if <u>Guthrie</u> did purport to erect some blanket rule requiring an in-person examination, the case was subsequently abrogated by <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008), because it erroneously applied a "sliding scale" or "reduced discretion" standard of review.  *See*, *e.g.*, <u>Williams v. Metropolitan Life Ins. Co.</u>, 609 F.3d 622, 630-31 (4th Cir. 2010)(recognizing <u>Guthrie</u>'s abrogation).

Plaintiff also cites Stup v. Unum Life Ins. Co., 390 F.3d. 301 (4th Cir. 2004), in support of his contention that Lincoln should have conducted an in-person examination, but the Court in Stup criticized a reviewing physician for misinterpreting the ambiguous results of a functional capacity exam, not for his failure to undertake an additional in-person exam.  Plaintiff's reliance on the case is also misplaced in that Stup, like Guthrie, was abrogated by Glenn.  See Williams, 609 F.3d at 630–31.

The only remotely relevant cases that Plaintiff cites actually confirm that in-person examinations are "not required," even under the Fourth Circuit's old, and now-discredited, sliding scale standard of review.  See, e.g., Laser v. Provident Life & Accident Ins. Co., 211 F. Supp. 2d 645, 650 (D. Md. 2002).

Finally, the circumstances of this case also weigh against any contention that Lincoln should have conducted an in-person exam.  The question in dispute at the time of Plaintiff's administrative reviews was the cause of his disability, not the extent of his functional impairment.  To the extent that the Plaintiff's personal history and self-reported symptoms are important in distinguishing between Lyme and CFS diagnoses, obtaining a patient history does not require a physical examination.  Indeed, as discussed above, that information was already in the records of the Plaintiff's treating providers, and both Lincoln and its consulting physicians duly considered it.

**E.      The vocational and functional-capacity evidence in the record, including lay witness statements and the award of Social Security disability benefits, are all irrelevant to the question of Plaintiff's alleged Lyme diagnosis.**

Despite the fact that the only material question in dispute is the reasonableness of Lincoln's determination as to the cause of Plaintiff's disability, Plaintiff devotes large portions of his Memorandum to a discussion of vocational and functional-capacity evidence, including lay

witness statements, the award of Social Security disability benefits, disability duration guidelines, and so forth.  *See*, *e.g*., Pl.'s Memo. at 15–19; 19–20; 23; 41–45.

For purposes of its determination, Lincoln found that the Plaintiff was disabled under the terms of the Group Policy.  As stated in Lincoln's second uphold letter, "Separate reviews of the medical records by two Board Certified physicians do support the diagnosis of and restrictions and limitations on the basis of CFS; however, maximum benefits for CFS have previously been considered and paid . . . ."  LIN00219.  As such, all of Plaintiff arguments concerning restrictions and limitations—pages and pages of it—are utterly irrelevant.  Similarly, there is no indication in the record, for example, that Lincoln made any use whatsoever of disability duration guidelines in reaching its determination as to the cause of Plaintiff's disability.

Even to the extent that witness statements or the Social Security materials submitted might have some tangential bearing on the question of diagnosis, there is no doubt that Lincoln furnished those materials to the consulting physicians who duly considered them.  *See*, *e.g*., LIN02299 (specifically identifying "Social Security Claim Forms/Documents" as among the materials reviewed by Dr. Crossley); LIN08474 (specifically identifying "Testimonial letters from Claimant's mother, wife, brother, and acquaintance" as among the materials reviewed by Dr. Wessolossky).

III.    **So-called "structural conflict" is not an important factor in this case, and Plaintiff has not shown that bias influenced Lincoln's determination in any way.**

An alleged structural conflict does not alter the "arbitrary and capricious" standard of review or otherwise render it less deferential.  *See* Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (U.S. 2008).  Instead, the existence of such a conflict is treated merely as one factor among many, with the factor's weight or importance determined in light of the procedural safeguards in place to abate the risk of prejudice and to promote accuracy:

18

> In such circumstances, any one factor may act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessarily depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.

*Id.*, 554 U.S. at 117.  In applying Glenn, this Court has found that the importance of a structural conflict reduces "to the vanishing point" where the active steps to promote accuracy taken by the insurer include "setting up multiple levels of review by different individuals" and by "seeking input from a neutral third-party [physician] reviewer . . . who has no personal stake in the outcome."  Brown v. Hartford Life & Accident Ins. Co., 12 F. Supp. 3d 88, 98 (D.D.C. 2014).

Here, the evidence is not so closely balanced that there is any need to resort to the conflict of interest factor as a "tiebreaker" to resolve the case.  *See* Glenn, 554 U.S. at 117.  Because the evidence overwhelmingly supports Lincoln's determination, there is simply no need for the Court to reach the conflict factor.  *See*, *e.g.*, Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 362 (4th Cir. 2008)("Indeed, the factors are not closely balanced here, and the conflict factor in particular approaches 'the vanishing point.'")(quoting Glenn, 554 U.S. at 117).

But even if the Court were to consider the conflict factor, Plaintiff bears the burden of proving "that any allegedly self-interested behavior actually affected" Lincoln's decision.  Brown, 12 F. Supp. 3d at 99; Pettaway v. Teachers Ins. & Annuity Ass'n, 699 F. Supp. 2d 185, 206 (D.D.C. 2010), *aff'd*, 644 F.3d 427 (D.C. Cir. 2011); Becker v. Weinberg Group, Inc. Pension Trust, 473 F. Supp. 2d 48, 62 (D.D.C. 2007).

Plaintiff has made no such showing, nor could he.  Here, Lincoln initially awarded benefits despite conflicting and equivocal evidence of impairment.   Lincoln gave Plaintiff ample opportunity to submit additional medical evidence supporting his contention that his disability was

due to Lyme disease rather than CFS.  Lincoln conduced multiple levels of review, each using different personnel and different independent medical vendors.  The vendors, in turn, selected qualified independent physicians to review the record.  Lincoln did not select the consulting doctors.  None of the medical reviewers, or outside vendors, had any personal stake in the outcome of Plaintiff's claim.  All of the consulting physician reports received by Lincoln contain an attestation that the physician has no personal or financial interest in the outcome of the claim.  *See*, *e.g.*, LIN00243; LIN00246–47; LIN01466–67; LIN01473; LIN02301.  Lincoln considered Plaintiff's second-level appeal even though his request was untimely under the terms of the Group Policy.  During the course of that second-level appeal, Lincoln even gave Plaintiff an opportunity to review and rebut the conclusions of the independent medical reviewers before Lincoln made its final determination.  As the Court in <u>Brown</u> commented under similar circumstances, "None of these actions were in [the insurer's] interest, and they therefore provide strong indications that [the insurer] endeavored to administer the plan fairly."  *Id.*, 12 F. Supp. 3d at 98; *see also*, *e.g.*, <u>Champion</u>, 550 F.3d at 362 (affording the claimant a second level of appeal "increased the likelihood of an accurate final decision, thereby reducing the conflict factor 'to the vanishing point'").

> **A.      Plaintiff has made no showing that Lincoln's alleged "bonus structure," if any, violates ERISA regulations.**

Plaintiff asserts without citation to any evidence whatsoever that "Lincoln's bonus structure" violates recently-enacted 29 C.F.R. § 2560.503-1(b)(7).  *See* <u>Pl.'s Memo.</u> at 29.  That regulation provides,

> In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision.   Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual

(such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits.

29 C.F.R. § 2560.503-1(b)(7).  This regulation, by its terms, does not apply to this claim.  *See id.* at §§ 2560.503-1(p)(3)(specifying that paragraph (b)(7) only applies to claims filed after April 1, 2018).  Regardless, as demonstrated by Plaintiff's failure to cite any evidence in support of his contention, there is simply nothing in the administrative record, or any other evidence of any kind, that even describes Lincoln's alleged "bonus structure," let alone suggests that Lincoln sets compensation or makes any other employment decisions based on its employees' likelihood of denying claims.

Indeed, all of the record evidence that is even remotely relevant to this issue demonstrates Lincoln's commitment to ensuring fair and impartial claim decisions—both before and after the new regulation's effective date.  For example, and as discussed above, the consulting physician reports all contain attestations of no personal or financial interest.  *See*, *e.g.*, LIN00243; LIN00246–47; LIN01466–67; LIN01473; LIN02301.  By contrast, Plaintiff relies upon the deposition of Barbara True, a Lincoln Employee who had no involvement in this Plaintiff's claim, which was taken in an unrelated case some five years ago and subsequently shoveled into the administrative record of this case by Plaintiff's counsel.  *See* Pl.'s Memo. at 20–21.  But even to the extent the Court might consider her deposition, Ms. True testified that she "couldn't say what all goes into" Lincoln's employee incentive plan, but "to [her] knowledge, it's the same for all employees at all levels."  LIN03662.  "Bonus criteria isn't different for appeals than it is for anyone else in the company."  LIN03661–62.  Indeed, in other cases in which Ms. True has testified, courts have affirmed that Lincoln does not pay bonuses based on the denial of claims and otherwise takes "appropriate steps" to prevent the risk of bias from improperly influencing the claims process.  *See*, *e.g.*, Irgon v. Lincoln Nat'l Corp., 2014 WL 12718984 at *8 (D.N.J. Oct. 23, 2014).

21

In case there is any doubt about such facts, which are undisputed on the record that is actually before the Court, Lincoln has submitted the declaration of Thomas Vargo to confirm the procedural safeguards employed by Lincoln in this matter. *See* <u>Decl. Vargo</u> at ¶ 2.[1] Personnel in Lincoln's financial, actuarial, and underwriting departments have no influence on claims decisions. *Id.* at ¶¶ 3–4. Employees in Lincoln's claims department and appeals unit are paid fixed salaries and are not compensated based on the outcome of the claims they review. *Id.* at ¶¶ 6–7. Lincoln does not provide financial or other incentives for its employees to deny or close disability claims. *Id.* at ¶ 7. Pursuant to United States Department of Labor regulations requiring that an employee benefit plan consult an appropriate health care professional for advice in certain types of claims, Lincoln utilizes consulting physicians in various medical specialty areas, to review files and to answer medical questions that arise in connection with long-term disability claims. *Id.* at ¶ 8. Lincoln does not compensate such consulting physicians based on the content of their reports or the outcome of any claim. *Id.* at ¶¶ 8–14.

**B.**     **Lincoln's use of multiple independent medical reviews is a procedural safeguard which comports with ERISA regulations.  It is not "sandbagging."**

Plaintiff also argues that Lincoln's use of multiple medical reviewers constitutes a form of "sandbagging" which violates ERISA regulations. *See* <u>Pl.'s Memo.</u> at 29, 39–41. This contention is utterly misguided because the use of multiple reviewers and multiple stages of appeal is expressly required by ERISA regulations. *See* 29 U.S.C. § 2560.503-1(h)(3)(ii) (requiring administrators to "Provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the

---

[1] A copy of Mr. Vargo's declaration is filed herewith as <u>Exhibit A</u>.

subordinate of such individual."); *id*. at § 2560.503-1(h)(3)(iii) (requiring the administrator to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment"); *and id*. at § 2560.503-1(h)(3)(v) (requiring that "the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual.")

Such measures are required, and Lincoln employed them here, because they are procedural safeguards which are well-recognized to increase the likelihood of an accurate decision. *See*, *e.g*., Champion, 550 F.3d at 362; *see also*, *e.g.*, Decl. Vargo at ¶¶ 2, 8–15.

Moreover, Plaintiff's assertion that Lincoln denied him an opportunity to respond to the opinions of the consulting physicians is simply false. As is clear on the face of the record, Lincoln not only gave Plaintiff such an opportunity, *see* LIN01456, but Plaintiff's counsel used that opportunity to inundate Lincoln with irrelevant materials, including counsel's own supposed investigation of the reviewers themselves, rather than to submit any new medical evidence that might weigh against the reviewers' opinions. *See* LIN00213; *see also*, *e.g.*, LIN01404–28. Nevertheless, the reviewers and Lincoln duly considered the information counsel submitted. *See*, *e.g.*, LIN00206–21; LIN00238–43; LIN00244–47.

**C.      Plaintiff's other scattered and generic attacks on Lincoln and the insurance industry are meritless and irrelevant.**

Plaintiff's reference elsewhere in his Memorandum to news articles discussing years-old fluctuations in Lincoln's stock price, *see*, *e.g.*, Pl.'s Memo. at 22, do not show any regulatory violation, let alone satisfy Plaintiff's burden to prove that bias infected the determination of his individual claim. *Compare*, *e.g.*, Price v. UNUM Life Ins. Co., 2018 WL 1352965 at *16 (D. Md.

Mar. 14, 2018)("[T]he Court weighs Unum's actual decision-making process as set forth in the administrative record in this case over general criticisms leveled against Unum or its affiliates."); Jones v. Unum Life Ins. Co., Case No. 1:16-cv-01273, hearing tr. at 76–79 (D. Md. June 28, 2017)(oral ruling from the bench describing Attorney Elkind as being "on a virtual warpath" against the insurer and rejecting counsel's use of such tactics), aff'd, Appeal No. 17-1933 (4th Cir. July 11, 2018)(unpublished).[2]

The voluminous materials that Plaintiff also submitted concerning other insurers or the insurance industry in general, see, e.g., id. at 23–24, are even more remote, and thus Plaintiff's discussion of them serves no purpose in this litigation other than to distract from the narrow issue that is actually before the Court.

### Conclusion

For the foregoing reasons, and those contained in Lincoln's initial memorandum, the Court should enter summary judgment in Lincoln's favor and thereby affirm the reasonableness of Lincoln's determination that Plaintiff failed to meet his burden below to prove that his disability is due to Lyme disease rather than CFS.

Dated: July 30, 2018                              Respectfully submitted,

                                                  /s/  Robert R. Niccolini
                                                  Robert R. Niccolini, D.C. Bar No. 1000251
                                                  OGLETREE, DEAKINS, NASH, SMOAK &
                                                  STEWART, P.C.
                                                  1909 K Street, N.W., Suite 1000
                                                  Washington, D.C. 20006
                                                  Tel: (202) 887-0855
                                                  Fax: (202) 887-0866

---

[2] For the Court's convenience, copies of Judge Titus's bench ruling in Jones and the Fourth Circuit's unpublished decision affirming "the district court's detailed oral ruling at the hearing" are attached hereto as Exhibits B and C, respectively.  In Jones, Attorney Elkind made, and the Court duly rejected, many of the same generic and ad hominem arguments that he also makes here.

robert.niccolini@ogletree.com

-and-

/s/ Byrne J. Decker
Byrne J. Decker (admitted *pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
477 Congress Street, 5th Floor
Portland, ME 04101
Tel: (207) 387-2963
Fax: (207) 387-2986
byrne.decker@ogletree.com

*Counsel for Defendant The Lincoln National
Life Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2018, I electronically filed the above Opposition to Plaintiff's Motion for Summary Judgment using the CM/ECF system which will send notification of such filing(s) via email to the following:

Scott B. Elkin, Esq.
ELKIND & SHEA
The Disability Benefits Law Firm
801 Roeder Road, Suite 550
Silver Spring, MD 20910
(301) 495-6665
selkind@elkindshea.com

/s/  Robert R. Niccolini
Robert R. Niccolini, D.C. Bar No. 1000251
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
1909 K Street, N.W., Suite 1000
Washington, D.C. 20006
Tel: (202) 887-0855
Fax: (202) 887-0866
robert.niccolini@ogletree.com

34801571.3