# EXHIBIT B

1        UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MARYLAND
2              SOUTHERN DIVISION

3    SHEELA JONES,                 Civil No. RWT-16-2653

4            Plaintiff,

5        v.                     Greenbelt, Maryland

6    UNUM LIFE INSURANCE COMPANY   June 28, 2017
     OF AMERICA, et al.,
7

8            Defendants.         2:00 p.m.

9    -------------------------/

10              TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE ROGER W. TITUS
11              UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      Elkind and Shea
                             By: SCOTT BERTRAM ELKIND, ESQUIRE
14                           801 Roeder Road
                             Suite 550
15                           Silver Spring, Maryland 20910

16

17   For the Defendant:      Funk and Bolton PA
                             By: MICHAEL P. CUNNINGHAM, ESQUIRE
18                           36 South Charles Street
                             12th Floor
19                           Baltimore, Maryland  21201

20
     Court Reporter          Lisa K. Bankins RMR FCRR
21                           United States District Court
                             6500 Cherrywood Lane
22                           Greenbelt, Maryland 20770

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.

25

1          P R O C E E D I N G S

2          THE CLERK:  The matter now pending before this

3     Court is Civil Number RWT-16-2653, Sheela Jones versus

4     UNUM Life Insurance Company of America, et al.  We are

5     here today for the purpose of a motions hearing.  Counsel,

6     please identify yourself for the record.

7          MR. ELKIND:  Scott Elkind on behalf of Ms.

8     Jones.

9          MR. CUNNINGHAM:  Good afternoon, Your Honor.

10    Michael Cunningham on behalf of the defendants, UNUM Life

11    Insurance Company and Riggs Counselman Michaels and Downes

12    Group Long Term Disability Plan.

13         THE COURT:  All right.  Good afternoon, counsel.

14    Sorry for being a few minutes late.  We have a weekly

15    judges' meeting that ran over.  So that's why I'm late.

16         We're here on cross motions for summary

17    judgment.  I think the first to file were the plaintiffs.

18    I'll be glad to hear from you, sir.

19         MR. ELKIND:  Thank you, Your Honor.  Good

20    afternoon.  I'm representing Ms. Jones.  Anywhere you

21    would like me to start because we have a huge claim record

22    to address?  Do you have specific questions because I

23    would love to us not to have to talk and get to what you

24    want to know.

25         THE COURT:  Well, tell me what you want to tell

1     me.  I mean --

2              MR. ELKIND:  Okay.  Fine.  I can be a wind-up

3     doll, too.

4              THE COURT:  Well, you've raised a number of

5     issues and I think I understand the issues.  This a very

6     extensive record.  And the question here is my role as the

7     reviewing court and how narrow or how wide my scope of

8     review is and you've addressed some factors you think

9     would make it wider than ordinary and the defense has

10    indicated that the abuse of discretion standard should

11    apply and so forth.

12             So I think the major part of deciding this case

13    is going to be the question of the Booth factors and how

14    we assess this case under the applicable standard of

15    review.  But those are overall.  Take it from the top.

16             MR. ELKIND:  Thank you, Your Honor.

17             THE COURT:  Your show.

18             MR. ELKIND:  Well, I'm -- my position would be

19    stemming from the Glenn case, the Supreme Court case,

20    which states that you have to have higher than marketplace

21    standards when undertaking reviews.  You must take

22    affirmative steps to reduce potential bias and promote

23    accuracy of claims decisions.  There are a certain amount

24    of factors that have come down from the court.  Decisions

25    about Glenn.  These include that there's no independent

1  examination, improper transfer skills analysis, based on

2  only selective reports and not on all the evidence,

3  ignoring favorable evidence of the claimant and failing to

4  account for vocational inconsistencies.  And I would argue

5  that each and every one of those factors has been violated

6  in this case.

7           And I'll take them one by one.  First, there was

8  no independent examination.

9           THE COURT:  Well, wait a minute.  There wasn't

10 an independent examination because you insisted on having

11 a videotape and somebody there to watch it.

12           MR. ELKIND:  Either or.

13           THE COURT:  Where do you get the right to do

14 that?

15           MR. ELKIND:  There is -- the right is to have

16 the examination under the plan.  Under that, it has no

17 further definition.  My right is just to have it recorded

18 or witnessed.  The witness or the recording does not

19 interfere with the examination.  Merely records.  The

20 reason being is I have seen --

21           THE COURT:  Do you have a case that stands for

22 the proposition you have the right to insist upon that?

23           MR. ELKIND:  There's no right to insist.

24 There's no right to enforce on their side either.  There's

25 no case period, Your Honor.  Not in this jurisdiction.  I

4

1    know of a Florida case then that says it's a state case.

2         THE COURT:  Does that make it irrelevant just

3    because it's a state case?

4         MR. ELKIND:  Not it's irrelevant, but there's

5    nothing pertinent in the entire Fourth Circuit or anywhere

6    else.  And it's the only case I know of in the entire

7    United States.  It's a very vague area of the law.  And we

8    didn't refuse.  We said we wanted a condition.  There's a

9    difference between refusal and a condition, Your Honor.

10   The only thing I want to do is have a witness.  That means

11   when a person sits in a corner with a pad and takes notes.

12   What does that have to do with interfering with an

13   examination when a person just sits there and takes notes?

14        THE COURT:  Well, that may be your position, but

15   what right do you have to insist upon that?

16        MR. ELKIND:  The right to make sure that my

17   client doesn't have a bad exam that goes for five minutes

18   like it's done many times during these exams, Your Honor.

19   The person comes in --

20        THE COURT:  Or you can take a stop watch in and

21   time the length of the exam.

22        MR. ELKIND:  Absolutely.  I don't have an

23   independent witness to that and they can just gainsay it

24   if I have an independent witness in there.

25        And also my client isn't medically educated.

1   She doesn't know the proper exam techniques.  And she

2   doesn't know what exams are being -- even what exam is to

3   be performed or are performed.  She won't even know the

4   definition for them.  She has no medical background

5   whatsoever.  She was a -- her position was that of a

6   client manager.  She has no medical background.  So she

7   would make a very poor witness against a seasoned doctor

8   who knows all the ins and outs and has done hundreds, if

9   not thousands of these examinations usually for defense

10  purposes.  That puts my person at quite a disadvantage.

11  The only thing I ask was to have a person there to record.

12          I even said if you didn't want the person there,

13  you can put a machine there to record it if you felt that

14  was interfering with your process.  I gave the options.  I

15  have to protect my client's interest.  In other words, I

16  am committing malpractice, Your Honor.

17          THE COURT:  Are you saying that that's standard

18  practice of people who practice --

19          MR. ELKIND:  Standard practice in my profession.

20  Yes.  My peers will have a witness there.  We will either

21  request a witness or videotaping.  Yes.  Because what

22  happens in those rooms sometimes is ridiculous.  They

23  sometimes -- as I've said, the exam goes for five minutes,

24  it's over.  They barely touch her person.  And they say

25  she's ready to tap dance and she's ready to go be in the

1     Olympics.  And that's not fair to my client.  I have no
2     other way of contradicting that other than my person
3     submitting an affidavit with no other witness.  If I have
4     a witness there who has a medical background who can state
5     with certainty what tests were performed versus those that
6     weren't, the duration of each test and each and everything
7     along the way which they do just by recording on a piece
8     of paper, taking notes, not interfering, then it's a fair
9     exam.  I don't care how the exam is done.  I just care
10    that it was recorded.  I'm not telling them what to do
11    with their examination.  That's on them.

12          So yes, there was no reason not to have the
13    examination.  A witness sitting in the back of the room
14    does not interfere with your examination.  If she did,
15    then I'm at fault.  I would agree with that, Your Honor.
16    But just recordation, there's no interference.

17          The next is improper transferable skills
18    analysis.  The employer in this case stated that in their
19    job description, the client had to lift five to
20    twenty-five pounds and had repetitive hand movements
21    throughout her day.  The client supplemented this.  Not
22    only did she confirm additional job duties, it was also
23    ratified by a couple of her co-employees.  And there was
24    40% standing, walking involved and lifting 25 to 40 pounds
25    on her job.  And under the Dictionary of Occupational

1    Titles, this would list this job as being light to medium

2    in scope and I gave you the definition.  It's listed in

3    the summary judgment brief.

4            But UNUM decided to describe the job and

5    classify it as sedentary, meaning you're only lifting up

6    to ten pounds a day for one-third of the day and you only

7    would be walking up to one-third of the day.  There's

8    absolutely no support for this.  It's completely invented.

9            THE COURT:  Didn't the defendant interview

10   her about --

11           MR. ELKIND:  No.  They never interviewed my

12   client about her job that I know of.  They never had an

13   extensive interview.  They never went through it.  We --

14           THE COURT:  I'm not sure the defense agrees with

15   that, but we'll see.

16           MR. ELKIND:  Well, we provided all the job

17   duties and everything that was there.  So why wasn't that

18   part of the review then?  We supplied all of her job

19   duties from the employer and from her and confirmed by

20   fellow employees.  Once you put that up, how do you come

21   to the conclusion of sedentary?  The evidence states

22   contrary.  And all this case comes down to is what's

23   called substantial evidence.  The evidence is not

24   substantial.  That they invented something that does not

25   exist.

8

1          THE COURT:  Well, what's your position on the

2     relevance of the decision of Judge Quarles in Mass Mutual

3     versus Lanham with regard to your idea being required to

4     have videotaping and so forth?

5          MR. ELKIND:  Oh, my God.  You pulled that one

6     out of the ancient ones.

7          THE COURT:  Pardon me?

8          MR. ELKIND:  That's an old case.  Yes.  I

9     litigated that case, Your Honor.  My position is that it's

10    necessary and always has been and I have it routinely done

11    in my practice.  Now the only place you cannot have

12    videotaping is in a neuropsych assessment because there's

13    been new studies done, let's say videotaping or a witness

14    interferes during the neuropsych assessment process.

15    There is no such findings for a physical examination.  And

16    this case only involves a physical examination.  And I do

17    insist upon it, Your Honor, because it's just unfair to my

18    client.  Otherwise, she's at such a disadvantage to a

19    medical professional.

20         The next step is basing only on selected

21    reports.

22         THE COURT:  Well, Judge Quarles acknowledged

23    what the client in that case's position was.  He said even

24    assuming she's correct, she's still obligated to submit to

25    the IME and she can challenge later that it wasn't done

1    under the conditions she requested.

2           MR. ELKIND:  Your Honor, we consent to the IME.

3    I said I just wanted a witness there.  We never once said

4    no.  They said no.  And that's an important distinction to

5    draw here.  You know, there's not one piece of paper in

6    the entire record that says we said no.  I said we will

7    have her there, we will have a witness.  They called it

8    off.  And that is important because when they did that,

9    they therefore waived their right.

10          Now if you take a look at the nurse reviews and

11   the doctor reviews, they don't contain all the medical

12   reports.  They never do.  They are a selective review of

13   the evidence.  And they always take evidence favoring

14   their position.  They don't take always evidence favoring

15   the client's -- I mean the claimant's position and this

16   would be Ms. Jones' position.

17          Even in the briefing of this case after the

18   defense filed the summary judgment, I went through

19   meticulously and pointed out each and every factual

20   citation to the medical record pointing out where they had

21   purposely evaded referencing positive references to my

22   client's disability.  And it was one after another after

23   another.  This practice extends part through just through

24   the claims process.  It also includes the litigation

25   process and that's not fair because in the end, Your

1   Honor, this is about a fiduciary duty.

2         Now ERISA is controlled -- excuse me.  This is

3   contract and trust law and they're held to that being a

4   fiduciary.  This means that you have to look after my

5   person's best interest, not your own economic interest.

6   You are going to see time and time again throughout this

7   record where UNUM is taking positions favoring its

8   economic interest in denying the claim, not my client's

9   interest of whether she should be granted disability

10  benefits.  They behaved as an adversary the entire time.

11  And that's what is not permitted.

12        Next, we have the vocational inconsistencies I

13  have now listed to you, Your Honor.  They have advanced

14  post hoc rationalization arguments in their brief.  They

15  at one point state that Ms. Jones was being let go and

16  that was the reason why she went and declared disability.

17  There is no reference to that in the claim denials

18  whatsoever.  You are not permitted to bring new defenses

19  up once the administrative review is completed and that's

20  what's been done in this case on more than one occasion.

21  And that is needs to be, first of all, stricken.  The

22  second part was I had a motion, actually a motion to

23  strike because they brought up favorable evidence to

24  buttress their position in their briefing.

25        Now again under the Glenn analysis, you have to

1   take affirmative steps to reduce potential bias and

2   promote accuracy.  That needs to be in the claims record

3   because I have a right to see it and have a meaningful

4   dialogue it's called under ERISA and I can't have a

5   meaningful dialogue if you are sandbagging me with new

6   review, medical reviews afterwards, new arguments and new

7   evidence concerning UNUM's conduct.  All three which were

8   done after the reviews were completed.  That is being

9   unfair, Your Honor, and that is exactly why we're here.

10          That's not the behavior of a fiduciary.  We are

11  supposed to have a conversation that goes back and forth

12  and then a reasoned and fair decision is made.  This was

13  none of the sort.  This was a sandbagging opportunity.

14  They did it in the short term disability.  They did it

15  again at the long term disability.  Put new medical

16  reviews in without any chance to review or comment.  And

17  then afterwards, they made new arguments up in litigation.

18  You can't do this.  This is where you're behaving unfair

19  and it's showing your conflict of interest when you're

20  both administrator and payor of the claim.  Since the

21  money is coming out of UNUM's pockets, they are behaving

22  in a very bad way.  And as I included in this ad nauseum

23  is UNUM's horrible history for treating people badly and

24  the penalties they've suffered.

25          Now it would be one thing if it had stopped.  It

1    hasn't.  They are using the same technique of denial that

2    has been -- I have accurately shown throughout dozens of

3    depositions and all the other materials I've submitted.

4            THE COURT:  What do you mean by the technique --

5            MR. ELKIND:  The technique of denial goes as

6    follows.  They have protocol and it's the same thing every

7    time.  They give a list of cases to be denied.  It's given

8    to a claims handler.  He plucks the cases.  The cases go

9    to the nurse reviewer.  The nurse reviewer writes a

10   selective review of the evidence, creates this review.

11   She gives it to the doctor.  The doctor signs off and

12   includes functional statements saying that the person is

13   not showing any evidence to support her functional

14   restrictions and therefore is not disabled.  Then it goes

15   back to the claims handler to deny the case.

16           Now here are the real problems with it in

17   between, Your Honor.

18           THE COURT:  And are you suggesting that that's

19   exactly what happened in this case?

20           MR. ELKIND:  It did.  I charted it all out and I

21   put it right in my brief step by step.  They filed the

22   same thing.  Although they got caught years ago, they

23   haven't changed their technique.  They're just trying to

24   pretend that they're not doing the same thing.  It's

25   always the same thing, Your Honor.  I've done hundreds of

1    these.  So it's not like they're giving me a new act in

2    this play.

3            Now the real disturbing part is the bonus

4    compensation system.  The bonus compensation system is

5    designed to reward people based on company performance is

6    one of the main standards.  This is the claims division,

7    Your Honor.  Claims divisions do not bring income into an

8    insurance company.  The only thing they can do is limit

9    losses.  That's it.

10           THE COURT:  Isn't that the life of every claims

11   adjustor everywhere?

12           MR. ELKIND:  And you're a hundred percent

13   correct.  Yes.  The problem is --

14           THE COURT:  I mean in my distant, distant past

15   in law school, I worked as a claims adjustor.

16           MR. ELKIND:  You're making --

17           THE COURT:  A very educational field.

18           MR. ELKIND:  Well, you're --

19           THE COURT:  I wasn't there to hand out money.  I

20   was there to hand out the right amount of money.

21           MR. ELKIND:  That's right.  But if you have

22   bonus compensation based on company performance, that

23   doesn't exactly encourage you to go and promote more

24   efficient claims handling or you're also being told in

25   these depositions, you have Dr. Mitshari and you have

1    Linda hundred's both saying that pressure was placed upon

2    the doctors to sign off on these denials.  And it will be

3    done by management and it would be done by the nurse

4    reviewers and it will be done by the claims handlers and

5    it's done all the time because that's how they get bonus

6    payments.

7            Now the second part of the bonus payment

8    structure is even more disturbing and that's the more

9    recent one that I submitted.  This is rather remarkable.

10   The doctors are medical directors in the UNUM structure.

11   They get compensated with stock and stock options.

12   They're required to hold certain amounts of stock and

13   therefore, if you want more stock, you have to continue,

14   number one, working for them and, number two, doing what

15   they want you to do, which means again those options are

16   based on company performance --

17           THE COURT:  Does that get you an automatic

18   reversal?

19           MR. ELKIND:  No.  These are all factors to be

20   considered under the Glenn analysis.  There's no

21   automatical reversal for anything under the Glenn

22   analysis, Your Honor.  It's an analysis.

23           If it got me an automatic reversal, we wouldn't

24   be here today because the other side would have known it

25   was an automatic reversal.  It would have saved us both,

1    what, a week of briefing and we would not be here arguing.

2    So that's the way the law works.  These are all factors,

3    Your Honor, to be considered.

4           So we now have a bonus structure that says if

5    the company's performance is better, I get more stock.

6    And guess what?  If I don't do what they want and they

7    fire me, it restricts my dates when I can sell my stock

8    and I have to sell my stock much quicker and that's all

9    documented there for you, Your Honor.  So it's a carrot

10   and stick approach to how this is being done.  These are

11   facts, Your Honor.  This is not made up.  It's not

12   supposition.  It's right there in these plans.  And I just

13   extracted it out and it's devastating to UNUM.  And these

14   plans have not been made part of the case yet.  This is

15   the first case that's hitting the courts right now under

16   this new information which was divulged by this very same

17   law firm in another case I have in this court.

18          So it is important evidence because it shows not

19   only that they have a compensation structure based on

20   company performance in a claims division, which should not

21   be based on any company performance.  It should be based

22   on just is the claim merit worthy or not with no other

23   pressure.

24          And Your Honor, if you have been in that

25   position, the last thing you need do is a superior over

16

1    you or on top of you saying my bonus and my stock options

2    depend on your results on what you're doing to deny these

3    claims because you don't increase company performance by

4    approving claims.  You decrease it.  And that is obvious

5    as the nose on your face, Your Honor, and you know it.  So

6    that is a real problem.

7            The next thing I'd like to discuss is there's

8    been a complete concert of medical opinions supporting

9    disability in this case.  Not one doctor has made a

10   finding that contradicts disability.  If you look right

11   down the line, each and every report is supported and Drs.

12   Drakes and You, Y-O-U, both stated or he's a -- Dr. Drakes

13   being a physiatrist and Dr. You an orthopedist, both had

14   stated that the claimant was unable to work.

15           You have other doctors confirming other

16   problems.  Dr. Yokel, Henry, Johnson and Phu.  That's

17   P-H-U.  Her condition are as follows:  She has a myriad of

18   conditions.  She has a displaced lumbar vertebrae.  She

19   has a fractured foot.  She has osteoarthritis.  She has

20   hereditary neuropathy.  She has Charcot-Marie-Tooth

21   Disease, which is a damaging disease that disrupts

22   peripheral nerves, especially nerves controlling muscles

23   for locomotion.  So she trips and she falls.  This has all

24   been noted in her records.  And she also suffers from

25   insomnia and a complete tear of the right knee.  She's

1     also on many, many, many medications.

2          So this has been tested.  We had a functional

3     capacity evaluation done.  They found deficits in almost

4     everything, sitting, standing, walking, bouncing,

5     squatting, reaching, general hand use and she was found to

6     be unemployable with low improvement potential.

7          A neuropsych evaluation was done.  They found

8     deficits in executive which is organizational ability,

9     memory, especially recall and retrieval and again finding

10    her impaired from any employment capacity due to the

11    severity of her condition.

12         So what happens once we have all this medical

13    evidence?  They performed medical reviews.  Now again no

14    examinations were performed.  So they went with medical

15    reviews.  Now medical reviews are conducted by several

16    doctors and you need to know about these doctors because

17    I've done a lot of research on them.  This is all in the

18    brief.

19         The neuropsych evaluation was first addressed by

20    Dr. Jana Zimmerman who does about 129 claims a year for

21    UNUM and she uses form denials.  I've had similar denials

22    from her in the past.  I included them in there.  They

23    read about the same.

24         Now this is another inconsistency in this.

25    Later on you'll hear about Dr. Black.  Dr. Black, he's

1    another psychologist for UNUM, Dr. William Black.  He sent

2    Dr. Zimmerman's report to Dr. Shostak to review and

3    comment on it.  And Dr. Shostak stated the following:  The

4    entire review was based on speculation and hypotheticals.

5    It violated the ethical guidelines because the ethical

6    guidelines for a psychologic review had been provided and

7    there's many guidelines through this, but they all agree

8    on one thing.  You have to do an in-person evaluation.  If

9    you just do a paper review, it is patently unethical.  And

10   the reviews here are all done without benefit of

11   examination.  So they are unethical on their face or

12   unethical, per se.

13          The validity testing they said was not done was

14   done.  And she says other tests need to be done.  So the

15   first question is why and what other tests?  There's no

16   explanation for this.  And Dr. Black did the same thing in

17   his review.  He would say, well, this is incorrect and

18   that is incorrect and he goes down the list of things he

19   thinks are incorrect about the reporting except for one

20   thing, Your Honor.  He never cited a single source for why

21   those things are incorrect.  How do you respond other than

22   saying they are correct, I did the testing.  There's

23   nothing you can do.  They don't cite sources because the

24   truth is this is not truthful.  It's all invented.

25          And Dr. Zimmerman's reports, Dr. Black's, they

1    all read the same.  It reads like circular reasoning.  It

2    is gobbledygook.  It doesn't really say anything.  There's

3    no substance.  And again we're under the substantial

4    evidence standard.  You just can't come out and say I

5    don't think so.  You have to give me a reasoned

6    explanation.  You owe that to us.  You are our fiduciary

7    relationship.  Again we are the beneficiary.  That did not

8    happen in this case.

9              Now let's discuss another one of the reviewers.

10   Malcolm Spica.  He is another one of my favorites.  He in

11   2008 reviewed over 600 claims alone for UNUM.  His opinion

12   was given very little weight in this court.  That's the

13   Clarke versus UNUM case.  I litigated that one as well.

14   And in the Clarke case, the FCE undertaken was done by an

15   outfit called CAM Physical Therapy and that was advanced

16   by UNUM as being supported.  It's the same test done in

17   this case by the same provider, Carlos A. Martinez, who is

18   CAM physical therapy.  So if the defense wants to argue

19   that the FCE is no good when it was done in favor of them,

20   it seemed like it was wonderful in that case, Your Honor.

21   So I would see that as being not only inconsistent, but

22   just hypocritical.

23             Now again Malcolm Spica in his own personal

24   medical practice does in-person evaluations, not just

25   paper reviews.  But when UNUM calls, he does paper

1    reviews, left and right.  And that information has been

2    provided as part of my brief.

3              Now we have Dr. Collins.  Dr. Collins is very

4    special, too.  He's worked for multiple insurance

5    companies.  In fact that's about all the work he's ever

6    done.  Now he made a really great point in his findings.

7    He said that EMG findings were not indicative of certain

8    forms of Marie Charcot Tooth Disease.  I wrote that there

9    myself in my explanation.  If you read in my brief about

10   Marie Charcot Tooth Disorder, it's right there.  It's the

11   last line in fact in my explanation saying that EMGs don't

12   always show this condition.  I completely agree with him.

13   The problem with this is she has hereditary neuropathy and

14   that showed up on the EMG and it was stated by the doctor.

15   So you might want to try to exclude one, but you can't

16   exclude the other.  So he didn't do a full evaluation.  He

17   was just looking for reasons to try to shoot the case down

18   and he got caught because he wasn't thinking about it.

19             And again now we will discuss Dr. Black.

20   Dr. Black was another one who said there's no known

21   relationship for Marie Charcot Tooth Disease for cognitive

22   limitations.  I will agree with him.  But she also has

23   chronic pain and insomnia, which are loaded in lots of

24   literature, which I provided to this court at my -- that

25   you will see.  If you look to my full recitation I

1    provided UNUM, there's many findings that they have

2    cognitive limitations are produced by chronic pain and

3    insomnia.  And that's funny that Dr. Black's account never

4    references them.  Why?  It's a selective review of the

5    evidence.  He didn't really look at it, Your Honor.  Nor

6    was he going to.  His job is to deny it.  And if you have

7    to look at everything, it makes it much harder.

8              Also Dr. William Black was a co-author of a

9    book, which is again listed in my materials.  And that

10   book states about the need to examine patients for

11   diagnostic purposes.  So Dr. Black believes one thing, but

12   does another.  He's another hypocrite.  Again he went

13   against his ethical duties to examine -- that require him

14   to do an in-person examination of a psychologic case and

15   instead did a paper review.

16             And again they play what is called the

17   inconsistencies game.  I love this one.  Everything is

18   inconsistent.  It doesn't matter what they say.  You will

19   see the word "inconsistency" used by every nurse reviewer,

20   every doctor.  They always use the word.  Oh, that's

21   inconsistent, this is inconsistent.  But they never tell

22   you what it's consistent with.  They just say it's

23   consistent.  And that's how we always start the denial

24   process.  We find there are inconsistencies.  It's time to

25   do a medical evaluation and start the denial process.

1    It's the same thing every time.  It's very tired, but I'm

2    going to be the one pointing it out because the

3    inconsistency game plays both ways.  I can point out their

4    inconsistencies.

5           And in the end, Your Honor, you know what the

6    real standard is to determine whether this case flies or

7    not, it's not whether I'm right or wrong.  That's not the

8    standard.  I don't have to prove my client's disability.

9    Disabled.  I don't have to.  I have to prove that the

10   review was unreasonable.  That's my standard.  That's the

11   law and I've provided it to you.  And is this

12   unreasonable?  Yes.  And I am going through all the levels

13   why it was unreasonable.  That is the standard I have to

14   satisfy, Your Honor.  And given all these things going on,

15   it's right on target.

16          Then we have Linda Cowell.  She's an older

17   practitioner.  So she only does medical reviews.  I

18   provided recitation about independent medical evaluations

19   and how they are used, mostly for defense purposes.  And

20   you will read that.  It's in my brief.  There's a short

21   summary and a longer summary in my materials.  And it's

22   all documented.

23          The medical journals themselves will tell you

24   and there's some great quotes in there.  If this is what

25   you are going to do to be honest, you are not going be in

1    this very long, one doctor says.  Because you know why?

2    Because it's about telling the insurance company what it

3    needs to hear to get paid.  They are usually older

4    practitioners who are slowing down in clinical work who

5    want to buttress their income by doing these medical

6    reviews.  And Linda Cowell is a perfect example of it.

7           Now Your Honor had asked me about my path to

8    denial.  And that was in my opposition brief on page 10

9    that begins, just to point out to you.  It's several pages

10   and I go piece by piece every step of the way to show you

11   how they got to the answer of no.  Tell each and every

12   step.  And why I know this all happened because I lived it

13   and kept track of each and every one.

14          Just give me one moment to review so I make sure

15   I didn't miss anything.  I have said quite a few

16   mouthfuls.  There is one other thing that didn't make any

17   sense in this case.  Ms. Jones was paid short-term

18   disability.  That was denied.  UNUM did not provide a

19   claim form for long-term disability.  I had to request it.

20   I got it.  They paid long-term disability.  There's no

21   change in her condition between those two times.  But they

22   paid long-term disability under a reservation of rights.

23   There's no reservation of rights under the plan.  This is

24   completely invented.  You're not allowed just to make

25   things up and put them in the plan.

1          And then similarly, under the vocational review,
2     they said she could use a standing desk.  That's an
3     accommodation.  Again, Your Honor, there are no -- there's
4     no definition for own occupation or other, any other
5     occupation that states that an inclusion of accommodations
6     to perform that work.  So again, they are adding language
7     into a plan which they are absolutely not allowed to do.
8     So those are two more violations along that Glenn
9     standard.
10         So I have placed about everything I can imagine
11    here.  And just one piece of sensibility, Your Honor.
12    When you're working in a claims division and you are
13    working the side -- you know, these doctors are all
14    working together and they are working the same -- most of
15    them are working the same offices.  If you review the guy
16    next to you, what do you think your chances are of
17    contradicting him when you know it's going to cost you
18    both your bonus?  Let's be honest there.  That's not
19    happening.  This is a point of practicality.
20         And I will just point back to my favorite Upton
21    Sinclair quote and end.  It's hard to make a man
22    understand something when his livelihood depends on his
23    not understanding it.  Thank you, Your Honor.
24         THE COURT:  Thank you.  All right.
25    Mr. Cunningham?

1              MR. CUNNINGHAM:  Thank you, Your Honor.

2      Defendants UNUM Life Insurance Company of America and The

3      Riggs Councilman Michaels and Downes Group Long Term

4      Disability Plan are entitled to summary judgment because

5      UNUM reasonably determined that Ms. Jones is not entitled

6      to short-term disability or long-term disability benefits

7      under her former employer's ERISA plan.  This is an ERISA

8      case in which the parties agree UNUM's claim

9      determinations should be reviewed for an abuse of

10     discretion.  When a claim decision is reviewed for abuse

11     of discretion, the decision should not be disturbed by the

12     court if it is reasonable.  Claim decision --

13             THE COURT:  Doesn't that window or scope of that

14     review get widened where there's demonstrable conflict?

15             MR. CUNNINGHAM:  No.  The standard of review,

16     the abuse of discretion standard remains the same.  The

17     standard does not change even if there is a conflict.

18     Conflict is one of the factors, one of the Booth factors,

19     it's the last Booth factor and it's also something that

20     was discussed in the Glenn case.  So the conflict can

21     be -- if the plaintiff shows that the conflict had an

22     impact and affected the claim decision, then that's

23     something --

24             THE COURT:  Well, they contend that it did.

25     What is your contention with regard to whether any

26

1      conflict that existed impacted the decision?

2              MR. CUNNINGHAM:  Well, for the short-term

3      disability claim, there is no conflict.  The short-term

4      disability benefits are paid by the employer, not by UNUM.

5      So there is no conflict on the short-term disability claim

6      decision.

7              On the long-term disability claim, those

8      benefits are insured by UNUM.  So there is that conflict

9      that exists that's identified in Glenn.  But as the

10     Supreme Court said in Glenn, that conflict can be reduced

11     to the vanishing point if the company took steps to --

12     active steps to reduce potential bias --

13             THE COURT:  I'm familiar with the language.

14     Tell me what those steps were in this case.

15             MR. CUNNINGHAM:  Well, in this case, it's the

16     way the entire claim was handled.  So for starters, you

17     know, they interviewed Ms. Jones on two separate

18     occasions.  They obtained four comprehensive vocational

19     reviews from the vocational consultants.  They had two

20     physicians, two neuropsychologists, psychologists and

21     three nurses to review the medical evidence.  Each of whom

22     delivered their own comprehensive reports that fully set

23     forth the reasons and basis for their respective opinions.

24     And they directed their reviewers to contact plaintiff's

25     treating providers to discuss the findings of the treating

1    providers.  Some of the providers responded.  Some did

2    not.

3              UNUM asked its medical specialists pointed

4    relevant questions to get to the issue of what are Ms.

5    Jones' functional limitations.  So in terms of the claim

6    process, I think the documents show what went on in terms

7    of getting to the bottom of this.

8              The other point I wanted to make about the

9    issues, plaintiff's counsel raised about these bad claims

10   practices, all the evidence in the administrative record

11   predates the 2004 regulatory settlement agreement.  So all

12   the evidence of bad claims practices goes back before the

13   regulatory settlement agreement.

14             And since the implementation of the regulatory

15   settlement agreement, UNUM's claims practices had been

16   praised by the same insurance regulators that developed

17   the RSA in the first place.  And this was explained in our

18   briefs.  We had a couple of attachments to our motion,

19   Attachments A and B, which were letters from various

20   insurance regulators talking about how UNUM's claims

21   practices have changed since 2004 and the systemic

22   problems that previously existed do not exist now.  So in

23   this case UNUM's conflicts should carry little if any

24   weight because of the active steps that it has taken to

25   reduce the potential bias.

1            And one other point.  On the Bonus Compensation

2    Plan, these documents are public documents.  They are

3    publicly available.  This wasn't some nefarious bonus

4    denial scheme that the plaintiff wants to characterize it

5    as.  These documents are available on the Internet.  They

6    were provided to the plaintiff's counsel.  He's now using

7    them in all these cases saying that they have a --

8    essentially, that UNUM has a denial scheme that because

9    they provide bonuses to their employees that incentivizes

10   all the employees to cheat and lie and deny claims and

11   that's just not true.  There's no evidence to support

12   that.

13            This is not a new bonus plan.  There's been

14   revisions over the years.  But there's nothing new about

15   this.  And there's no cases, there's no regulators,

16   insurance regulators that have come out and said no, you

17   can't -- UNUM or any other insurance, you can't give

18   bonuses to your employees because you have a claim

19   division.  That's just not the law.

20            UNUM conducted a full and fair review with

21   respect to Ms. Jones' contentions that she is cognitively

22   impaired.  That was based entirely on Dr. Shostak's

23   report.  UNUM requested medical reviews from

24   Dr. Zimmerman, Black and Spica.  These are licensed

25   psychologists and neuropsychologists.  Each of the

1    reviewers found serious deficiencies in Dr. Shostak's

2    report.

3            And, for example, all of them found that the

4    exam, the neuropsychological exam that was performed was

5    an abbreviated exam.  It did not fully assess all

6    cognitive and emotional functions.  It only tested

7    intellectual executive function, visual, memory.  So it

8    wasn't a full battery of tests.

9            There was no formal performance validity testing

10   as recommended by the American Academy of Clinical

11   Neuropsychology and National Academy of Neuropsychology.

12   Ms. Jones failed three embedded validity measures based on

13   the test data in the report and that calls into question

14   the test results.  There was an inconsistent pattern of

15   neural cognitive performance that was not compatible with

16   any diagnosed neurological condition or medication side

17   effects.  So Drs. Black and Spica I think were showing

18   that there were some scores that were implausibly low,

19   very low scores and then other scores in that same

20   cognitive domain, which were average or normal.  And what

21   they were saying is that this pattern of score is, you

22   know, high scores and really low scores didn't add up.  It

23   didn't make sense.  You couldn't -- based on those scores,

24   you couldn't conclude that there was a physical

25   neurocognitive problem with the brain that was causing a

1    cognitive deficit.

2              They also point out that there's no known

3    physical relationship between CMT, Charcot-Marie-Tooth

4    Disease cognitive impairment.  So CMT is not a disease of

5    the central nervous system.  It affects the nerves in the

6    arms and legs.  It doesn't affect the brain.  And so what

7    they were saying is -- Dr. Shostak is attributing these

8    cognitive impairments to CMT, but there's no known

9    connection between someone who has CMT and cognitive

10   deficits.  The cognitive deficits aren't caused --

11   ordinarily are not caused by CMT.

12             There's also an absence of restrictions and

13   limitations related to cognitive functioning in the

14   treating provider records.  And in fact in some of the

15   records, her treating providers reported she has no memory

16   loss and so forth.  So the whole idea that she has

17   cognitive deficits comes only from the Shostak report.

18   It's not supported by any of the treating provider

19   records.

20             Dr. Black also noted the absence of any

21   behavioral health condition that could plausibly result in

22   cognitive impairment.  Sometimes even if someone doesn't

23   have a physical based problem, they may have a psychiatric

24   problem that's causing cognitive impairments and he found

25   no evidence of that.

1           Moreover, Dr. Black attempted on a couple of

2     occasions to obtain further information and clarification

3     from Dr. Shostak particularly with respect to Ms. Jones'

4     failures on the embedded validity tests in the report and

5     he received no substantive response to his questions.  And

6     Dr. Shostak's response is Exhibit 41 of our appendix and

7     it's nine pages and it says essentially nothing.  It

8     doesn't answer the questions that Dr. Black had raised.

9           And so in conclusion, all of those, all of the

10    Spica, Black and Zimmerman, they found no cognitive

11    restrictions and limitations were supported by the

12    evidence, either physically based or based on any

13    behavioral health condition.

14          Now with respect to Ms. Jones' contention that

15    she's impaired by Charcot-Marie-Tooth Disease and lower

16    back pain with neuropathy, these are neurological

17    disorders and UNUM requested medical reviews by Drs.

18    Collins and Cowell.  Both of these are board certified

19    neurologists.  In his report, Dr. Collins described among

20    other things his attempt to obtain further information

21    from Dr. Drakes, who was Ms. Jones' pain management

22    physician and Dr. Drakes did not respond to his questions.

23          He also pointed out that the clinical findings

24    in the functional capacity evaluation, which was the FCE

25    that plaintiff submitted with her short-term disability

1    appeal.  The findings in that FCE were not consistent with

2    impairing Charcot-Marie-Tooth Disease.  Specifically, he

3    was pointing to the findings of five out of five strength

4    bilaterally in the upper and lower extremities, except

5    there was four or four-plus out of five strength in the

6    middle deltoids quadriceps hamstrings.  And what Dr.

7    Collins was saying is that for someone who has impairing

8    CMT, who is unable to use their arms and legs, you

9    wouldn't expect to find five out of five strength in the

10   upper and lower extremities the way it was found in the

11   functional capacity evaluation.

12           There's also other treating provider records

13   that had similar findings.  Dr. Victor Herry, he is the

14   primary care physician.  There were records from

15   February 25th or his office note from February 25, 2014

16   when Ms. Jones saw Dr. Herry.  This was after she had

17   fallen at home and she injured her foot and ankle and she

18   was actually on short-term disability at the time.  And he

19   found in his physical exam, normal motor strength, upper

20   and lower extremities.  And also in that same office note,

21   plaintiff was reporting no balance difficulties, no gate

22   abnormality.  She denied loss of strength, the loss of use

23   of extremity.  She denied low back pain, denies tingling

24   or numbness.  So this is one of the records in Exhibit 15.

25   It's the February 25, 2014 office note.  So those are the

1    inconsistencies that Dr. Collins identified.  There's
2    these findings in the medical record showing that she's
3    got normal strength in the upper and lower extremities,
4    you know, with some exceptions, but and he found that not
5    consistent with someone who's impaired by CMT.
6            With respect to the lower back pain, Dr. Collins
7    found no evidence of nerve root compression in the lower
8    back based on the only available MRI.  So they did
9    consider the MRI report and it does not indicate that
10   there's any nerve root compression.  Only age appropriate
11   degenerative changes in the spine.
12           He also noted that Ms. Jones responded well to
13   transforaminal epidural steroid injections for her back.
14   So she was being treated for the back pain with steroid
15   injections and those seem to have been working okay.
16           He found there's no evidence that these issues,
17   either the CMT, the back, either separately or together
18   warrant restrictions in the limitations that would
19   preclude Ms. Jones from performing her sedentary
20   occupation.  And also with respect to medications, he
21   found no evidence that prescription medications caused any
22   impairing, cognitive or physical side effects.
23   Dr. Collins concluded that Ms. Jones' reported activities
24   and documented physical examination findings are
25   consistent with the physical capacity to perform her

1    sedentary occupation on a full-time basis including

2    lifting up to ten pounds occasionally, constant sitting,

3    talking and keyboarding and occasional standing and

4    walking.

5              The medical records were also reviewed by

6    Dr. Cowell, again she's a board certified neurologist, and

7    she found that the clinical examinations in the record

8    consistently indicate no significant functional decrease

9    of the use of upper extremities for dextrose activities

10   performed in a seated position.  So based on her review of

11   the clinical findings, the physical examination findings

12   in the record, there's no loss of use of the upper

13   extremities, at least the arms.

14             Now with respect to the lower extremities, she

15   thought it was unclear and she said that functional

16   abilities regarding lower extremities was just not clear

17   based on the available medical records and that's why she

18   recommended, Dr. Cowell is the one that recommended that

19   there be an IME by a neurologist with a specialty in

20   neuromuscular disease.  So someone that could try to get

21   to the bottom of what's going on with some of the reports

22   of weakness in the lower extremities.

23             Not all the records supported weakness in the

24   lower extremities, but there were some and she

25   acknowledged that and that's why she thought an IME would

1    be best.  But as we know, UNUM attempted to schedule the

2    IME, but Ms. Jones refused to appear for the IME

3    without imposing conditions --

4            THE COURT:  Now what is your position on whether

5    he had the right to refuse to participate unless he was

6    able to record it and have an observer?

7            MR. CUNNINGHAM:  Right.  Well, plaintiff has no

8    contractual right to impose any conditions on UNUM's

9    choice of physician or the way the IME is conducted by the

10   physician.  There are certainly cases that recognize that

11   choices made by an insurer about IMEs needs to be

12   reasonable, such as the location of the IME or the

13   selection of a physician, the type of physician.  So if

14   someone has got back pain, it would be unreasonable to

15   send them to a psychiatrist, for example, the frequency of

16   examinations may be challenged.  But there's no cases that

17   recognize a right of the claimant to impose conditions on

18   IMEs, either reasonable or otherwise --

19           THE COURT:  Well, he's also saying that, well,

20   you may not have liked the conditions, but you didn't get

21   the IME and therefore, you can't base your denial in any

22   way, shape or manner on the absence of an IME.  What's

23   your answer to that?

24           MR. CUNNINGHAM:  No.  Quite the opposite.  We

25   tried to get the IME.  She refused to appear for it

1   without imposing these conditions that UNUM was not

2   willing to accept.  The consequences of that are hers.

3            THE COURT:  Well, he's trying to lay it at your

4   doorstep because you didn't proceed with it.

5            MR. CUNNINGHAM:  We tried to schedule it, Your

6   Honor.  There's extensive documentation about it.  And one

7   of the things plaintiff's counsel said was that they never

8   called it off, it was never scheduled.  And they never

9   called it off is somehow suggesting that it had been

10  scheduled.  That's not true.  It was never scheduled.  She

11  never gave us a date that she could do the IME and the

12  reason was because we wouldn't agree or UNUM wouldn't

13  agree to do the videotape or the witness.

14           So I think Exhibit 54 has some of this

15  correspondence.  But on LTD page 6223, this is a letter

16  from Mr. Elkind dated August 15, 2015.  This is in

17  response to one of UNUM's letters trying to schedule the

18  IME and he says in the second to the last paragraph, once

19  you consent to a witness or a video camera, we'll be glad

20  to set a date.  So it was never set.  It had never been

21  scheduled because they wouldn't agree to even provide a

22  date to schedule the IME unless UNUM agreed to the witness

23  or a video camera.

24           The only case that touches on this is the Mass

25  Mutual versus -- in this jurisdiction is Mass Mutual

1    versus Lanham, which we cited in our --

2              THE COURT:  That's the one I was mentioning with

3    counsel earlier.

4              MR. CUNNINGHAM:  Right.  And Judge Quarles said

5    no, as the claimant on that policy, you have to appear for

6    the IME.  The company gets to choose the doctor and how

7    it's performed.  That's their discretion.  You have no

8    right to impose -- in that case they wanted to do it by

9    videotape.

10             The problem with starting to allow claimants to

11   impose conditions on IMEs and on the doctors that perform

12   them is essentially an invitation to litigate every IME

13   request under ERISA.  That's not contemplated by the plan

14   or ERISA.  That's something that claimants have, you know,

15   will have the legal right to insist on certain conditions

16   before they appear for an IME.  There's no such law that

17   permits that.  The plan doesn't permit it.  The language

18   of the plan doesn't permit it.  It's not permitted under

19   ERISA.

20             And there's practical considerations for having

21   someone in the examination room.  There's distractions

22   from having a camera and videographer in there.  These are

23   things that UNUM was concerned about.  And UNUM's position

24   was that it would create a lot of distractions and they're

25   not going to start allowing claimants to impose their

1    conditions on how IMEs are conducted or the manner in

2    which they are conducted.

3            And also the other problem with that is when you

4    start allowing claimants to impose conditions, it's also

5    going to limit UNUM's choice of physicians.  And many

6    physicians won't agree to these sorts of conditions being

7    imposed and UNUM will have a more difficult time finding

8    physicians willing to do IMEs based on various conditions

9    that plaintiffs try to impose on those IME's.

10           With respect to UNUM's vocational analysis, that

11   was also reasonable and appropriate.  It's consistent with

12   the language in the plan.  UNUM looked at Ms. Jones'

13   regular occupation as it's normally performed in the

14   national economy instead of how the work tasks are

15   performed for a specific employer or a specific location.

16   That's the way regular occupation is defined in the

17   short-term disability plan.  So they're looking at the

18   occupations performed in the national economy.

19           UNUM's vocational consultants determined that

20   Ms. Jones' regular occupation was most consistent with

21   that of an enrollment supervisor, which is a sedentary

22   occupation.  It involves constant sitting, occasional

23   standing and walking, an occasional lifting or exertion up

24   to ten pounds as described in the enhanced Dictionary of

25   Occupational Titles, which was described in each of the

1    vocational reports.  It's one of the resources that

2    vocational consultants use.

3            THE COURT:  Is there any basis in either the

4    documents that form this plan or in ERISA regulations or

5    case law that would require that the vocational assessment

6    use something in the Department of Labor's Dictionary of

7    Occupational Titles?

8            MR. CUNNINGHAM:  No.  A lot of vocational

9    consultants do use it and even in this case, you'll see

10   that the vocational consultants cited to the Dictionary of

11   Occupational Titles as well.  It's another resource that

12   was used.  But they are not required to only use the

13   Dictionary of Occupational Titles.

14           They do have to find an occupation that's

15   comparable to and consistent with the job description and

16   occupational duties reported by the claimant and her

17   employer and that's what they did here.  She's someone who

18   is involved in helping to administer employee benefit

19   plans.  She fills out Form 5500s.  These are the ERISA

20   plans.  She helps enroll employees.  And what she reported

21   and there were interviews, there's a couple of interviews

22   with her, but the one I'm referring to now is Exhibit 34

23   of our appendix, there was a telephone call to Ms. Jones

24   and she confirmed that her occupation involved sitting for

25   long periods and lifting up to ten pounds.  She didn't say

1    25 pounds.  She said ten pounds.

2          The employer in Exhibit 17 of our appendix

3    clarified that in terms of lifting, she would have to lift

4    her laptop and maybe some paper files.  In terms of

5    walking, she might have to walk 15 feet to the printer

6    outside her office and they found that -- and they also

7    reported she had no restrictions on taking breaks or

8    moving or stretching.

9          UNUM also talked to the employer.  Exhibit 30,

10   it documents the conversation with the employer where the

11   employer verified that there were no restrictions on

12   taking ten-minute breaks from sitting every hour and that

13   they would be willing to offer, not just her, but other

14   employees sit, stand, raise workstations as an

15   accommodation.

16         There are also cases that we cited in our brief,

17   our opening brief that said under ERISA, insurers, claim

18   administrators are allowed to consider reasonable

19   accommodations that employers could take so that an

20   employee could return to work and could perform their

21   occupation.

22         And then lastly, the FCE, the functional

23   capacity evaluation, the evaluator who did that, he found

24   that her occupation was sedentary.  On the first page of

25   the FCE report, Exhibit 23, he found that she has a

1    sedentary occupation.

2          So in terms of the reasonableness of the

3    vocational assessment, there's a lot of evidence in the

4    record to show that this was a sedentary occupation.  It

5    involves mostly sitting, some standing, some walking, but

6    it's mostly sitting and it does not require lifting up to

7    25 pounds and it does not require, you know, standing for

8    40% of the day.

9          I think the conflict factor, we already covered.

10         MR. ELKIND:  Mike, I didn't cover the statutory

11   penalties.  Do you want to do your argument on that and

12   I'll just respond to that when I get up?  I was going to

13   bring it up.  I didn't want to make you have to sit down

14   and get up again.  That's all.

15         MR. CUNNINGHAM:  Right.  Yeah.  There's an

16   argument about statutory penalties in the brief.  Before I

17   get to that though, in terms of the sandbagging, that UNUM

18   was engaged in sandbagging and deciding these claims and

19   not letting Ms. Jones know what the basis of her claims

20   were, that's not true.  UNUM followed -- and it's clear.

21   It's documented in the record the process that was

22   followed here.  And when they made the claim decisions,

23   they reported what they found.  When her counsel requested

24   the claim file, she got the claim file.  So the idea that

25   they are making these secret decisions and not telling her

1     about them is not true and that's not supported by the

2     record at all.

3              THE COURT:  Well, when you say when she

4     requested the claim file, she got the claim file.

5              MR. CUNNINGHAM:  Absolutely.

6              THE COURT:  How much time between the request

7     and the production of the file was there?

8              MR. CUNNINGHAM:  Well, the requests were made

9     multiple times.  So I'd have to go back and look.  But we

10    do have the -- in our exhibit appendix, we have the

11    request and the letter after.

12             THE COURT:  My notes indicate that she made a

13    request in the end of August and they were produced up to

14    2014 and she didn't get the documents until December 2016.

15             MR. CUNNINGHAM:  That doesn't sound right.

16             MR. ELKIND:  That's the short-term disability

17    plan.  It's the statutory penalties argument.

18             MR. CUNNINGHAM:  No.  The claim file was

19    absolutely provided.  The only document -- and timely

20    filed.  So that's not true.  The only document Ms. Jones

21    did not receive before filing her complaint is the STD

22    plan itself.  The claim file was produced and was produced

23    timely.  What she's complaining about with respect to the

24    statutory penalties and where she's seeking statutory

25    penalties pertains only to the plan --

1          THE COURT:   Just to the plan document itself.

2          MR. CUNNINGHAM:   The STD plan itself, yes, which

3    is Plaintiff's Exhibit 1.   However, the definition of

4    disability and other pertinent terms used in that plan

5    document were known to Ms. Jones and were quoted in all

6    the relevant denial letters by UNUM along with the

7    pertinent procedural requirements for appeals.   So the

8    lack of the STD plan did not prevent Ms. Jones from timely

9    pursuing her appeals or filing this action.   She's made no

10   showing of prejudice that would warrant the imposition of

11   statutory penalties.

12         Moreover, as a matter of law, UNUM had no duty

13   to provide her a copy of the STD plan, the plan document

14   itself I'm talking about.   It's not liable for any

15   statutory penalties with respect to the plan.   Under

16   ERISA, the plan administrator, not the insurer, is

17   responsible for providing documents governing the

18   operation of the plan and neither defendant in this case

19   is the plan administrator and therefore, statutory

20   penalties should be denied.

21         The case that deals with this squarely is a

22   Fourth Circuit case, Coleman versus Nationwide Life

23   Insurance Company and is cited in our brief where the

24   court -- I mean some jurisdictions do recognize what's

25   called a de facto plan administrator and sometimes they

1    impose some of the plan administrator duties on insurers.

2    That's not the case in the Fourth Circuit.  In the Fourth

3    Circuit, the plan documents need to be provided by the

4    plan administrator.  The insurer does not have that

5    obligation under ERISA.

6            In conclusion, the defendants respectively

7    request that the Court grant the defendants' cross motion

8    for summary judgment and deny plaintiff's motion for

9    summary judgment because UNUM's claim determinations were

10   reasonable as a result of a deliberate principled

11   reasoning process and supported by substantial evidence.

12   Thank you.

13           THE COURT:  All right.  Let me hear again from

14   Mr. Elkind.

15           MR. ELKIND:  I'll pick up where Mr. Cunningham

16   left off because what he said was not accurate.  In my

17   brief, you will see a letter sent to the plan

18   administrator.  On the same day, I sent the request to

19   UNUM requesting all pertinent documents which is the how

20   these documents are defined in ERISA and that includes the

21   short-term disability plan.  Also that is the most

22   essential document there is in this case.  That is the

23   plan that controls everything.  So there's no way to say I

24   am not prejudiced by not receiving it.  Just because you

25   put a few definitions in my appeal rights within a letter

1    doesn't give me the entirety of the plan by which I need

2    to look at for everything you define in the plan, every

3    operation of the plan.  The plan itself is quite

4    extensive.  Not a one-page summary of definitions just

5    placed in a letter, Your Honor.  So we were very

6    prejudiced.  They have absolutely no excuse for producing

7    it.  It took --

8            THE COURT:  Did it in any way interfere with

9    your pursuit of this case in this court?

10           MR. ELKIND:  Absolutely.

11           THE COURT:  How?

12           MR. ELKIND:  I wrote to them also because I

13   didn't know what I was going against.  I need to see the

14   plan to see what is going on with the case.  I couldn't

15   make any arguments about the plan because I couldn't read

16   it.

17           In my appeal on the short-term disability case

18   where I put pertinent plan provisions, I wrote right in

19   it, UNUM, no one has supplied the plan, I cannot speak to

20   what provisions apply to this, therefore, I will seek

21   penalties if this matter is litigated.  I gave them

22   another opportunity to produce it.

23           Now remember, I did produce it to -- I did

24   request to the plan administrator for that plan.  I

25   requested for the plan administrator on all occasions

1   because it come back the insurers and say, well, you

2   didn't make a request, you have to request of the plan

3   administrator.  Well, I did.  The employer was the plan

4   administrator and I sent it to their plan administrator

5   and the letter is there and it's an exhibit attached right

6   to my brief.

7          Now here's the kicker, Your Honor.  You're going

8   to love this one.  The plan administrator, I have to

9   request all documents from the plan administrator.  So if

10  UNUM doesn't give them to me, UNUM can come back and say,

11  well, you didn't request it from the plan administrator.

12  Well, the plan administrator doesn't typically have a lot

13  of documents.  They are just taken care of.  They hired

14  UNUM to do all this work.  They don't have to have these

15  plans on their facility.  They don't have to have it

16  there.  It's almost senseless.

17          UNUM is the administrator and the payor of the

18  claim.  The right to a plan administrator who is assigned

19  this as a claims administrator, which is what UNUM is and

20  this is only deals with the claim is an absurdity in the

21  law.  That's why I like to point it out because the

22  defense will quickly jump on you if you hadn't made that

23  service.  But in this case, I did.  I got caught once

24  years ago and I argued about the de facto administrator.

25  And from then on, I've learned to serve everybody, Your

1    Honor.  You learn your lessons.  So it was served.  And

2    the proof of it is in the record.

3            Now we're back to my word "reasonable" and this

4    is where we wanted to discuss.  Was this reasonable?

5    Well, before I do that, as you can see about the statutory

6    penalties, you have the exact number of days they were not

7    produced.  It is discretionary with this Court what to

8    award.  It is allowed up to $110 a day.  That is up to

9    you, Your Honor, what you award and how much.  I have no

10   more to say about that.  But there is no more single

11   important document than that one and they did not produce

12   it.  They admit they didn't produce it.  I have the email

13   from them saying they didn't produce it and give it to me

14   for I think 476 days late after the whole process was

15   done.  After not only was the short-term process done, the

16   long-term process was done and I had filed a lawsuit about

17   it.  That's terrible conduct.  And it needs to be

18   dissuaded.  And only this Court has the power to teach

19   them the lesson so they don't do it again and send the

20   same message to other insurers.  So that's why I am

21   seeking the maximum penalty.  It was grossly unfair to my

22   client and there's absolutely no excuse for that conduct.

23           Now we're going to discuss reasonable.  I like

24   the word "reasonable."  I don't consider myself a

25   reasonable person.  Everybody thinks they are.  I will

1    admit that a lot of times I'm not.  Why?  Because I know

2    who I am on some level.  But in this case, I'm not a

3    fiduciary to somebody else.  That's probably good for

4    them.  But UNUM is a fiduciary to Ms. Jones and they

5    failed her.  They have a special duty to her.  And that

6    meant they had to give a full and fair evaluation under

7    ERISA.  Those are the keywords.  Full and fair.  Did they

8    do it?  That is the essential question.

9         Now you are going to say that the -- counsel

10   points out.  He said under the functional capacity

11   evaluation, they termed her job as sedentary.  This is

12   called the selective review of evidence again.  He said

13   they found it.  Therefore, the job is sedentary.  They

14   also found she couldn't do a sedentary job, Your Honor.

15   It's funny how he forgot to say that.  That would be the

16   most important mention I think there will be from the --

17   from this.  No.  Covered that one up nice.  But if you are

18   going to use the example, you have to look at the entire

19   record and that is replete throughout this process.  It's

20   nothing but cherrypicking by the defense.

21        Another one I like is they keep trying to point

22   to her diagnosis of Charcot-Marie-Tooth Disease as being

23   responsible for everything.  That's absolutely incorrect.

24   She was diagnosed with hereditary neuropathy, lumbar

25   displacement, insomnia.  She had many diagnoses.  That was

1    not the only one.  You can't go keep picking on the one

2    and ignore all the rest.

3           Also she had a complex tear of her for right

4    knee.  You know, this is ridiculous.  And osteoarthritis.

5    You never once see all these diagnoses addressed by the

6    doctors.  They cherrypick one here.  They cherrypick one

7    there.  They never do a combination of the impairments or

8    what would really be called the whole person analysis.

9    They treat her as if she were a jigsaw puzzle and we are

10   not jigsaw puzzles.  We are functioning human beings.  One

11   part affects the next in many cases.  And when you have

12   that many diagnoses, you can't select little bits and

13   pieces of the medical record, try to negate them and say

14   oh, she's just fine because those are inconsistencies.

15   That's their favorite word.  I love that word.  Everything

16   is an inconsistency.  You know what's really inconsistent?

17   The way they decided the claim because they weren't full

18   and fair about their analysis the way they were required

19   to be.

20          Now they come back and they say the proper tests

21   weren't done.  Everywhere they go.  Oh, the proper tests

22   were done.  Not once did they say what were the proper

23   tests, Your Honor.  How are we supposed to know?  Again,

24   this is supposed to be meaningful dialogue.  And the

25   counsel again stated that he produced the claim records.

1    Yes, he did, Your Honor.  But when they put the final

2    denial, they included new medical reviews which couldn't

3    be responded to and that is sandbagging.  He won't admit

4    to that.  But they did it and they did it twice at the end

5    of the short-term disability appeal and at the end of the

6    long-term disability appeal and it's right there in the

7    record and I have it both times and it's part of my

8    pleading.  So they are not exactly being honest either.

9         So now we take a look at what's going on here.

10   He wants to claim that the EDOT is equivalent to the

11   Dictionary of Occupational Titles.  Well, the Dictionary

12   of Occupational Titles is published by the Department of

13   Labor.  EDOT is published by a private company and is not

14   endorsed by the Department of Labor.  It's not even

15   included in your Westlaw subscription.  It's barely used

16   by anybody.  It's used by the defense.  Why?  It favors

17   them.  But in this case, when they listed the job, they

18   said it was a DOT number.  And if you'll take a look at

19   the reports and I'll refer to them for you.  And when I

20   looked up that job they listed, enrollment supervisor does

21   not exist in the DOT.  And they're the ones who claimed it

22   was.  So again you want to look to an inconsistency,

23   that's enough one.  They're not telling the truth.  And

24   they've never told the truth in this case.

25        And now we look back for another one.  They said

1    oh, after the multi-state disciplinary action, we're much

2    better.  I provided you a four-page recitation string cite

3    of cases showing each and every time UNUM kept getting

4    overturned for the same violations over and over and over

5    again and they were -- and it's after the review period.

6    After that whole -- they were fined.  Their conduct hasn't

7    changed.

8          There were three cases that were especially

9    illustrative of it.  And you have -- give me one moment.

10   I wrote them down.  The Merrick case, the McCauley case

11   and the Stephan case.  All three cases are listed there.

12   They are after that time period and it shows you UNUM has

13   not changed its stripes.  The same pattern that were all

14   these depositions were stated, they were -- those

15   depositions came both before and after the regulatory

16   fines.  The conduct is exactly the same.  I lead you right

17   through the process in my opposition brief, page 10 to

18   about page 12, step by step.  And it's the same routine

19   every time.  We have a denial formula and this is how it's

20   done.

21         And also the fact they use multiple reviewers

22   doesn't mean a thing.  The law is very clear in the Fourth

23   Circuit even in another case.  I have two cases that are

24   cited.  Multiple reviewers are no better than one

25   reviewer, Your Honor.  They're all working for the same

1      company.  In this case, it's a company that has a

2      compensation structure based on giving bonuses and stock

3      options to procure denials.  There's no way around it.

4      That's it.  And as a claims department, you cannot give

5      incentive -- an incentivization of denials through

6      compensation plans.  That would be the worst conflict of

7      interest you could probably ever commit.  And that's

8      exactly what's been done here.

9              And I will argue with you.  He says these are

10     public documents.  No.  The proxy statement is public.

11     The compensation plan are not.  They were produced to me

12     during discovery and I would love for him to produce a

13     link that shows that they are public record because they

14     are not, Your Honor.  Again I looked it up.  This is not

15     true.

16             So we have a lot of things here that are not

17     true.  And I have documented everything here to death.

18     That's why I have such long appeals.  That's why I have

19     all these documents in them.  It is my job to corner UNUM

20     or else I don't win the case.  And I have to work very

21     hard to get there.  Can you imagine the repository of

22     information I keep on UNUM alone in my office to have that

23     recitation and how many years it took to accumulate that

24     and the work that goes into this?  You know why?  They own

25     60% of the market.  That's why, Your Honor.  And I'm

1    driven to prove that in this case and in the other cases,

2    they are using a denial formula.  It's been shown

3    especially if you look for good guidelines.  Those cases I

4    referenced of Merrick, Stephan and McCauley, they give you

5    a very good guideline about how this is done and why UNUM

6    is who UNUM is.

7              They are the people who appeared on 60 Minutes.

8    They are the people who appeared on Dateline.  Why?  Not

9    because they were being celebrated, but because they were

10   being scorned because they don't pay claims that deserve

11   to be paid, Your Honor.

12             Now I will thank you in advance.  There is an

13   enormity of information to go through in this claim

14   primarily because of me.  So I will thank you for your

15   patience in advance and I again thank you for your time.

16             THE COURT:  You're very industrious and that's

17   your job.  Anything further since there's a cross appeal

18   or cross motion?

19             MR. CUNNINGHAM:  Yes, Your Honor.  If I can just

20   respond to some of these arguments?  The claim file was

21   timely produced on the STD side.  So the request was made

22   on August 29th.  That's Exhibit 20 of the record appendix

23   and the response is Exhibit 21 where UNUM provided the

24   claim file on September 8th.

25             THE COURT:  September 8th?

1              MR. CUNNINGHAM:  September 8th.  About a week or

2     so later.  That's the claim file.  I did not say that the

3     STD plan was produced by UNUM.  It wasn't.

4              THE COURT:  So what you're saying is in response

5     to the August 29th correspondence on September 8th, the

6     claim file was produced.  But the only thing missing was

7     the description of the plan.

8              MR. CUNNINGHAM:  Correct.  That is correct.

9              THE COURT:  Okay.

10             MR. CUNNINGHAM:  The other argument being made

11    about these new medical reviews being dumped at the end

12    and sandbagging the plaintiff with these new medical

13    reviews, what he's talking about is the medical reviews

14    that were created during the appeal process.  And as a

15    matter of law, UNUM had no obligation to provide Ms. Jones

16    with medical consultant reports, medical reviews generated

17    during the appeal process before it rendered its decision

18    on appeal.  That's just not true.  Plaintiff's counsel

19    keeps saying we had an obligation to turn this over during

20    the appeal process.  That's not true.  We conduct our

21    review as part of that review.  There's medical consultant

22    reports that are generated under ERISA.  We do not have an

23    obligation to turn those over prior to the claim decision.

24    After the claim decision is made, certainly we have an

25    obligation to turn over the entire claim file and that's

1    what happened here.  That's the process that was followed

2    here.

3              I briefed this entire argument on page 43 of our

4    opening brief and there's a case, District of Maryland

5    case, Giles versus Bert Bell/Pete Rozelle NFL Player

6    Retirement Plan that deals with that exact issue.

7              The various diagnoses.  Diagnoses do not equal

8    disability.  The fact that someone has a diagnosis of

9    something does not mean that they're disabled.  UNUM has

10   an obligation to see how that condition is impacting their

11   function, how it impacts their ability to work.

12   Hereditary neuropathy is a type of CMT and that's why

13   you'll see these words usually next to each other in a lot

14   of these reports.

15             Dr. Collins, for example, talked about how the

16   testing, the test results from the electromyography study,

17   the nerve conduction study, some of the results did not --

18   were not consistent with a diagnosis of the hereditary

19   form of CMT.  So those things are -- hereditary neuropathy

20   is not a different diagnoses than the CMT that Dr. Drakes

21   and the others have been talking about.

22             In terms of some of these other things, insomnia

23   and the obesity, no treating provider documented any

24   restrictions or limitations due to obesity, insomnia, drug

25   allergies or other side effects.  They are other things

1    that may appear in the medical record.  I think at one

2    point I think in 2015 shows a shoulder problem for a short

3    time.  But no one is documenting that as the basis for the

4    disability.

5           With respect to the Merrick and McCauley cases,

6    Merrick is a 2007 case and McCauley is a 2008 case and

7    plaintiff argues that that shows that UNUM's bad claims

8    practices continued after 2004 into 2007 and 2008 and

9    that's an attractive argument except if you look at the

10   case and read the case, what it says is that those cases

11   were dealing with claim decisions that occurred in 1994 to

12   1997 time period.  Exactly during the time period that

13   predated the RSA and we talk about that or we point that

14   out in our reply brief at Footnote 6.  And I believe

15   that's all that I have.

16          THE COURT:  All right.  Counsel, we have been

17   going for a long time.  I'm going to take a break and come

18   back and see if I can address some of these issues with

19   you.  All right.  Thank you.  Will be back in about ten

20   minutes.

21          (Recess.)

22          THE COURT:  On July 22, 2016, the plaintiff in

23   this case, Sheela Jones, filed a complaint against the

24   defendants, Riggs Counselman Michaels and Downes Group

25   Long Term Disability Plan and UNUM Life Insurance Company

1    of America.  This is an ERISA case challenging the

2    handling of an application for disability benefits by

3    Ms. Jones, a former employee of Riggs Counselman Michaels

4    and Downes, commonly referred to as RCMD.

5          The case has proceeded through the summary

6    judgment process and there's been a filing of

7    administrative record under seal.  The plaintiff on

8    March 3rd filed a motion for summary judgment.  On

9    March 31st, the defendants filed a cross motion for

10   summary judgment.  The parties have in turn responded and

11   filed replies.  There's also been a motion to strike,

12   which is Number 27.  The matter has been fully briefed and

13   is now before the Court for consideration.

14         In her motion for summary judgment, the

15   plaintiff asserts that UNUM acted unreasonably in denying

16   her benefits claims by failing to undertake a full and

17   fair medical analysis instead using what they describe as

18   a or she describes as a patented denial formula which

19   included a pay for denial scheme in denying her claim for

20   disability benefits.  The defendants on the other hand,

21   take the position that they are entitled to summary

22   judgment because the claim determinations were the result

23   of a deliberate principled reasoning process and are

24   supported by substantial evidence.

25         The plaintiff previously worked as a Client

1    Services Manager for RCMD and she filed her first

2    disability benefits claim in February 2014.  Her former

3    employer, RCMD, had both a group short-term disability

4    plan and a long-term disability plan that gave her certain

5    protections.

6              The short-term plan provided that she is

7    disabled will be determined duty or sickness or injury,

8    one, you are unable to perform the material and

9    substantial duties of your regular occupation and, two,

10   you are not working in any occupation.  And under the

11   short-term plan, regular occupation means "the occupation

12   you are routinely performing when your disability begins.

13   We look at your occupation as it is normally performed in

14   the national economy instead of how the work tasks are

15   performed for a specific employer or at a specific

16   location."

17             Under the long-term disability plan, disability

18   and disabled mean that because of injury or sickness, one,

19   the insured cannot perform each of the material duties of

20   her regular occupation or -- and there's an intervening

21   paragraph.  I'm eliminating it.  It's not pertinent.

22   Three, the insured while unable to perform all of the

23   material duties of her regular occupation on a full time

24   basis is, A, performing at least one of the material

25   duties of her regular occupation or another occupation on

1     a part-time or full time basis and, B, earning currently

2     at least 20% less per month than her index pre-disability

3     earnings due to the same injury or sickness.

4            The long-term disability policy among others has

5     a provision that states that the company at its own

6     expense will have the right and opportunity to have an

7     employee whose injury or sickness is the basis of a claim,

8     one, examined by a physician, other health professional or

9     vocational expert of its choice and/or, two, interviewed

10    by an authorized company representative.  And it goes on

11    to provide that this right may be used as often as

12    reasonably required.

13           There is a fairly extensive record that's been

14    placed before the Court as the administrative record in

15    this case or the record of the claims administrator and

16    I'm not going to recite every single thing that's in it.

17    Suffice it to say that her troubles began at least in

18    terms of this case in February of 2014 when she fell at

19    home and injured her right foot.  She saw an orthopedist

20    who diagnosed her with a foot fracture and ankle sprain.

21    She submitted a claim for short-term benefits that was

22    approved and she was paid benefits for a little less than

23    a month in between February and March 2014.  She returned

24    to work.  Shortly thereafter, she saw a pain management

25    specialist complaining of pain at the level of 10 out of

10.

On April 15th the physician that she saw
Dr. George Drakes completed an attending physician
statement indicating that her primary diagnosis was
Charcot-Marie-Tooth Disease, reported that she was unable
to walk more than ten feet due to that condition, which
causes weakness in the extremities.  Also indicated she
had a restrictions or limitations of sitting, standing,
walking, climbing or twisting and could only occasionally
lift up to ten pounds.  Ms. Jones continued to work for
RCMD through April 24 of 2014.  She submitted a new claim
including the attending physician statement from Dr.
Drakes claiming disability due to CMT, lumbar disc
displacement and lumbar sacral spondylosis.  She last
worked on April 24, 2014 and said she was no longer able
to perform a sedentary job.

In May of 2014, UNUM conducted a round table
review attended by an onsite clinical consultant, Diana
Martin, a registered nurse, a disability benefits
specialist, Shellie Warmwood and a lead disability
specialist Mark Pare.  The group noted that she had a
chronic medical condition, the CMT, and acknowledged that
she would have difficulty with prolonged standing and
walking due to CMT.  And on May 13, 2014, UNUM notified
Ms. Jones of its decision to deny benefits.

1          Later in May, Ms. Jones requested that UNUM

2     reconsider its claim decision.  She included a statement

3     from Dr. Drakes in which she wrote that Ms. Jones cannot

4     maintain a full time or even a part-time work schedule and

5     is unable to maintain an employer-appropriate schedule.

6     UNUM then conducted a vocational review in July and

7     determined that her occupational duties were most

8     consistent with those performed by an enrollment

9     supervisor in the national economy as documented in what's

10    referred to as the Enhanced Dictionary of Occupational

11    Titles or EDOT.

12         UNUM concluded that her regular occupation

13    called for a sedentary level of physical exertion, which

14    includes constant sitting, occasional standing and walking

15    and lifting or exertion of up to ten pounds.  On July 7th,

16    UNUM advised her that the additional information submitted

17    did not change its original determination to deny STD

18    benefits.

19         While UNUM may acknowledge that her capacity for

20    prolonged standing or walking was limited, it concluded

21    that her occupational duties were primarily seated with

22    only occasional brief periods of standing or walking.  She

23    filed an appeal of that denial in October and submitted

24    additional medical records, a functional capacity

25    evaluation, a neuropsychological evaluation by clinical

1    psychologist, Dr. Shostak, and multiple letters of support

2    from friends and family.  She argued that her regular

3    occupation was light and required standing and walking for

4    40% of the day, lifting up to 25 pounds, constant arm and

5    hand use, occasional postural changes and significant

6    cognitive demands.

7            In response to this appeal, UNUM obtained a

8    second vocational review in November of 2014 and the

9    vocational consultant confirmed that her occupational

10   duties were most consistent with those performed by an

11   enrollment supervisor based upon the EDOT.  This

12   occupation of enrollment supervisor is sedentary meaning

13   it requires constant sitting, occasional standing and

14   walking and occasional lifting of up to ten pounds.

15           In January of 2015, UNUM notified Ms. Jones that

16   it determined that she was able to perform the duties of

17   her regular occupation and therefore, it was upholding its

18   denial of benefits.  These were short-term benefits.

19           On April 6, 2015, she initiated a long-term

20   disability claim.  After receiving reviews from its

21   consultants, Drs. Zimmerman, Black and Spica, UNUM sent a

22   letter to Ms. Jones requesting an independent medical

23   examination.  Her counsel wrote back stating that

24   Ms. Jones would not attend the IME unless it was either

25   videotaped or a medical witness was allowed to attend.

1    UNUM replied that the policy provided no conditions on the

2    right of examination and videotaping would not be

3    permitted as a videotape could be edited and taken out of

4    context.  Despite requests by UNUM, Ms. Jones never

5    attended an IME.

6            In September of 2015, UNUM notified Ms. Jones'

7    counsel that her claim was being denied because the

8    medical evidence failed to show that she was unable to

9    perform her full time occupational demands and that she

10   had refused to attend an IME.

11           In November, she appealed that denial.  In

12   support of her appeal, she submitted additional

13   information including the claim file from the short and

14   long-term disability claim files, medical records,

15   literature on obesity and documents associated with her

16   physicians.

17           On December 29, 2015, UNUM sent a letter to her

18   counsel upholding the denial of long-term benefits,

19   explained that it had determined that an IME was needed to

20   establish her functional capacity as it related to her

21   ability to work and her refusal to attend without

22   conditions precluded UNUM from completing its review.  And

23   that as a result, her claim would remain closed with no

24   benefits payable.

25           As I said before, she commenced her action in

1    this court in July of 2016.  Cross motions for summary

2    judgment had been filed.  The case is before the Court on

3    motion for summary judgment, the standards of which are

4    familiar to all parties and I won't repeat them.  Of

5    special note though is the standard of review of ERISA

6    claim denials.

7           While courts review a denial of ERISA plan

8    benefits under a de novo standard unless the plan provides

9    to the contrary and grants the discretionary authority to

10   make benefit determinations, in this case the plan gave

11   the administrator discretion to construe its provisions

12   and make benefit determinations and under these

13   circumstances, the court reviews the administrator's

14   decision only for abuse of discretion.  Both parties agree

15   that the benefit plan confers UNUM the discretionary

16   authority to determine eligibility of benefits and

17   therefore, the claim decision must be reviewed under the

18   abuse of discretion standard.

19          Under the abuse of discretion standard, a

20   decision will not be disturbed if it is reasonable even if

21   the Court were to come to a different conclusion

22   independently.  The plan decision is reasonable if it is

23   the result of deliberate principled reasoning process and

24   if it is supported by substantial evidence.  Substantial

25   evidence in this context is the quantum and quality of

1    relevant evidence that is more than a scintilla but less

2    than a preponderance and that a reasoning mind would

3    accept as sufficient to support a particular conclusion.

4            Under the standards set forth by the Fourth

5    Circuit in Booth versus Wal-Mart stores, 201 Fed. 3rd.

6    335, in reviewing the reasonableness of a claim

7    administrator's decision, the Court may consider but is

8    not limited to such factors and then there are eight

9    factors.  First is the language of the plan.  The second

10   is the purpose and goals of the plan.  Third, the adequacy

11   of the materials considered to make the decision and the

12   degree to which they support it.  Four, whether the

13   fiduciary's interpretation was consistent with other

14   provisions in the plan and with earlier interpretations of

15   the plan.  Five, whether the decision making process was

16   reasoned and principled.  Six, whether the decision was

17   consistent with the procedural and substantive

18   requirements of ERISA.  Seven, any external standard

19   relevant to the exercise of discretion and finally, number

20   eight, the fiduciary's motives and any conflict of

21   interest it may have.

22           The Court is required to balance the Booth

23   factors.  Any one factor will act as the tie breaker.  But

24   other factors are closely balanced and the degree of

25   closeness necessarily depends upon the tie-breaking

1     factors inherent or case specific importance.

2            Now let me review those factors in the context

3     of the cross-motions for summary judgment that are before

4     me.  First is the question of the independent medical

5     exam.  I am in agreement with my colleague, Judge Quarles,

6     who ruled that there is not a right to condition an IME on

7     the right to attend with a medical professional of your

8     own or to videotape it.  The plan gives the unrestricted

9     right to conduct the IME and it does not give the

10    applicant for benefits the right to condition it with

11    matter to his or her liking.  Having done so, I find that

12    the language of the plan is supportive of the decision so

13    far as it is based at least in small part on the refusal

14    to participate in the examination.

15            Second is the purposes and goals of the plan.

16    That is a relatively benign factor in this case.

17    Obviously, the purpose of the plan is to provide benefits

18    for those who become disabled.  And there's just as much

19    of an interest in having legitimate claims honored as

20    there is in having claims that do not comply with the plan

21    be denied.  Otherwise you would bankrupt the plan by

22    paying out claims that are not worthy of compensation.  So

23    I think that's a benign factor in this case.

24            The third factor is the adequacy of the

25    materials considered to make the decision and the degree

1    to which they support it.  The first allegation that the
2    plaintiff makes is that the defendant had the right to
3    conduct an IME and chose not to do it.  I find that that
4    is transparently inadequate reasoning.  While it is true
5    that it's arbitrary and capricious to deny a claim without
6    examining a claimant under normal circumstances here, it
7    is a very different circumstance where she decided on her
8    own to preclude the IME from taking place unless
9    conditions of her choosing were met.  But the claim denial
10   in this case does not need to nor does it rest solely on
11   the failure to participate in an IME without
12   preconditions.  The record here is more than sufficient to
13   evaluate her claim.  And based upon the record here, there
14   was a richly developed record that would meet the standard
15   that courts apply in reviewing a denial of benefits under
16   ERISA, which is a abuse of discretion standard and I'll be
17   talking more about that in a moment under the other
18   factors that had been raised by the plaintiff.
19          She also contends that the denial was
20   unreasonable because the defendants failed to consider the
21   effects of medication.  That's simply not true.  They did
22   consider how the medication affected her ability to work
23   and found no evidence of adverse side effects from her
24   medications and that's contained in the reports from
25   Dr. Zimmerman and Nurse Cowell, both of whom said there

1    was no report of a cognitive problem or medical side

2    effects in her treatment records.  To the same effect was

3    a report by Dr. Black, the neuropsychologist who declared

4    that her -- she had an inconsistent pattern of cognitive

5    performance by Dr. Shostak's neuropsychological evaluation

6    and that was incompatible with any diagnosed neurological

7    condition, physical disability or side effects of

8    prescribed medication.

9            It is clear that the record in this case

10   includes conflicting medical opinions.  That's not

11   surprising.  It is however not an abuse of discretion for

12   a plan fiduciary to deny benefits where conflicting

13   medical reports are presented.  So observed the Fourth

14   Circuit in Elliott versus Sara Lee Corporation, 190

15   Federal Third 601.

16           Third, she alleges that the defendants ignored

17   witness statements that were provided.  First of all, they

18   did consider them, but concluded that statements from a

19   person who has a significant potential for bias were

20   insufficient to overcome the findings of medical

21   specialists and that the plaintiff has the functional

22   capacity and cognitive ability to perform her regular

23   occupation.  They are not bound by what the friends and

24   family members may say and they are entitled to consider

25   the opinions of medical professionals, which is what they

1    did in this case.

2           Although the Fourth Circuit has not specifically

3    addressed the question of affidavits from friends and

4    family, other courts have.  For example, the Central

5    District of California in Shaw versus Life Insurance

6    Company of North America, 144 Fed. Sup. 3rd. 1114 noted

7    that there's -- they present a significant potential for

8    bias.  And I conclude that it was not unreasonable for

9    them to give less weight to affidavits from family and

10   friends than it did to medical evidence and the medical

11   consultants' reports.

12          Fourth, the plaintiff also argues that the

13   defendants' use of multiple reviewers is not sufficient

14   because they did not physically examine her and those

15   multiple medical reviews cannot overcome the opinions from

16   treating physicians.  It is true that a plan administrator

17   may not arbitrarily refuse to credit a claimant's reliable

18   evidence.  But courts do not require administrators

19   automatically to accord special weight to the opinions of

20   a claimant's physician.  Of particular note here is that

21   the plaintiff refused to allow an IME to take place except

22   under conditions that she unreasonably I think I conclude

23   sought to impose.

24          In addition, the use of multiple reviewers can

25   be reasonable and may bolster a claim's denial.  In this

1   case, to be true, the plaintiff has provided reports from

2   her treating physicians.  But the record also shows that

3   multiple medical reviewers reviewed such reports and came

4   to the conclusion that Ms. Jones is able to perform her

5   job responsibilities.

6          Now returning now to the overall factors, the

7   next one is whether the fiduciary's interpretation was

8   consistent with other provisions in the plan and with

9   earlier interpretations of the plan.  I find nothing in

10  the record before me and nor do I have any argument that

11  UNUM's interpretation of the plan was inconsistent with

12  other provisions of the plan or with earlier

13  interpretations.  Accordingly, that factor is benign.

14         The next which is one of the key contentions of

15  the plaintiff in this case and is hotly disputed by the

16  defense is, number five, whether the decision making

17  process was reasoned and principled.  The plaintiffs start

18  off by contending that the vocational assessment was

19  unreasonable because no such job title exists in the

20  Department of Labor's Dictionary of Occupational Titles

21  and they claim they never interviewed her and ignored the

22  physical requirements of her job.

23         First of all, I find nothing that indicates that

24  the assessment of the job is limited to ones that are

25  listed in the Department of Labor's Dictionary of

1    Occupations.  In fact, the EDOT Dictionary is also used

2    and that is the one that was used in this case, which was

3    enrollment supervisor and it was a job that was quite

4    striking in its similarity to what this record shows was

5    the duties performed by the plaintiff in this case.

6            The record here indicates that UNUM considered

7    the information provided by the employer, RCMD, and spoke

8    to the plaintiff regarding her occupational duties.  It's

9    simply not true that they didn't talk to her at all.  What

10   she reported was that her job required sitting at her desk

11   for long periods, talking on the phone, sending emails,

12   walking from her desk to the printer and lifting up to ten

13   pounds.  The consultants at UNUM hired confirmed that the

14   plaintiff's regular occupation as performed in the

15   national economy was most consistent with enrollment

16   supervisor, which they got from the EDOT.  A review of the

17   record here indicates clearly that the claims denials were

18   the result of a deliberate principled reasoning process,

19   one with which the plaintiff may disagree, but it was

20   nevertheless a deliberate principled reasoning process.

21           Once again, the plaintiff sought reconsideration

22   and once again matters were considered by UNUM and it

23   upheld its decision because the additional information she

24   submitted was insufficient to change the claim decision.

25           She then appealed again and submitted a

1    neuropsychological evaluation by Dr. Shostak.  UNUM then

2    referred the file to a different vocational consultant,

3    who reviewed her prior statements about her job duties,

4    her job description from RCMD and the specific

5    clarification of job duties and physical demands provided

6    by RCMD.  That consultant concluded that her regular

7    occupation in the national economy was most consistent

8    again with enrollment supervisor from the EDOT and at that

9    point, UNUM requested that Dr. Zimmerman review the

10   neuropsychological evaluation of Dr. Shostak.  But

11   Zimmerman found the neuropsychological evaluation by

12   Shostak failed to comply with standard industry practices

13   and failed to administer performance validity testing to

14   ensure valid test results.  Given that data, UNUM

15   concluded that the restrictions and limitations placed on

16   cognitive impairment were simply not supported.

17          And once again, UNUM upheld its denial of

18   benefits.  Again considered her contention that she's

19   cognitively impaired, requested two additional specialists

20   to review the neuropsychological evaluation of Dr. Shostak

21   and both ultimately concluded that the physically based

22   cognitive restrictions and limitations were simply not

23   supported.

24          UNUM then took the additional step of referring

25   the file to Dr. Collins, a board certified neurologist,

1    for further review.  He sent questionnaires to Drs. Drakes

2    and You to get a better understanding of it.  He found

3    that the evidence -- that these conditions warrant any

4    restrictions or limitations.  Found no evidence -- excuse

5    me -- that these conditions warrant any restrictions or

6    limitations and concluded that her reported activities and

7    documented physical examination and findings were

8    consistent with the physical capacity to perform the

9    occupational demands of her sedentary occupation on a full

10   time basis.

11          UNUM took the additional step of referring the

12   file to Dr. Cowell, a board certified neurologist and

13   designated medical officer.  He found that her functional

14   abilities in regard to her lower extremities could not be

15   determined based on available medical records and

16   recommended an IME.  That's when UNUM requested one and

17   that's when she declined to do so unless these conditions

18   of videotaping or a medical person attending with her were

19   met.  After she refused to do so, UNUM denied the claim

20   because the medical evidence failed to show that she was

21   unable to perform her full time occupational duties and

22   she failed to attend an IME.

23          This record in my opinion clearly and

24   meticulously demonstrates these claim determinations are

25   the result of a deliberate, principled reasoning process

1       and are supported by substantial evidence.

2               The next Booth factor, the sixth one is whether

3       the decision was consistent with procedural and

4       substantive requirements of ERISA.  She complains that she

5       was denied a full and fair review and complains that the

6       defendants undertook a post-denial medical review which

7       rendered the new reasons for the claim denial that were

8       not communicated to the plaintiff prior to making the

9       final decision improper.

10              It is true that under ERISA, a plan

11      administrator cannot introduce evidence post hoc to

12      support its benefit determination when the district court

13      reviews that decision under a deferential standard.  Here,

14      however, the administrative record shows that multiple

15      medical reviews were conducted prior to claim denials and

16      throughout the appeal process.  Essentially, what we're

17      talking about is multiple reconsideration requests.  The

18      records also show that UNUM provided a copy of the claim

19      file to the plaintiff before she filed her appeal on

20      October 29, 2014.  And therefore, I conclude that the

21      record does not support the notion that UNUM violated the

22      ERISA requirements.  Furthermore, UNUM does not seek to

23      bolster its argument with the evidence obtained after the

24      initial claim denial.  And I don't believe that's what

25      they're doing here.

1        The seventh Booth factor is any external

2   standard relating to the exercise of discretion.  I don't

3   see that that's a factor that is pertinent in this case

4   and I will not further discuss it.

5        The eighth Booth factor is the fiduciary's

6   motives and any conflict of interest that it may have.

7   Now here the plaintiff goes on a virtual warpath against

8   UNUM and its prior practices that have been documented in

9   prior proceedings and seeks to have the collateral damage

10  of the prior indiscretions that have been uncovered tar

11  and feather UNUM in its handling of this case.

12       It is true that there is a history of some

13  practices that have been called into question.  And the

14  essential contention of the plaintiff is a conflict of

15  interest and it must be weighed as a factor in determining

16  whether there is or is not an abuse of discretion.

17       In the opinion of Justice Breyer I think it was

18  in the Metropolitan Life versus Glenn case, he pointed out

19  that an insurer's conflict could prove more importance,

20  perhaps of great importance where circumstances suggest a

21  higher likelihood that it affected the benefits decision

22  such as where the claims administrator has a history of

23  biased claims administration.  But on the other hand, he

24  observed that a conflict should prove less important

25  perhaps to the vanishing point where the administrator has

1   taken active steps to reduce potential bias and to promote

2   accuracy.

3            The plaintiff lays out what it complains is a

4   history of abuse of claims handling processes by UNUM,

5   refers to compensation plans that provide incentives to

6   employees and contends that there's a conflict here and

7   that the whole process that I've just described here was a

8   sham.

9            The defendants, however, have put very

10  substantial information into this record that demonstrates

11  that UNUM took active steps to review bias by, first,

12  interviewing Ms. Jones on two occasions.  Second,

13  obtaining four comprehensive vocational reviews.  Third,

14  requesting that two physicians, two neuropsychologists, a

15  psychologist and three nurses to review the medical

16  evidence, each of whom delivered comprehensive reports

17  that set forth the reasons and bases for their respective

18  opinions.  Four, directing the reviewer to contact

19  plaintiff's treating providers to discuss her condition.

20  Five, asking the medical specialists pointed, relevant

21  questions that focused on plaintiff's occupational duties.

22  Sixth, attempting to schedule Ms. Jones for an IME based

23  upon the recommendation of Dr. Cowell, which she refused

24  to attend.  And seven, paying Ms. Jones benefits that she

25  ultimately was not entitled to so that UNUM could take the

1    time necessary to complete a thorough and comprehensive

2    review.

3              I am still upon reviewing this record looking

4    for something that would show that these so-called

5    conflict of interest actually influenced the decision.

6    This is a case in which the medical records are voluminous

7    to put it mildly and reflect the fact that this is not one

8    arbitrary rent-a-doctor cranking out an opinion on demand.

9    It's a multitude of physicians and healthcare providers

10   that have evaluated this case.

11             I don't see strong evidence of a conflict of

12   interest above the level of -- that would get up to the

13   level mentioned by Justice Breyer.  What I see in this

14   case is a financial interest that's not too much different

15   than any claims adjustor or any person handling claims in

16   this world that you have an obligation just as you did

17   under the factor I talked about -- the Booth factor of the

18   purposes and goals of the plan.  It would be inconsistent

19   with the purpose of any plan to allow unsupported claims

20   to be paid.  On the other hand, it would be inappropriate

21   to not pay a well-documented and richly-deserved claim.

22   The fact that somebody has an incentive to perform that

23   role and perform it well does not mean to me that this

24   person is automatically suspect and I should attenuate

25   heavily the abuse of discretion standard.

1           And UNUM has made -- provided significant

2     information to the Court that it undertook significant

3     steps in the wake of the controversial actions documented

4     in the past to reduce bias and promote an accurate

5     decision during the claim determination and appeal

6     process.  Thus, in my opinion bringing the conflict issue

7     to the vanishing point.

8           As I said, this is not a case of just one doctor

9     whose services have been rented by an insurance company to

10    deny claims.  It's a multitude of physicians and other

11    healthcare providers who on repeated occasions became

12    involved in the decision making process in this case.  I

13    consider this to be a well-reasoned decision.  One that is

14    the product of a deliberate and principled reasoning

15    process and is supported by substantial evidence.

16          Accordingly, I conclude that the plaintiff's

17    motion for summary judgment should be denied and the

18    defendants' cross motion for summary judgment should be

19    granted affirming the denial of benefits in this case.

20          There's also an additional issue in this case

21    about the imposition of statutory penalties.  In this

22    case, the plaintiff contends that she requested documents

23    on August 29, 2014 and didn't get what she wanted.  What

24    she got in response to that a mere ten or so days later

25    was the complete claim file.  What she didn't get, what

1   she's complaining about is a copy of the short-term

2   disability plan.  And that was not given to her for a

3   considerable period of time and she contends that violates

4   ERISA.

5           I have the discretion to impose statutory

6   penalties and among the factors I should consider is

7   prejudice to the plaintiff and the nature of the

8   administrative conduct in responding to the participant's

9   request for plan documents.  The defendants do not dispute

10  that they did not produce the disability plan until after

11  the litigation commenced.

12          What is of note though is that the claim file

13  itself had and is typical with insurance communications

14  most of which I can barely understand because they are so

15  full of quotations.  But in this case, these documents

16  that are in the claim file contain the text of the

17  pertinent provisions of the plan.  So that I fail to see

18  how a very experienced attorney in this field such as

19  Mr. Elkind would be somehow prejudiced in his ability to

20  pursue a challenge to the decisions made by the defendants

21  in this case.  The simple fact is that the furnishing the

22  claim file minus a copy of the STD did not leave him

23  without a map for a voyage that he needed to take his

24  client on in order to overturn the benefit denial in this

25  case, especially since as I said the communications sent

1    to her explaining why the claim was being denied had

2    extensive quotations from the plan itself.

3              Accordingly, I will in the exercise of

4    discretion decline to award any statutory penalties in

5    this case.

6              I believe there is a motion to strike in this

7    case, but I believe as a result of the circumstances, it

8    is now moot and I will deny that as moot.  I believe that

9    concludes everything in the case.  Have I overlooked

10   anything, counsel?

11             MR. ELKIND:  No.  I'm fine.

12             THE COURT:  All right.  I will enter an order

13   that incorporates the ruling that I just made from the

14   bench orally and will close the case.  Thank you very

15   much.

16             (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Lisa K. Bankins, an Official Court Reporter

4    for the United States District Court for the District of

5    Maryland, do hereby certify that I reported, by machine

6    shorthand, in my official capacity, the proceedings had

7    and testimony adduced upon the motions hearing in the case

8    of the Sheela Jones versus UNUM Life Insurance Company of

9    America, et al., Civil Action Number RWT-16-2653, in said

10   court on the 28th day of June, 2017.

11         I further certify that the foregoing 81 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, together with the

14   backup tape of said proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this 16th day of August, 2017.

17

18

19                            Lisa K. Bankins

20                            Lisa K. Bankins
                              Official Court Reporter
21

22

23

24

25

**MR. CUNNINGHAM: [20]**  2/8 25/25 26/14 27/1 27/14 36/6 36/23 37/4 38/3 40/7 42/14 43/4 43/7 43/14 43/17 44/1 54/18 54/25 55/7 55/9

**MR. ELKIND: [30]**  2/6 2/18 3/1 3/15 3/17 4/11 4/14 4/22 5/3 5/15 5/21 6/18 8/10 8/15 9/4 9/7 10/1 13/4 13/19 14/11 14/15 14/17 14/20 15/18 42/9 43/15 45/14 46/9 46/11 81/10

**THE CLERK: [1]**  2/1

**THE COURT: [46]**  2/12 2/24 3/3 3/16 4/8 4/12 4/20 5/1 5/13 5/19 6/16 8/8 8/13 8/25 9/6 9/21 13/3 13/17 14/9 14/13 14/16 14/18 15/16 25/23 26/12 26/23 27/12 36/3 36/18 37/2 38/1 40/2 43/2 43/5 43/11 43/25 45/12 46/7 46/10 54/15 54/24 55/3 55/8 57/15 57/21 81/11

**$**

**$110 [1]**  48/8

**1**

**10 [4]**  24/8 52/17 60/25 61/1
**1114 [1]**  70/6
**12 [1]**  52/18
**129 [1]**  18/20
**12th [1]**  1/18
**13 [1]**  61/24
**144 [1]**  70/6
**15 [2]**  33/24 37/16
**15 feet [1]**  41/5
**15th [1]**  61/2
**16th [1]**  82/16
**17 [1]**  41/2
**190 [1]**  69/14
**1994 [1]**  57/11
**1997 [1]**  57/12

**2**

**20 [2]**  54/22 60/2
**2004 [3]**  28/11 28/21 57/8
**2007 [2]**  57/6 57/8
**2008 [3]**  20/11 57/6 57/8
**201 [1]**  66/5
**2014 [13]**  33/15 33/25 43/14 59/2 60/18 60/23 61/11 61/15 61/17 61/24 63/8 75/20 79/23
**2015 [6]**  37/16 57/2 63/15 63/19 64/6 64/17
**2016 [3]**  43/14 57/22 65/1

**2017 [3]**  1/6 82/10 82/16
**20770 [1]**  1/22
**20910 [1]**  1/15
**21 [1]**  54/23
**21201 [1]**  1/18
**22 [1]**  57/22
**23 [1]**  41/25
**24 [2]**  61/11 61/15
**25 [6]**  7/24 33/15 33/25 41/1 42/7 63/4
**25th [1]**  33/15
**2653 [3]**  1/3 2/3 82/9
**27 [1]**  58/12
**28 [1]**  1/6
**28th [1]**  82/10
**29 [3]**  64/17 75/20 79/23
**29th [2]**  54/22 55/5
**2:00 [1]**  1/8

**3**

**30 [1]**  41/9
**31st [1]**  58/9
**335 [1]**  66/6
**34 [1]**  40/22
**36 [1]**  1/17
**3rd [3]**  58/8 66/5 70/6

**4**

**40 [4]**  7/24 7/24 42/8 63/4
**41 [1]**  32/6
**43 [1]**  56/3
**476 [1]**  48/14

**5**

**54 [1]**  37/14
**550 [1]**  1/14
**5500s [1]**  40/19

**6**

**60 [2]**  53/25 54/7
**600 [1]**  20/11
**601 [1]**  69/15
**6223 [1]**  37/15
**6500 [1]**  1/21

**7**

**7th [1]**  62/15

**8**

**801 [1]**  1/14
**81 [1]**  82/11
**8th [4]**  54/24 54/25 55/1 55/5

**A**

**abbreviated [1]**  30/5
**abilities [2]**  35/16 74/14

**ability [7]**  18/8 56/11 64/21 68/22 69/22 80/19 82/14
**abnormality [1]**  33/22
**above [1]**  78/12
**absence [3]**  31/12 31/20 36/22
**absolutely [9]**  5/22 8/8 25/7 43/5 43/19 46/6 46/10 48/22 49/23
**absurdity [1]**  47/20
**abuse [12]**  3/10 26/9 26/10 26/16 65/14 65/18 65/19 68/16 69/11 76/16 77/4 78/25
**Academy [2]**  30/10 30/11
**accept [2]**  37/2 66/3
**accommodation [2]**  25/3 41/15
**accommodations [2]**  25/5 41/19
**accord [1]**  70/19
**Accordingly [3]**  71/13 79/16 81/3
**account [2]**  4/4 22/3
**accumulate [1]**  53/23
**accuracy [3]**  3/23 12/2 77/2
**accurately [1]**  13/2
**acknowledge [1]**  62/19
**acknowledged [3]**  9/22 35/25 61/22
**act [2]**  14/1 66/23
**acted [1]**  58/15
**action [4]**  44/9 52/1 64/25 82/9
**actions [1]**  79/3
**activities [3]**  34/23 35/9 74/6
**ad [1]**  12/22
**add [1]**  30/22
**adding [1]**  25/6
**addition [1]**  70/24
**address [2]**  2/22 57/18
**adduced [1]**  82/7
**adequacy [2]**  66/10 67/24
**adjustor [3]**  14/11 14/15 78/15
**administer [2]**  40/18 73/13
**administration [1]**  76/23
**administrative [6]**  11/19 28/10 58/7 60/14 75/14 80/8
**administrator [26]**  12/20 44/16 44/19 44/25 45/1 45/4 45/18 46/24 46/25 47/3 47/4 47/4 47/8 47/9 47/11 47/12 47/17 47/18 47/19 47/24 60/15 65/11 70/16 75/11 76/22 76/25
**administrator's [2]**  65/13 66/7
**administrators [2]**  41/18 70/18
**admit [3]**  48/12 49/1 51/3
**advance [2]**  54/12 54/15
**advanced [2]**  11/13 20/15

**A**

adversary [1] 11/10
adverse [1] 68/23
affidavit [1] 7/3
affidavits [2] 70/3 70/9
affirmative [2] 3/22 12/1
affirming [1] 79/19
afternoon [3] 2/9 2/13 2/20
afterwards [2] 12/6 12/17
age [1] 34/10
agreement [4] 28/11 28/13 28/15 67/5
al [3] 1/6 2/4 82/9
allegation [1] 68/1
alleges [1] 69/16
allergies [1] 56/25
allow [3] 38/10 70/21 78/19
allowed [5] 24/24 25/7 41/18 48/8 63/25
allowing [2] 38/25 39/4
almost [2] 18/3 47/16
alone [2] 20/11 53/22
Although [2] 13/22 70/2
AMERICA [6] 1/6 2/4 26/2 58/1 70/6 82/9
American [1] 30/10
amount [2] 3/23 14/20
amounts [1] 15/12
analysis [10] 4/1 7/18 11/25 15/20 15/22 15/22 39/10 50/8 50/18 58/17
ancient [1] 9/6
and/or [1] 60/9
ankle [2] 33/17 60/20
answer [3] 24/11 32/8 36/23
appeal [16] 33/1 45/25 46/17 51/5 51/6 54/17 55/14 55/17 55/18 55/20 62/23 63/7 64/12 75/16 75/19 79/5
appealed [2] 64/11 72/25
appeals [3] 44/7 44/9 53/18
APPEARANCES [1] 1/12
appendix [5] 32/6 40/23 41/2 43/10 54/22
applicable [1] 3/14
applicant [1] 67/10
application [1] 58/2
apply [3] 3/11 46/20 68/15
approach [1] 16/10
approved [1] 60/22
approving [1] 17/4
April [4] 61/2 61/11 61/15 63/19
April 15th [1] 61/2
April 24 [2] 61/11 61/15

**April 6 [1]** 63/19
arbitrarily [1] 70/17
arbitrary [2] 68/5 78/8
area [1] 5/7
aren't [1] 31/10
argue [3] 4/4 20/18 53/9
argued [2] 47/24 63/2
argues [2] 57/7 70/12
arguing [1] 16/1
argument [8] 42/11 42/16 43/17 55/10 56/3 57/9 71/10 75/23
arguments [5] 11/14 12/6 12/17 46/15 54/20
arm [1] 63/4
arms [3] 31/6 33/8 35/13
asserts [1] 58/15
assess [2] 3/14 30/5
assessment [9] 9/12 9/14 40/5 42/3 71/18 71/24
assigned [1] 47/18
associated [1] 64/15
assuming [1] 9/24
attached [1] 47/5
attachments [2] 28/18 28/19
attempt [1] 32/20
attempted [2] 32/1 36/1
attempting [1] 77/22
attend [7] 63/24 63/25 64/10 64/21 67/7 74/22 77/24
attended [2] 61/18 64/5
attending [3] 61/3 61/12 74/18
attenuate [1] 78/24
attorney [1] 80/18
attractive [1] 57/9
attributing [1] 31/7
August [6] 37/16 43/13 54/22 55/5 79/23 82/16
August 15 [1] 37/16
August 29 [1] 79/23
August 29th [2] 54/22 55/5
author [1] 22/8
authority [2] 65/9 65/16
authorized [1] 60/10
automatic [3] 15/17 15/23 15/25
automatical [1] 15/21
automatically [2] 70/19 78/24
average [1] 30/20
award [3] 48/8 48/9 81/4

**B**

background [3] 6/4 6/6 7/4
backup [1] 82/14
badly [1] 12/23
balance [2] 33/21 66/22

balanced [1] 66/24
Baltimore [1] 1/18
Bankins [4] 1/20 82/3 82/19 82/20
bankrupt [1] 67/21
barely [3] 6/24 51/15 80/14
base [1] 36/21
bases [1] 77/17
basis [9] 27/23 35/1 40/3 42/19 57/3 59/24 60/1 60/7 74/10
battery [1] 30/8
behaved [1] 11/10
behaving [2] 12/18 12/21
behavior [1] 12/10
behavioral [2] 31/21 32/13
beings [1] 50/10
Bell [1] 56/5
Bell/Pete [1] 56/5
bench [1] 81/14
beneficiary [1] 20/7
benefit [7] 19/10 40/18 65/10 65/12 65/15 75/12 80/24
benefits [27] 11/10 26/6 27/4 27/8 58/2 58/16 58/20 59/2 60/21 60/22 61/19 61/25 62/18 63/18 63/18 64/18 64/24 65/8 65/16 67/10 67/17 68/15 69/12 73/18 76/21 77/24 79/19
benign [3] 67/16 67/23 71/13
Bert [1] 56/5
BERTRAM [1] 1/13
bias [9] 3/22 12/1 27/12 28/25 69/19 70/8 77/1 77/11 79/4
biased [1] 76/23
bilaterally [1] 33/4
Black [16] 18/25 18/25 19/1 19/16 21/19 21/20 22/8 22/11 29/24 30/17 31/20 32/1 32/8 32/10 63/21 69/3
Black's [2] 19/25 22/3
board [4] 32/18 35/6 73/25 74/12
bolster [2] 70/25 75/23
Bolton [1] 1/16
bonus [11] 14/3 14/4 14/22 15/5 15/7 16/4 17/1 25/18 29/1 29/3 29/13
bonuses [3] 29/9 29/18 53/2
book [2] 22/9 22/10
Booth [9] 3/13 26/18 26/19 66/5 66/22 75/2 76/1 76/5 78/17
bottom [2] 28/7 35/21
bouncing [1] 18/4
bound [1] 69/23
brain [2] 30/25 31/6

## B

breaker [1]  66/23
Breyer [2]  76/17 78/13
brief [18]  8/3 11/14 13/21 18/18 21/2 21/9 23/20 24/8 41/16 41/17 42/16 44/23 45/17 47/6 52/17 56/4 57/14 62/22
briefed [2]  56/3 58/12
briefing [3]  10/17 11/24 16/1
briefs [1]  28/18
buttress [2]  11/24 24/5

## C

California [1]  70/5
CAM [2]  20/15 20/18
camera [3]  37/19 37/23 38/22
capacity [13]  18/3 18/10 32/24 33/11 34/25 41/23 49/10 62/19 62/24 64/20 69/22 74/8 82/6
capricious [1]  68/5
Carlos [1]  20/17
carrot [1]  16/9
carry [1]  28/23
case's [1]  9/23
caught [3]  13/22 21/18 47/23
celebrated [1]  54/9
central [2]  31/5 70/4
certainty [1]  7/5
CERTIFICATE [1]  82/1
certified [4]  32/18 35/6 73/25 74/12
certify [2]  82/5 82/11
challenge [2]  9/25 80/20
challenged [1]  36/16
challenging [1]  58/1
chance [1]  12/16
chances [1]  25/16
characterize [1]  29/4
Charcot [9]  17/20 21/8 21/10 21/21 31/3 32/15 33/2 49/22 61/5
Charcot-Marie-Tooth [6]  17/20 31/3 32/15 33/2 49/22 61/5
Charles [1]  1/17
charted [1]  13/20
cheat [1]  29/10
cherrypick [2]  50/6 50/6
cherrypicking [1]  49/20
Cherrywood [1]  1/21
choice [3]  36/9 39/5 60/9
choices [1]  36/11
choose [1]  38/6
choosing [1]  68/9
chose [1]  68/3

chronic [3]  21/23 22/2 61/22
Circuit [8]  5/5 44/22 45/2 45/3 52/23 66/5 69/14 70/2
circular [1]  20/1
circumstance [1]  68/7
circumstances [4]  65/13 68/6 76/20 81/7
citation [1]  10/20
cite [2]  19/23 52/2
cited [6]  19/20 38/1 40/10 41/16 44/23 52/24
Civil [3]  1/3 2/3 82/9
claim [72]  2/21 11/8 11/17 12/20 16/22 24/19 26/8 26/10 26/12 26/22 27/3 27/5 27/7 27/16 28/5 29/18 41/17 42/22 42/24 42/24 43/4 43/4 43/18 43/22 45/9 47/18 47/20 50/17 50/25 51/10 54/13 54/20 54/24 55/2 55/6 55/23 55/24 55/25 57/11 58/19 58/22 59/2 60/7 60/21 61/11 62/2 63/20 64/7 64/13 64/14 64/23 65/6 65/17 66/6 68/5 68/9 68/13 71/21 72/24 74/19 74/24 75/7 75/15 75/18 75/24 78/21 79/5 79/25 80/12 80/16 80/22 81/1
claim's [1]  70/25
claimant [6]  4/3 17/14 36/17 38/5 40/16 68/6
claimant's [3]  10/15 70/17 70/20
claimants [4]  38/10 38/14 38/25 39/4
claimed [1]  51/21
claiming [1]  61/13
claims [41]  3/23 10/24 12/2 13/8 13/15 14/6 14/7 14/10 14/15 14/24 15/4 16/20 17/3 17/4 18/20 20/11 25/12 28/9 28/12 28/15 28/20 29/10 42/18 42/19 47/19 53/4 54/10 57/7 58/16 60/15 67/19 67/20 67/22 72/17 76/22 76/23 77/4 78/15 78/15 78/19 79/10
clarification [2]  32/2 73/5
clarified [1]  41/3
Clarke [2]  20/13 20/14
classify [1]  8/5
clear [4]  35/16 42/20 52/22 69/9
client [12]  5/17 5/25 6/6 7/1 7/19 7/21 8/12 9/18 9/23 48/22 58/25 80/24
client's [5]  6/15 10/15 10/22 11/8 23/8

climbing [1]  61/9
clinical [7]  24/4 30/10 32/23 35/7 35/11 61/18 62/25
close [1]  81/14
closed [1]  64/23
closely [1]  66/24
closeness [1]  66/25
CMT [14]  31/3 31/4 31/8 31/9 31/11 33/8 34/5 34/17 56/12 56/19 56/20 61/13 61/22 61/24
co [2]  7/23 22/8
co-author [1]  22/8
co-employees [1]  7/23
cognitive [22]  21/21 22/2 30/6 30/15 30/20 31/1 31/4 31/8 31/9 31/10 31/13 31/17 31/22 31/24 32/10 34/22 63/6 69/1 69/4 69/22 73/16 73/22
cognitively [2]  29/21 73/19
Coleman [1]  44/22
collateral [1]  76/9
colleague [1]  67/5
Collins [10]  21/3 21/3 32/18 32/19 33/7 34/1 34/6 34/23 56/15 73/25
combination [1]  50/7
commenced [2]  64/25 80/11
comment [2]  12/16 19/3
commit [1]  53/7
committing [1]  6/16
commonly [1]  58/4
communicated [1]  75/8
communications [2]  80/13 80/25
companies [1]  21/5
company [24]  1/6 2/4 2/11 14/5 14/8 14/22 15/16 16/20 16/21 17/3 24/2 26/2 27/11 38/6 44/23 51/13 53/1 53/1 57/25 60/5 60/10 70/6 79/9 82/8
company's [1]  16/5
comparable [1]  40/15
compatible [1]  30/15
compensated [1]  15/11
compensation [10]  14/4 14/4 14/22 16/19 29/1 53/2 53/6 53/11 67/22 77/5
complaint [2]  43/21 57/23
complete [4]  17/8 17/25 78/1 79/25
completed [3]  11/19 12/8 61/3
completing [1]  64/22
complex [1]  50/3
comply [2]  67/20 73/12
comprehensive [5]  27/18 27/22

**C**

comprehensive... [3] 77/13
77/16 78/1
compression [2] 34/7 34/10
concert [1] 17/8
conclude [5] 30/24 70/8 70/22
75/20 79/16
concluded [9] 34/23 62/12
62/20 69/18 73/6 73/15 73/21
74/6 81/16
concludes [1] 81/9
conclusion [6] 8/21 32/9 45/6
65/21 66/3 71/4
condition [16] 5/8 5/9 17/17
18/11 21/12 24/21 30/16 31/21
32/13 56/10 61/6 61/22 67/6
67/10 69/7 77/19
conditions [20] 10/1 17/18 36/3
36/8 36/17 36/20 37/1 38/11
38/15 39/1 39/4 39/6 39/8 64/1
64/22 68/9 70/22 74/3 74/5
74/17
conduct [9] 12/7 48/17 48/22
52/6 52/16 55/20 67/9 68/3 80/8
conducted [8] 18/15 29/20 36/9
39/1 39/2 61/17 62/6 75/15
conduction [1] 56/17
confers [1] 65/15
confirm [1] 7/22
confirmed [4] 8/19 40/24 63/9
72/13
confirming [1] 17/15
conflict [22] 12/19 26/14 26/17
26/18 26/20 26/21 27/1 27/3
27/5 27/8 27/10 42/9 53/6 66/20
76/6 76/14 76/19 76/24 77/6
78/5 78/11 79/6
conflicting [2] 69/10 69/12
conflicts [1] 28/23
connection [1] 31/9
consent [2] 10/2 37/19
consequences [1] 37/2
considerable [1] 80/3
consideration [1] 58/13
considerations [1] 38/20
consistent [18] 22/22 22/23
33/1 34/5 34/25 39/11 39/20
40/15 56/18 62/8 63/10 66/13
66/17 71/8 72/15 73/7 74/8 75/3
consistently [1] 35/8
constant [5] 35/2 39/22 62/14
63/4 63/13
constitute [1] 82/12
construe [1] 65/11

consultant [6] 55/16 55/21
61/18 63/9 73/2 73/6
consultants [7] 27/19 39/19
40/2 40/9 40/10 63/21 72/13
consultants' [1] 70/11
contain [2] 10/11 80/16
contained [1] 68/24
contemplated [1] 38/13
contend [1] 26/24
contending [1] 71/18
contends [4] 68/19 77/6 79/22
80/3
contention [4] 26/25 32/14
73/18 76/14
contentions [2] 29/21 71/14
context [3] 64/4 65/25 67/2
continued [2] 57/8 61/10
contract [1] 11/3
contractual [1] 36/8
contradicting [2] 7/2 25/17
contradicts [1] 17/10
contrary [2] 8/22 65/9
controlled [1] 11/2
controlling [1] 17/22
controls [1] 45/23
controversial [1] 79/3
corner [2] 5/11 53/19
Corporation [1] 69/14
correspondence [2] 37/15 55/5
Councilman [1] 26/3
Counselman [3] 2/11 57/24
58/3
court [31] 1/1 1/20 1/21 2/3 3/7
3/19 3/24 16/17 20/12 21/24
26/12 27/10 44/24 45/7 46/9
48/7 48/18 58/13 60/14 65/1
65/2 65/13 65/21 66/7 66/22
75/12 79/2 82/3 82/4 82/10
82/20
courts [5] 16/15 65/7 68/15
70/4 70/18
cover [1] 42/10
covered [2] 42/9 49/17
Cowell [8] 23/16 24/6 32/18
35/6 35/18 68/25 74/12 77/23
cranking [1] 78/8
create [1] 38/24
created [1] 55/14
creates [1] 13/10
credit [1] 70/17
cross [8] 2/16 45/7 54/17 54/18
58/9 65/1 67/3 79/1
cross-motions [1] 67/3
CUNNINGHAM [4] 1/17 2/10
25/25 45/15

**D**

damage [1] 76/9
dance [1] 6/25
data [3] 30/13 73/14
Dateline [1] 54/8
de [3] 44/25 47/24 65/8
death [1] 53/17
December [2] 43/14 64/17
December 2016 [1] 43/14
December 29 [1] 64/17
decided [3] 8/4 50/17 68/7
decision [34] 9/2 12/12 26/10
26/11 26/12 26/22 27/1 27/6
55/17 55/23 55/24 61/25 62/2
65/14 65/17 65/20 65/22 66/7
66/11 66/15 66/16 67/12 67/25
71/16 72/23 72/24 75/3 75/9
75/13 76/21 78/5 79/5 79/12
79/13
decisions [6] 3/23 3/24 42/22
42/25 57/11 80/20
declared [2] 11/16 69/3
decline [1] 81/4
declined [1] 74/17
decrease [2] 17/4 35/8
defendant [4] 1/16 8/9 44/18
68/2
defendants [13] 1/8 2/10 26/2
45/6 57/24 58/9 58/20 68/20
69/16 75/6 77/9 80/9 80/20
defendants' [3] 45/7 70/13
79/18
defense [10] 3/9 6/9 8/14 10/18
20/18 23/19 47/22 49/20 51/16
71/16
defenses [1] 11/18
deferential [1] 75/13
deficiencies [1] 30/1
deficit [1] 31/1
deficits [5] 18/3 18/8 31/10
31/10 31/17
defined [2] 39/16 45/20
definition [5] 4/17 6/4 8/2 25/4
44/3
definitions [2] 45/25 46/4
degenerative [1] 34/11
deliberate [7] 45/10 58/23
65/23 72/18 72/20 74/25 79/14
delivered [2] 27/22 77/16
deltoids [1] 33/6
demand [1] 78/8
demands [4] 63/6 64/9 73/5
74/9
demonstrable [1] 26/14

**D**

**demonstrates [2]** 74/24 77/10
**denial [29]** 13/1 13/5 22/23
22/25 24/8 29/4 29/8 36/21 44/6
51/2 52/19 54/2 58/18 58/19
62/23 63/18 64/11 64/18 65/7
68/9 68/15 68/19 70/25 73/17
75/6 75/7 75/24 79/19 80/24
**denials [9]** 11/17 15/2 18/21
18/21 53/3 53/5 65/6 72/17
75/15
**denied [11]** 13/7 24/18 33/22
33/23 44/20 64/7 67/21 74/19
75/5 79/17 81/1
**denies [1]** 33/23
**deny [11]** 13/15 17/2 22/6 29/10
45/8 61/25 62/17 68/5 69/12
79/10 81/8
**denying [3]** 11/8 58/15 58/19
**department [6]** 40/6 51/12
51/14 53/4 71/20 71/25
**depend [1]** 17/2
**depends [2]** 25/22 66/25
**depositions [4]** 13/3 14/25
52/14 52/15
**description [4]** 7/19 40/15 55/7
73/4
**deserve [1]** 54/10
**deserved [1]** 78/21
**designated [1]** 74/13
**desk [3]** 25/2 72/10 72/12
**Despite [1]** 64/4
**determination [3]** 62/17 75/12
79/5
**determinations [6]** 26/9 45/9
58/22 65/10 65/12 74/24
**determined [7]** 26/5 39/19 59/7
62/7 63/16 64/19 74/15
**devastating [1]** 16/13
**developed [2]** 28/16 68/14
**dextrose [1]** 35/9
**diagnosed [4]** 30/16 49/24
60/20 69/6
**diagnoses [6]** 49/25 50/5 50/12
56/7 56/7 56/20
**diagnosis [4]** 49/22 56/8 56/18
61/4
**diagnostic [1]** 22/11
**dialogue [3]** 12/4 12/5 50/24
**Diana [1]** 61/18
**Dictionary [11]** 7/25 39/24 40/6
40/10 40/13 51/11 51/11 62/10
71/20 71/25 72/1
**difference [1]** 5/9

**difficult [1]** 39/2
**difficulties [1]** 33/21
**difficulty [1]** 61/23
**directed [1]** 27/24
**directors [1]** 15/10
**disability [50]** 2/12 10/22 11/9
11/16 12/14 12/15 17/9 17/10
23/8 24/18 24/19 24/20 24/22
26/4 26/6 26/6 27/3 27/4 27/5
27/7 32/25 33/18 39/17 43/16
44/4 45/21 46/17 51/5 51/6 56/8
57/4 57/25 58/2 58/20 59/2 59/3
59/4 59/12 59/17 59/17 60/2
60/4 61/13 61/19 61/20 63/20
64/14 69/7 80/2 80/10
**disabled [6]** 13/14 23/9 56/9
59/7 59/18 67/18
**disadvantage [2]** 6/10 9/18
**disagree [1]** 72/19
**disc [1]** 61/13
**disciplinary [1]** 52/1
**discovery [1]** 53/12
**discretion [17]** 3/10 26/10
26/11 26/16 38/7 65/11 65/14
65/18 65/19 66/19 68/16 69/11
76/2 76/16 78/25 80/5 81/4
**discretionary [3]** 48/7 65/9
65/15
**disease [11]** 17/21 17/21 21/8
21/21 31/4 31/4 32/15 33/2
35/20 49/22 61/5
**Disorder [1]** 21/10
**disorders [1]** 32/17
**displaced [1]** 17/18
**displacement [2]** 49/25 61/14
**dispute [1]** 80/9
**disputed [1]** 71/15
**disrupts [1]** 17/21
**dissuaded [1]** 48/18
**distant [2]** 14/14 14/14
**distinction [1]** 10/4
**distractions [2]** 38/21 38/24
**district [9]** 1/1 1/1 1/11 1/21
56/4 70/5 75/12 82/4 82/4
**disturbed [2]** 26/11 65/20
**disturbing [2]** 14/3 15/8
**division [5]** 1/2 14/6 16/20
25/12 29/19
**divisions [1]** 14/7
**divulged [1]** 16/16
**document [7]** 43/19 43/20 44/1
44/5 44/13 45/22 48/11
**documentation [1]** 37/6
**documented [11]** 16/9 23/22
34/24 42/21 53/17 56/23 62/9

74/7 76/8 78/21 79/3
**documenting [1]** 57/3
**documents [19]** 28/6 29/2 29/2
29/5 40/4 41/10 43/14 44/17
45/3 45/19 45/20 47/9 47/13
53/10 53/19 64/15 79/22 80/9
80/15
**doll [1]** 3/3
**domain [1]** 30/20
**doorstep [1]** 37/4
**DOT [2]** 51/18 51/21
**Downes [4]** 2/11 26/3 57/24
58/4
**dozens [1]** 13/2
**Dr [8]** 17/13 19/1 19/2 33/6
61/12 69/3 69/5 73/9
**Dr. [49]** 14/25 17/12 17/16
18/20 18/25 18/25 19/2 19/3
19/16 19/25 19/25 21/3 21/3
21/19 21/20 22/3 22/8 22/11
29/22 29/24 30/1 31/7 31/20
32/1 32/3 32/6 32/8 32/19 32/21
32/22 33/13 33/16 34/1 34/6
34/23 35/6 35/18 56/15 56/20
61/3 62/3 63/1 68/25 73/1 73/10
73/20 73/25 74/12 77/23
**Dr. Black [9]** 18/25 18/25 19/16
21/19 21/20 22/11 31/20 32/1
32/8
**Dr. Black's [2]** 19/25 22/3
**Dr. Collins [8]** 21/3 21/3 32/19
34/1 34/6 34/23 56/15 73/25
**Dr. Cowell [4]** 35/6 35/18 74/12
77/23
**Dr. Drakes [5]** 17/12 32/21
32/22 56/20 62/3
**Dr. George [1]** 61/3
**Dr. Herry [1]** 33/16
**Dr. Jana [1]** 18/20
**Dr. Mitshari [1]** 14/25
**Dr. Shostak [7]** 19/3 31/7 32/3
63/1 73/1 73/10 73/20
**Dr. Shostak's [3]** 29/22 30/1
32/6
**Dr. Victor [1]** 33/13
**Dr. William [1]** 22/8
**Dr. Yokel [1]** 17/16
**Dr. Zimmerman [2]** 29/24 68/25
**Dr. Zimmerman's [2]** 19/2
19/25
**Drakes [9]** 17/12 17/12 32/21
32/22 56/20 61/3 61/13 62/3
74/1
**draw [1]** 10/5
**Drs [5]** 17/11 30/17 32/17 63/21

## D

**Drs...** [1] 74/1
**drug** [1] 56/24
**dumped** [1] 55/11
**duration** [1] 7/6
**duties** [20] 7/22 8/17 8/19 22/13 40/16 45/1 59/9 59/19 59/23 59/25 62/7 62/21 63/10 63/16 72/5 72/8 73/3 73/5 74/21 77/21
**duty** [4] 11/1 44/12 49/5 59/7

## E

**earning** [1] 60/1
**earnings** [1] 60/3
**economic** [2] 11/5 11/8
**economy** [6] 39/14 39/18 59/14 62/9 72/15 73/7
**edited** [1] 64/3
**EDOT** [7] 51/10 51/13 62/11 63/11 72/1 72/16 73/8
**educated** [1] 5/25
**educational** [1] 14/17
**effect** [1] 69/2
**effects** [7] 30/17 34/22 56/25 68/21 68/23 69/2 69/7
**efficient** [1] 14/24
**eight** [2] 66/8 66/20
**eighth** [1] 76/5
**electromyography** [1] 56/16
**eligibility** [1] 65/16
**eliminating** [1] 59/21
**Elkind** [6] 1/13 1/13 2/7 37/16 45/14 80/19
**Elliott** [1] 69/14
**email** [1] 48/12
**emails** [1] 72/11
**embedded** [2] 30/12 32/4
**EMG** [2] 21/7 21/14
**EMGs** [1] 21/11
**emotional** [1] 30/6
**employee** [4] 40/18 41/20 58/3 60/7
**employees** [8] 7/23 8/20 29/9 29/10 29/18 40/20 41/14 77/6
**employer** [14] 7/18 8/19 27/4 39/15 40/17 41/2 41/9 41/10 41/11 47/3 59/3 59/15 62/5 72/7
**employer's** [1] 26/7
**employer-appropriate** [1] 62/5
**employers** [1] 41/19
**employment** [1] 18/10
**encourage** [1] 14/23
**endorsed** [1] 51/14

**enforce** [1] 4/24
**engaged** [1] 42/18
**enhanced** [2] 39/24 62/10
**enormity** [1] 54/13
**enroll** [1] 40/20
**enrollment** [8] 39/21 51/20 62/8 63/11 63/12 72/3 72/15 73/8
**ensure** [1] 73/14
**enter** [1] 81/12
**entirely** [1] 29/22
**entirety** [1] 46/1
**entitled** [5] 26/4 26/5 58/21 69/24 77/25
**epidural** [1] 34/13
**equal** [1] 56/7
**equivalent** [1] 51/10
**ERISA** [24] 11/2 12/4 26/7 26/7 38/13 38/14 38/19 40/4 40/19 41/17 44/16 45/5 45/20 49/7 55/22 58/1 65/5 65/7 66/18 68/16 75/4 75/10 75/22 80/4
**especially** [5] 17/22 18/9 52/8 54/3 80/25
**ESQUIRE** [2] 1/13 1/17
**essential** [3] 45/22 49/8 76/14
**essentially** [4] 29/8 32/7 38/12 75/16
**establish** [1] 64/20
**et** [3] 1/6 2/4 82/9
**ethical** [3] 19/5 19/5 22/13
**evaded** [1] 10/21
**evaluate** [1] 68/13
**evaluated** [1] 78/10
**evaluation** [18] 18/3 18/7 18/19 19/8 21/16 22/25 32/24 33/11 41/23 49/6 49/11 62/25 62/25 69/5 73/1 73/10 73/11 73/20
**evaluations** [2] 20/24 23/18
**evaluator** [1] 41/23
**everybody** [2] 47/25 48/25
**everywhere** [2] 14/11 50/21
**evidence** [45] 4/2 4/3 8/21 8/23 8/23 10/13 10/13 10/14 11/23 12/7 13/10 13/13 16/18 18/13 20/4 22/5 27/21 28/10 28/12 29/11 31/25 32/12 34/7 34/16 34/21 42/3 45/11 49/12 58/24 64/8 65/24 65/25 66/1 68/23 70/10 70/18 74/3 74/4 74/20 75/1 75/11 75/23 77/16 78/11 79/15
**exam** [12] 5/17 5/21 6/1 6/2 6/23 7/9 7/9 30/4 30/4 30/5 33/19 67/5
**examination** [20] 4/1 4/8 4/10

4/16 4/19 5/13 7/11 7/13 7/14 9/15 9/16 19/11 22/14 34/24 35/11 38/21 63/23 64/2 67/14 74/7
**examinations** [4] 6/9 18/14 35/7 36/16
**examine** [3] 22/10 22/13 70/14
**examined** [1] 60/8
**examining** [1] 68/6
**exams** [2] 5/18 6/2
**exceptions** [1] 34/4
**exclude** [2] 21/15 21/16
**excuse** [4] 11/2 46/6 48/22 74/4
**executive** [2] 18/8 30/7
**exercise** [3] 66/19 76/2 81/3
**exertion** [3] 39/23 62/13 62/15
**exist** [3] 8/25 28/22 51/21
**exists** [2] 27/9 71/19
**expense** [1] 60/6
**experienced** [1] 80/18
**expert** [1] 60/9
**explanation** [4] 19/16 20/6 21/9 21/11
**extends** [1] 10/23
**extensive** [6] 3/6 8/13 37/6 46/4 60/13 81/2
**external** [2] 66/18 76/1
**extracted** [1] 16/13
**extremities** [12] 33/4 33/10 33/20 34/3 35/9 35/13 35/14 35/16 35/22 35/24 61/7 74/14
**extremity** [1] 33/23

## F

**face** [2] 17/5 19/11
**facility** [1] 47/15
**fact** [9] 21/5 21/11 31/4 52/21 56/8 72/1 78/7 78/22 80/21
**facto** [2] 44/25 47/24
**factor** [14] 26/19 42/9 66/23 67/16 67/23 67/24 71/13 75/2 76/1 76/3 76/5 76/15 78/17 78/17
**factors** [17] 3/8 3/13 3/24 4/5 15/19 16/2 26/18 26/18 66/8 66/9 66/23 66/24 67/1 67/2 68/18 71/6 80/6
**facts** [1] 16/11
**factual** [1] 10/19
**fail** [1] 80/17
**failed** [8] 30/12 49/5 64/8 68/20 73/12 73/13 74/20 74/22
**failing** [2] 4/3 58/16
**failure** [1] 68/11
**failures** [1] 32/4

## F

**fallen [1]** 33/17
**falls [1]** 17/23
**family [4]** 63/2 69/24 70/4 70/9
**fault [1]** 7/15
**favor [1]** 20/19
**favorable [2]** 4/3 11/23
**favoring [3]** 10/13 10/14 11/7
**favorite [2]** 25/20 50/15
**favorites [1]** 20/10
**favors [1]** 51/16
**FCE [6]** 20/14 20/19 32/24 33/1 41/22 41/25
**FCRR [1]** 1/20
**feather [1]** 76/11
**February [6]** 33/15 33/15 33/25 59/2 60/18 60/23
**February 2014 [1]** 59/2
**February 25 [2]** 33/15 33/25
**February 25th [1]** 33/15
**Fed [2]** 66/5 70/6
**Federal [1]** 69/15
**fell [1]** 60/18
**fellow [1]** 8/20
**fiduciary [7]** 11/1 11/4 12/10 20/6 49/3 49/4 69/12
**fiduciary's [4]** 66/13 66/20 71/7 76/5
**field [2]** 14/17 80/18
**file [22]** 2/17 42/24 42/24 43/4 43/4 43/7 43/18 43/22 54/20 54/24 55/2 55/6 55/25 64/13 73/2 73/25 74/12 75/19 79/25 80/12 80/16 80/22
**files [2]** 41/4 64/14
**fills [1]** 40/19
**final [2]** 51/1 75/9
**finally [1]** 66/19
**financial [1]** 78/14
**findings [15]** 9/15 21/6 21/7 22/1 27/25 32/23 33/1 33/3 33/13 34/2 34/24 35/11 35/11 69/20 74/7
**flies [1]** 23/6
**Floor [1]** 1/18
**Florida [1]** 5/1
**focused [1]** 77/21
**foot [4]** 17/19 33/17 60/19 60/20
**Footnote [1]** 57/14
**foregoing [1]** 82/11
**forgot [1]** 49/15
**form [5]** 18/21 24/19 40/4 40/19 56/19

**formal [1]** 30/9
**former [3]** 26/7 58/3 59/2
**forms [1]** 21/8
**formula [3]** 52/19 54/2 58/18
**four-page [1]** 52/2
**four-plus [1]** 33/5
**Fourth [9]** 5/5 44/22 45/2 45/2 52/22 66/4 69/13 70/2 70/12
**fracture [1]** 60/20
**fractured [1]** 17/19
**frequency [1]** 36/15
**friends [4]** 63/2 69/23 70/3 70/10
**full-time [1]** 35/1
**function [2]** 30/7 56/11
**functional [14]** 13/12 13/13 18/2 28/5 32/24 33/11 35/8 35/15 41/22 49/10 62/24 64/20 69/21 74/13
**functioning [2]** 31/13 50/10
**functions [1]** 30/6
**Funk [1]** 1/16
**funny [2]** 22/3 49/15
**furnishing [1]** 80/21

## G

**gainsay [1]** 5/23
**game [2]** 22/17 23/3
**gate [1]** 33/21
**general [1]** 18/5
**generated [2]** 55/16 55/22
**George [1]** 61/3
**gets [1]** 38/6
**Giles [1]** 56/5
**gives [2]** 13/11 67/8
**glad [2]** 2/18 37/19
**Glenn [10]** 3/19 3/25 11/25 15/20 15/21 25/8 26/20 27/9 27/10 76/18
**goals [3]** 66/10 67/15 78/18
**gobbledygook [1]** 20/2
**God [1]** 9/5
**governing [1]** 44/17
**grant [1]** 45/7
**granted [2]** 11/9 79/19
**grants [1]** 65/9
**great [3]** 21/6 23/24 76/20
**Greenbelt [2]** 1/5 1/22
**grossly [1]** 48/21
**group [5]** 2/12 26/3 57/24 59/3 61/21
**guideline [1]** 54/5
**guidelines [4]** 19/5 19/6 19/7 54/3

## H

**hamstrings [1]** 33/6
**handled [1]** 27/16
**handler [2]** 13/8 13/15
**handlers [1]** 15/4
**handling [5]** 14/24 58/2 76/11 77/4 78/15
**harder [1]** 22/7
**health [3]** 31/21 32/13 60/8
**healthcare [2]** 78/9 79/11
**hearing [3]** 1/10 2/5 82/7
**heavily [1]** 78/25
**Henry [1]** 17/16
**her about [1]** 8/10
**here's [1]** 47/7
**hereby [1]** 82/5
**hereditary [6]** 17/20 21/13 49/24 56/12 56/18 56/19
**hereto [1]** 82/15
**Herry [2]** 33/13 33/16
**hers [1]** 37/2
**higher [2]** 3/20 76/21
**hired [2]** 47/13 72/13
**history [4]** 12/23 76/12 76/22 77/4
**hitting [1]** 16/15
**hoc [2]** 11/14 75/11
**hold [1]** 15/12
**home [2]** 33/17 60/19
**honest [3]** 23/25 25/18 51/8
**Honor [46]** 2/9 2/19 3/16 4/25 5/9 5/18 6/16 7/15 9/9 9/17 10/2 11/1 11/13 12/9 13/17 13/25 14/7 15/22 16/3 16/9 16/11 16/24 17/5 19/20 20/20 22/5 23/5 23/14 24/7 25/3 25/11 25/23 26/1 37/6 46/5 47/7 48/1 48/9 49/14 50/23 51/1 52/25 53/14 53/25 54/11 54/19
**HONORABLE [1]** 1/10
**honored [1]** 67/19
**horrible [1]** 12/23
**hotly [1]** 71/15
**hour [1]** 41/12
**huge [1]** 2/21
**human [1]** 50/10
**hundred [1]** 14/12
**hundred's [1]** 15/1
**hundreds [2]** 6/8 13/25
**hypocrite [1]** 22/12
**hypocritical [1]** 20/22
**hypotheticals [1]** 19/4

## I

**I'll [6]**  2/18 4/7 42/12 45/15 51/19 68/16
**I'm [18]**  2/15 2/20 3/18 7/10 7/15 8/14 23/1 23/7 27/13 40/22 44/14 49/1 49/2 53/25 57/17 59/21 60/16 81/11
**I've [8]**  6/23 13/3 13/25 18/17 18/21 23/11 47/25 77/7
**ignore [1]**  50/2
**ignored [2]**  69/16 71/21
**ignoring [1]**  4/3
**illustrative [1]**  52/9
**imagine [2]**  25/10 53/21
**IME [30]**  9/25 10/2 35/19 35/25 36/2 36/2 36/9 36/12 36/21 36/22 36/25 37/11 37/18 37/22 38/6 38/12 38/16 63/24 64/5 64/10 64/19 67/6 67/9 68/3 68/8 68/11 70/21 74/16 74/22 77/22
**IME's [1]**  39/9
**IMEs [5]**  36/11 36/18 38/11 39/1 39/8
**impact [1]**  26/22
**impacted [1]**  27/1
**impacts [1]**  56/11
**impaired [5]**  18/10 29/22 32/15 34/5 73/19
**impairing [3]**  33/2 33/7 34/22
**impairment [3]**  31/4 31/22 73/16
**impairments [3]**  31/8 31/24 50/7
**implausibly [1]**  30/18
**implementation [1]**  28/14
**importance [3]**  67/1 76/19 76/20
**impose [10]**  36/8 36/17 38/8 38/11 38/25 39/4 39/9 45/1 70/23 80/5
**imposed [1]**  39/7
**imposing [2]**  36/3 37/1
**imposition [2]**  44/10 79/21
**improper [3]**  4/1 7/17 75/9
**improvement [1]**  18/6
**in-person [3]**  19/8 20/24 22/14
**inadequate [1]**  68/4
**inappropriate [1]**  78/20
**incentive [2]**  53/5 78/22
**incentives [1]**  77/5
**incentivization [1]**  53/5
**incentivizes [1]**  29/9
**inclusion [1]**  25/5
**income [2]**  14/7 24/5

**incompatible [1]**  69/6
**inconsistencies [7]**  4/4 11/12 22/17 22/24 23/4 34/1 50/14
**inconsistency [5]**  18/24 22/19 23/3 50/16 51/22
**inconsistent [9]**  20/21 22/18 22/21 22/21 30/14 50/16 69/4 71/11 78/18
**incorporates [1]**  81/13
**incorrect [5]**  19/17 19/18 19/19 19/21 49/23
**increase [1]**  17/3
**independent [8]**  3/25 4/8 4/10 5/23 5/24 23/18 63/22 67/4
**independently [1]**  65/22
**index [1]**  60/2
**indicative [1]**  21/7
**indiscretions [1]**  76/10
**industrious [1]**  54/16
**industry [1]**  73/12
**influenced [1]**  78/5
**information [12]**  16/16 21/1 32/2 32/20 53/22 54/13 62/16 64/13 72/7 72/23 77/10 79/2
**inherent [1]**  67/1
**initial [1]**  75/24
**initiated [1]**  63/19
**injections [2]**  34/13 34/15
**injured [2]**  33/17 60/19
**injury [4]**  59/7 59/18 60/3 60/7
**ins [1]**  6/8
**insist [5]**  4/22 4/23 5/15 9/17 38/15
**insisted [1]**  4/10
**insomnia [6]**  17/25 21/23 22/3 49/25 56/22 56/24
**instead [4]**  22/15 39/14 58/17 59/14
**insufficient [2]**  69/20 72/24
**insurance [17]**  1/6 2/4 2/11 14/8 21/4 24/2 26/2 28/16 28/20 29/16 29/17 44/23 57/25 70/5 79/9 80/13 82/8
**insured [3]**  27/8 59/19 59/22
**insurer [3]**  36/11 44/16 45/4
**insurer's [1]**  76/19
**insurers [4]**  41/17 45/1 47/1 48/20
**intellectual [1]**  30/7
**interest [14]**  6/15 11/5 11/5 11/8 11/9 12/19 53/7 66/21 67/19 76/6 76/15 78/5 78/12 78/14
**interfere [3]**  4/19 7/14 46/8
**interference [1]**  7/16

**interferes [1]**  9/14
**interfering [3]**  5/12 6/14 7/8
**Internet [1]**  29/5
**interpretation [3]**  66/13 71/7 71/11
**interpretations [3]**  66/14 71/9 71/13
**intervening [1]**  59/20
**interview [2]**  8/9 8/13
**interviewed [4]**  8/11 27/17 60/9 71/21
**interviewing [1]**  77/12
**interviews [2]**  40/21 40/21
**introduce [1]**  75/11
**invented [4]**  8/8 8/24 19/24 24/24
**invitation [1]**  38/12
**irrelevant [2]**  5/2 5/4
**issue [4]**  28/4 56/6 79/6 79/20
**issues [5]**  3/5 3/5 28/9 34/16 57/18

## J

**Jana [1]**  18/20
**January [1]**  63/15
**jigsaw [2]**  50/9 50/10
**job [27]**  7/19 7/22 7/25 8/1 8/4 8/12 8/16 8/18 22/6 40/15 49/11 49/13 49/14 51/17 51/20 53/19 54/17 61/16 71/5 71/19 71/22 71/24 72/3 72/10 73/3 73/4 73/5
**Johnson [1]**  17/16
**JONES [35]**  1/3 2/3 2/8 2/20 11/15 24/17 26/5 27/17 30/12 33/16 34/12 34/19 36/2 40/23 42/19 43/20 44/5 44/8 49/4 55/15 57/23 58/3 61/10 61/25 62/1 62/3 63/15 63/22 63/24 64/4 71/4 77/12 77/22 77/24 82/8
**Jones' [10]**  10/16 28/5 29/21 32/3 32/14 32/21 34/23 39/12 39/20 64/6
**journals [1]**  23/23
**JUDGE [5]**  1/11 9/2 9/22 38/4 67/5
**judges' [1]**  2/15
**judgment [16]**  2/17 8/3 10/18 26/4 45/8 45/9 58/6 58/8 58/10 58/14 58/22 65/2 65/3 67/3 79/17 79/18
**July [4]**  57/22 62/6 62/15 65/1
**July 22 [1]**  57/22
**July 7th [1]**  62/15
**jump [1]**  47/22

**J**

**June [2]** 1/6 82/10
**jurisdiction [2]** 4/25 37/25
**jurisdictions [1]** 44/24
**Justice [2]** 76/17 78/13

**K**

**key [1]** 71/14
**keyboarding [1]** 35/3
**keywords [1]** 49/7
**kicker [1]** 47/7
**knee [2]** 17/25 50/4
**knows [1]** 6/8

**L**

**Labor [2]** 51/13 51/14
**Labor's [3]** 40/6 71/20 71/25
**lack [1]** 44/8
**Lane [1]** 1/21
**language [6]** 25/6 27/13 38/17
39/12 66/9 67/12
**Lanham [2]** 9/3 38/1
**laptop [1]** 41/4
**lastly [1]** 41/22
**late [3]** 2/14 2/15 48/14
**law [13]** 5/7 11/3 14/15 16/2
16/17 23/11 29/19 38/16 40/5
44/12 47/21 52/22 55/15
**lawsuit [1]** 48/16
**lay [1]** 37/3
**lays [1]** 77/3
**lead [2]** 52/16 61/20
**learn [1]** 48/1
**learned [1]** 47/25
**Lee [1]** 69/14
**legal [1]** 38/15
**legitimate [1]** 67/19
**legs [2]** 31/6 33/8
**length [1]** 5/21
**lesson [1]** 48/19
**lessons [1]** 48/1
**letter [8]** 37/15 43/11 45/17
45/25 46/5 47/5 63/22 64/17
**letters [4]** 28/19 37/17 44/6
63/1
**letting [1]** 42/19
**levels [1]** 23/12
**liable [1]** 44/14
**licensed [1]** 29/24
**life [10]** 1/6 2/4 2/10 14/10 26/2
44/22 57/25 70/5 76/18 82/8
**lift [3]** 7/19 41/3 61/10
**lifting [11]** 7/24 8/5 35/2 39/23
40/25 41/3 42/6 62/15 63/4
63/14 72/12

**light [2]** 8/1 63/3
**liked [1]** 36/20
**likelihood [1]** 76/21
**liking [1]** 67/11
**limit [2]** 14/8 39/5
**limitations [12]** 21/22 22/2 28/5
31/13 32/11 34/18 56/24 61/8
73/15 73/22 74/4 74/6
**limited [3]** 62/20 66/8 71/24
**Linda [3]** 15/1 23/16 24/6
**link [1]** 53/13
**Lisa [4]** 1/20 82/3 82/19 82/20
**list [3]** 8/1 13/7 19/18
**literature [2]** 21/24 64/15
**litigate [1]** 38/12
**litigated [3]** 9/9 20/13 46/21
**litigation [3]** 10/24 12/17 80/11
**livelihood [1]** 25/22
**loaded [1]** 21/23
**location [3]** 36/12 39/15 59/16
**locomotion [1]** 17/23
**long-term [13]** 1/9 24/20
24/22 26/6 27/7 48/16 51/6 59/4
59/17 60/4 63/19 64/14 64/18
**losses [1]** 14/9
**love [5]** 2/23 22/17 47/8 50/15
53/12
**lower [12]** 32/15 33/4 33/10
33/20 34/3 34/6 34/7 35/14
35/16 35/22 35/24 74/14
**LTD [1]** 37/15
**lumbar [4]** 17/18 49/24 61/13
61/14

**M**

**machine [3]** 6/13 82/5 82/13
**main [1]** 14/6
**maintain [2]** 62/4 62/5
**major [1]** 3/12
**Malcolm [2]** 20/10 20/23
**malpractice [1]** 6/16
**man [1]** 25/21
**management [3]** 15/3 32/1
60/24
**manager [2]** 6/6 59/1
**manner [2]** 36/22 39/1
**map [1]** 80/23
**March [3]** 58/8 58/9 60/23
**March 2014 [1]** 60/23
**March 31st [1]** 58/9
**March 3rd [1]** 58/8
**Marie [9]** 17/20 21/8 21/10
21/21 31/3 32/15 33/2 49/22
61/5
**market [1]** 53/25

**marketplace [1]** 3/20
**Mart [1]** 66/5
**Martin [1]** 61/19
**Martinez [1]** 20/17
**MARYLAND [7]** 1/1 1/5 1/15
1/18 1/22 56/4 82/5
**Mass [3]** 9/2 37/24 37/25
**material [4]** 59/8 59/19 59/23
59/24
**materials [5]** 13/3 22/9 23/21
66/11 67/25
**matter [7]** 2/2 22/18 44/12
46/21 55/15 58/12 67/11
**matters [1]** 72/22
**maximum [1]** 48/21
**May 13 [1]** 61/24
**McCauley [4]** 52/10 54/4 57/5
57/6
**meaningful [3]** 12/3 12/5 50/24
**measures [1]** 30/12
**mechanical [1]** 1/24
**medical [63]** 6/4 6/6 7/4 9/19
10/11 10/20 12/6 12/15 15/10
17/8 18/12 18/13 18/14 18/15
20/24 22/25 23/17 23/18 23/23
24/5 27/21 28/3 29/23 32/17
34/2 35/5 35/17 50/13 51/2
55/11 55/12 55/13 55/16 55/16
55/21 57/1 58/17 61/22 62/24
63/22 63/25 64/8 64/14 67/4
67/7 69/1 69/10 69/13 69/20
69/25 70/10 70/10 70/15 71/3
74/13 74/15 74/18 74/20 75/6
75/15 77/15 77/20 78/6
**medically [1]** 5/25
**medication [4]** 30/16 68/21
68/22 69/8
**medications [4]** 18/1 34/20
34/21 68/24
**medium [1]** 8/1
**meeting [1]** 2/15
**members [1]** 69/24
**memory [3]** 18/9 30/7 31/15
**mere [1]** 79/24
**Merely [1]** 4/19
**merit [1]** 16/22
**Merrick [4]** 52/10 54/4 57/5
57/6
**message [1]** 48/20
**meticulously [2]** 10/19 74/24
**Metropolitan [1]** 76/18
**MICHAEL [2]** 1/17 2/10
**Michaels [4]** 2/11 26/3 57/24
58/3
**middle [1]** 33/6

**M**

**Mike [1]**  42/10
**mildly [1]**  78/7
**minus [1]**  80/22
**miss [1]**  24/15
**missing [1]**  55/6
**Mitshari [1]**  14/25
**moment [3]**  24/14 52/9 68/17
**month [2]**  60/2 60/23
**moot [2]**  81/8 81/8
**mostly [3]**  23/19 42/5 42/6
**motion [14]**  11/22 11/22 28/18
 45/7 45/8 54/18 58/8 58/9 58/11
 58/14 65/3 79/17 79/18 81/6
**motions [6]**  1/10 2/5 2/16 65/1
 67/3 82/7
**motives [2]**  66/20 76/6
**motor [1]**  33/19
**mouthfuls [1]**  24/16
**movements [1]**  7/20
**Mr. [5]**  25/25 37/16 45/14 45/15
 80/19
**Mr. Cunningham [2]**  25/25
 45/15
**Mr. Elkind [3]**  37/16 45/14
 80/19
**MRI [1]**  34/8 34/9
**Ms [14]**  2/7 28/4 34/23 44/5
 44/8 55/15 61/10 61/25 63/15
 64/4 64/6 77/12 77/22 77/24
**Ms. [27]**  2/20 10/16 11/15 24/17
 26/5 27/17 29/21 30/12 32/3
 32/14 32/21 33/16 34/12 34/19
 36/2 39/12 39/20 40/23 42/19
 43/20 49/4 58/3 62/1 62/3 63/22
 63/24 71/4
**Ms. Jones [20]**  2/20 11/15
 24/17 26/5 27/17 30/12 33/16
 34/12 34/19 36/2 40/23 42/19
 43/20 49/4 58/3 62/1 62/3 63/22
 63/24 71/4
**Ms. Jones' [7]**  10/16 29/21 32/3
 32/14 32/21 39/12 39/20
**multi [1]**  52/1
**multi-state [1]**  52/1
**multiple [11]**  21/4 43/9 52/21
 52/24 63/1 70/13 70/15 70/24
 71/3 75/14 75/17
**multitude [2]**  78/9 79/10
**muscles [1]**  17/22
**Mutual [3]**  9/2 37/25 37/25
**myriad [1]**  17/17

**N**

**narrow [1]**  3/7
**national [7]**  30/11 39/14 39/18
 59/14 62/9 72/15 73/7
**Nationwide [1]**  44/22
**nature [1]**  80/7
**nauseum [1]**  12/22
**necessary [2]**  9/10 78/1
**nefarious [1]**  29/3
**negate [1]**  50/13
**neither [1]**  44/18
**nerve [3]**  34/7 34/10 56/17
**nerves [3]**  17/22 17/22 31/5
**nervous [1]**  31/5
**neural [1]**  30/15
**neurocognitive [1]**  30/25
**neurological [3]**  30/16 32/16
 69/6
**neurologist [4]**  35/6 35/19
 73/25 74/12
**neurologists [1]**  32/19
**neuromuscular [1]**  35/20
**neuropathy [6]**  17/20 21/13
 32/16 49/24 56/12 56/19
**neuropsych [4]**  9/12 9/14 18/7
 18/19
**neuropsychological [7]**  30/4
 62/25 69/5 73/1 73/10 73/11
 73/20
**neuropsychologist [1]**  69/3
**neuropsychologists [3]**  27/20
 29/25 77/14
**Neuropsychology [2]**  30/11
 30/11
**NFL [1]**  56/5
**nice [1]**  49/17
**nine [1]**  32/7
**none [1]**  12/13
**North [1]**  70/6
**nose [1]**  17/5
**notereading [1]**  1/24
**notified [3]**  61/24 63/15 64/6
**notion [1]**  75/21
**November [2]**  63/8 64/11
**novo [1]**  65/8
**Now this [1]**  18/24
**number [10]**  2/3 3/4 15/14
 15/14 48/6 51/18 58/12 66/19
 71/16 82/9
**numbness [1]**  33/24
**nurse [7]**  10/10 13/9 13/9 15/3
 22/19 61/19 68/25
**nurses [2]**  27/21 77/15

**O**

**obesity [3]**  56/23 56/24 64/15
**obligated [1]**  9/24
**obligation [7]**  45/5 55/15 55/19
 55/23 55/25 56/10 78/16
**observed [2]**  69/13 76/24
**observer [1]**  36/6
**obtain [2]**  32/2 32/20
**obtained [3]**  27/18 63/7 75/23
**obtaining [1]**  77/13
**obvious [1]**  17/4
**occasion [1]**  11/20
**occasional [8]**  35/3 39/22
 39/23 62/14 62/22 63/5 63/13
 63/14
**occasions [5]**  27/18 32/2 46/25
 77/12 79/11
**occupation [31]**  25/4 25/5
 34/20 35/1 39/13 39/16 39/20
 39/22 40/14 40/24 41/21 41/24
 42/1 42/4 59/9 59/10 59/11
 59/11 59/13 59/20 59/23 59/25
 59/25 62/12 63/3 63/12 63/17
 69/23 72/14 73/7 74/9
**occupational [18]**  7/25 39/25
 40/7 40/11 40/13 40/16 51/11
 51/12 62/7 62/10 62/21 63/9
 64/9 71/20 72/8 74/9 74/21
 77/21
**occupations [2]**  39/18 72/1
**October [2]**  62/23 75/20
**October 29 [1]**  75/20
**offer [1]**  41/13
**office [5]**  33/15 33/20 33/25
 41/6 53/22
**officer [1]**  74/13
**offices [1]**  25/15
**official [4]**  82/3 82/6 82/12
 82/20
**oh [5]**  9/5 22/20 50/14 50/21
 52/1
**older [2]**  23/16 24/3
**Olympics [1]**  7/1
**one-page [1]**  46/4
**one-third [2]**  8/6 8/7
**onsite [1]**  61/18
**opening [2]**  41/17 56/4
**operation [2]**  44/18 46/3
**opinion [5]**  20/11 74/23 76/17
 78/8 79/6
**opinions [7]**  17/8 27/23 69/10
 69/25 70/15 70/19 77/18
**opportunity [3]**  12/13 46/22
 60/6

# O

**opposite** [1] 36/24
**opposition** [2] 24/8 52/17
**options** [5] 6/14 15/11 15/15
 17/1 53/3
**orally** [1] 81/14
**order** [2] 80/24 81/12
**ordinarily** [1] 31/11
**ordinary** [1] 3/9
**organizational** [1] 18/8
**original** [1] 62/17
**orthopedist** [2] 17/13 60/19
**osteoarthritis** [2] 17/19 50/4
**outfit** [1] 20/15
**outs** [1] 6/8
**overall** [2] 3/15 71/6
**overcome** [2] 69/20 70/15
**overlooked** [1] 81/9
**overturn** [1] 80/24
**overturned** [1] 52/4
**owe** [1] 20/6

# P

**P-H-U** [1] 17/17
**p.m** [1] 1/8
**PA** [1] 1/16
**pad** [1] 5/11
**page** [8] 24/8 37/15 41/24 46/4
 52/2 52/17 52/18 56/3
**pages** [3] 24/9 32/7 82/11
**pain** [10] 21/23 22/2 32/16
 32/21 33/23 34/6 34/14 36/1
 60/24 60/25
**paper** [7] 7/8 10/5 19/9 20/25
 20/25 22/15 41/4
**paragraph** [2] 37/18 59/21
**Pardon** [1] 9/7
**Pare** [1] 61/21
**part** [14] 3/12 8/18 10/23 11/22
 14/3 15/7 16/14 21/2 50/11 51/7
 55/21 60/1 62/4 67/13
**part-time** [2] 60/1 62/4
**participant's** [1] 80/8
**participate** [3] 36/5 67/14 68/11
**parties** [4] 26/8 58/10 65/4
 65/14
**patented** [1] 58/18
**patently** [1] 19/9
**path** [1] 24/7
**patience** [1] 54/15
**patients** [1] 22/10
**pattern** [4] 30/14 30/21 52/13
 69/4
**pay** [3] 54/10 58/19 78/21

**payable** [1] 64/24
**payment** [1] 15/7
**payments** [1] 15/6
**payor** [2] 12/20 47/17
**peers** [1] 6/20
**penalties** [14] 12/24 42/11
 42/16 43/17 43/24 43/25 44/11
 44/15 44/20 46/21 48/6 79/21
 80/6 81/4
**penalty** [1] 48/21
**pending** [1] 2/2
**people** [5] 6/18 12/23 14/5 54/7
 54/8
**perfect** [1] 24/6
**performance** [11] 14/5 14/22
 15/16 16/5 16/20 16/21 17/3
 30/9 30/15 69/5 73/13
**perhaps** [2] 76/20 76/25
**period** [6] 4/25 52/5 52/12
 57/12 57/12 80/3
**periods** [3] 40/25 62/22 72/11
**peripheral** [1] 17/22
**permit** [2] 38/17 38/18
**permits** [1] 38/17
**permitted** [4] 11/11 11/18 38/18
 64/3
**person** [18] 5/11 5/13 5/19 6/10
 6/11 6/12 6/24 7/2 13/12 19/8
 20/24 22/14 48/25 50/8 69/19
 74/18 78/15 78/24
**person comes** [1] 5/19
**person's** [1] 11/5
**personal** [1] 20/23
**pertains** [1] 43/25
**pertinent** [8] 5/5 44/4 44/7
 45/19 46/18 59/21 76/3 80/17
**Pete** [1] 56/5
**phone** [1] 72/11
**Phu** [1] 17/16
**physiatrist** [1] 17/13
**physician** [11] 32/22 33/14
 36/9 36/10 36/13 36/13 60/8
 61/2 61/3 61/12 70/20
**physicians** [10] 27/20 39/5
 39/6 39/8 64/16 70/16 71/2
 77/14 78/9 79/10
**pick** [1] 45/15
**picking** [1] 50/1
**piece** [5] 7/7 10/5 24/10 24/10
 25/11
**pieces** [1] 50/13
**place** [4] 9/11 28/17 68/8 70/21
**plaintiff** [31] 1/4 1/13 26/21
 29/4 32/25 33/21 36/7 55/12
 57/7 57/22 58/7 58/15 58/25

68/2 68/18 69/21 70/12 70/21
71/1 71/15 72/5 72/8 72/19
72/21 75/8 75/19 76/7 76/14
77/3 79/22 80/7
**plaintiff's** [11] 27/24 28/9 29/6
 37/7 44/3 45/8 55/18 72/14
 77/19 77/21 79/16
**plaintiffs** [3] 2/17 39/9 71/17
**plan** [93]
**plans** [7] 16/12 16/14 40/19
 40/20 47/15 53/6 77/5
**plausibly** [1] 31/21
**play** [2] 14/2 22/16
**Player** [1] 56/5
**plays** [1] 23/3
**pleading** [1] 51/8
**plucks** [1] 13/8
**plus** [1] 33/5
**pockets** [1] 12/21
**point** [17] 11/15 21/6 23/3 24/9
 25/19 25/20 27/11 28/8 29/1
 31/2 47/21 49/21 57/2 57/13
 73/9 76/25 79/7
**points** [1] 49/10
**policy** [3] 38/5 60/4 64/1
**poor** [1] 6/7
**position** [15] 3/18 5/14 6/5 9/1
 9/9 9/23 10/14 10/15 10/16
 11/24 16/25 35/10 36/4 38/23
 58/21
**positions** [1] 11/7
**positive** [1] 10/21
**post** [3] 11/14 75/6 75/11
**post-denial** [1] 75/6
**postural** [1] 63/5
**potential** [8] 3/22 12/1 18/6
 27/12 28/25 69/19 70/7 77/1
**pounds** [14] 7/20 7/24 8/6 35/2
 39/24 40/25 41/1 41/1 42/7
 61/10 62/15 63/4 63/14 72/13
**power** [1] 48/18
**practical** [1] 38/20
**practicality** [1] 25/19
**practice** [6] 6/18 6/18 6/19 9/11
 10/23 20/24
**practices** [8] 28/10 28/12 28/15
 28/21 57/8 73/12 76/8 76/13
**practitioner** [1] 23/17
**practitioners** [1] 24/4
**praised** [1] 28/16
**pre** [1] 60/2
**pre-disability** [1] 60/2
**preclude** [2] 34/19 68/8
**precluded** [1] 64/22
**preconditions** [1] 68/12

# P

**predated [1]** 57/13
**predates [1]** 28/11
**prejudice [2]** 44/10 80/7
**prejudiced [3]** 45/24 46/6 80/19
**preponderance [1]** 66/2
**prescribed [1]** 69/8
**prescription [1]** 34/21
**present [1]** 70/7
**pressure [2]** 15/1 16/23
**pretend [1]** 13/24
**prevent [1]** 44/8
**primarily [2]** 54/14 62/21
**primary [2]** 33/14 61/4
**principled [9]** 45/10 58/23
65/23 66/16 71/17 72/18 72/20
74/25 79/14
**printer [2]** 41/5 72/12
**private [1]** 51/13
**problem [10]** 14/13 17/6 21/13
30/25 31/23 31/24 38/10 39/3
57/2 69/1
**problems [3]** 13/16 17/16 28/22
**procedural [3]** 44/7 66/17 75/3
**proceed [1]** 37/4
**proceeded [1]** 58/5
**proceedings [6]** 1/24 76/9
81/16 82/6 82/12 82/14
**process [31]** 6/14 9/14 10/24
10/25 22/24 22/25 28/6 42/21
45/11 48/14 48/15 48/16 49/19
52/17 55/14 55/17 55/20 56/1
58/6 58/23 65/23 66/15 71/17
72/18 72/20 74/25 75/16 77/7
79/6 79/12 79/15
**processes [1]** 77/4
**procure [1]** 53/3
**produce [7]** 46/22 46/23 48/11
48/12 48/13 53/12 80/10
**producing [1]** 46/6
**product [1]** 79/14
**production [1]** 43/7
**profession [1]** 6/19
**professional [3]** 9/19 60/8 67/7
**professionals [1]** 69/25
**prolonged [2]** 61/23 62/20
**promote [5]** 3/22 12/2 14/23
77/1 79/4
**proof [1]** 48/2
**proper [4]** 6/1 50/20 50/21
50/22
**proposition [1]** 4/22
**protect [1]** 6/15
**protections [1]** 59/5

**protocol [1]** 13/6
**prove [5]** 23/8 23/9 54/1 76/19
76/24
**provider [5]** 20/17 31/14 31/18
33/12 56/23
**providers [7]** 27/25 28/1 28/1
31/15 77/19 78/9 79/11
**provision [1]** 60/5
**provisions [7]** 46/18 46/20
65/11 66/14 71/8 71/12 80/17
**proxy [1]** 53/10
**psychiatric [1]** 31/23
**psychiatrist [1]** 36/15
**psychologic [2]** 19/6 22/14
**psychologist [3]** 19/1 63/1
77/15
**psychologists [2]** 27/20 29/25
**public [4]** 29/2 53/10 53/10
53/13
**publicly [1]** 29/3
**published [2]** 51/12 51/13
**pulled [1]** 9/5
**purposely [1]** 10/21
**purposes [5]** 6/10 22/11 23/19
67/15 78/18
**pursue [1]** 80/20
**pursuing [1]** 44/9
**pursuit [1]** 46/9
**puts [1]** 6/10
**puzzle [1]** 50/9
**puzzles [1]** 50/10

# Q

**quadriceps [1]** 33/6
**quality [1]** 65/25
**quantum [1]** 65/25
**Quarles [4]** 9/2 9/22 38/4 67/5
**question [8]** 3/6 3/13 19/15
30/13 49/8 67/4 70/3 76/13
**questionnaires [1]** 74/1
**questions [6]** 2/22 28/4 32/5
32/8 32/22 77/21
**quicker [1]** 16/8
**quickly [1]** 47/22
**quotations [2]** 80/15 81/2
**quote [1]** 25/21
**quoted [1]** 44/5
**quotes [1]** 23/24

# R

**raise [1]** 41/14
**raised [4]** 3/4 28/9 32/8 68/18
**ratified [1]** 7/23
**rationalization [1]** 11/14
**RCMD [7]** 58/4 59/1 59/3 61/11

**72/7 73/4 73/6**
**reaching [1]** 18/5
**ready [2]** 6/25 6/25
**reasonableness [2]** 42/2 66/6
**reasoned [5]** 12/12 20/5 66/16
71/17 79/13
**recent [1]** 15/9
**Recess [1]** 57/21
**recitation [4]** 21/25 23/18 52/2
53/23
**recite [1]** 60/16
**recognize [3]** 36/10 36/17
44/24
**recommendation [1]** 77/23
**recommended [4]** 30/10 35/18
35/18 74/16
**reconsider [1]** 62/2
**reconsideration [2]** 72/21
75/17
**record [42]** 2/6 2/21 3/6 6/11
6/13 10/6 10/20 11/7 12/2 28/10
34/2 35/7 35/12 36/6 42/4 42/21
43/2 48/2 49/19 50/13 51/7
53/13 54/22 57/1 58/7 60/13
60/14 60/15 68/12 68/13 68/14
69/9 71/2 71/10 72/4 72/6 72/17
74/23 75/14 75/21 77/10 78/3
**recordation [1]** 7/16
**recorded [3]** 1/24 4/17 7/10
**recording [2]** 4/18 7/7
**records [18]** 4/19 17/24 31/14
31/15 31/19 33/12 33/14 33/24
35/5 35/17 35/23 50/25 62/24
64/14 69/2 74/15 75/18 78/6
**reduce [6]** 3/22 12/1 27/12
28/25 77/1 79/4
**reduced [1]** 27/10
**reference [1]** 11/17
**referenced [1]** 54/4
**references [2]** 10/21 22/4
**referencing [1]** 10/21
**reflect [1]** 78/7
**refusal [3]** 5/9 64/21 67/13
**refuse [3]** 5/8 36/5 70/17
**refused [6]** 36/2 36/25 64/10
70/21 74/19 77/23
**registered [1]** 61/19
**regular [14]** 39/13 39/16 39/20
59/9 59/11 59/20 59/23 59/25
62/12 63/2 63/17 69/22 72/14
73/6
**regulations [1]** 40/4
**regulators [4]** 28/16 28/20
29/15 29/16
**regulatory [4]** 28/11 28/13

**regulatory... [2]** 28/14 52/15
**relationship [3]** 20/7 21/21 31/3
**relatively [1]** 67/16
**relevance [1]** 9/2
**reliable [1]** 70/17
**remain [1]** 64/23
**remains [1]** 26/16
**remarkable [1]** 15/9
**rendered [2]** 55/17 75/7
**rent-a-doctor [1]** 78/8
**repeated [1]** 79/11
**repetitive [1]** 7/20
**replete [1]** 49/19
**replies [1]** 58/11
**reply [1]** 57/14
**report [12]** 17/11 19/2 29/23 30/2 30/13 31/17 32/4 32/19 34/9 41/25 69/1 69/3
**Reporter [4]** 1/20 82/1 82/3 82/20
**reporting [2]** 19/19 33/21
**reports [17]** 4/2 9/21 10/12 19/25 27/22 35/21 40/1 51/19 55/16 55/22 56/14 68/24 69/13 70/11 71/1 71/3 77/16
**repository [1]** 53/21
**representative [1]** 60/10
**request [15]** 6/21 24/19 38/13 43/6 43/11 43/13 45/7 45/18 46/24 47/2 47/2 47/9 47/11 54/21 80/9
**requested [11]** 10/1 29/23 32/17 42/23 43/4 46/25 62/1 73/9 73/19 74/16 79/22
**requests [3]** 43/8 64/4 75/17
**required [8]** 9/3 15/12 40/12 50/18 60/12 63/3 66/22 72/10
**requirements [5]** 44/7 66/18 71/22 75/4 75/22
**research [1]** 18/17
**reservation [2]** 24/22 24/23
**resource [1]** 40/11
**resources [1]** 40/1
**respective [2]** 27/23 77/17
**respectively [1]** 45/6
**response [7]** 32/5 32/6 37/17 54/23 55/4 63/7 79/24
**responsibilities [1]** 71/5
**rest [2]** 50/2 68/10
**restrictions [12]** 13/14 31/12 32/11 34/18 41/7 41/11 56/24 61/8 73/15 73/22 74/4 74/5

**restricts [1]** 16/7
**result [8]** 31/21 45/10 58/22 64/23 65/23 72/18 74/25 81/7
**results [5]** 17/2 30/14 56/16 56/17 73/14
**Retirement [1]** 56/6
**retrieval [1]** 18/9
**return [1]** 41/20
**reversal [4]** 15/18 15/21 15/23 15/25
**review [45]** 3/8 3/15 8/18 10/12 11/19 12/6 12/16 13/10 13/10 19/2 19/4 19/6 19/9 19/17 22/4 22/15 23/10 24/14 25/1 25/15 26/14 26/15 27/21 29/20 35/10 49/12 52/5 55/21 55/21 61/18 62/6 63/8 64/22 65/5 65/7 67/2 72/16 73/9 73/20 74/1 75/5 75/6 77/11 77/15 78/2
**reviewer [5]** 13/9 13/9 22/19 52/25 77/18
**reviewers [9]** 15/4 20/9 27/24 30/1 52/21 52/24 70/13 70/24 71/3
**reviews [28]** 3/21 10/10 10/11 12/6 12/8 12/16 18/13 18/15 18/15 19/10 20/25 21/1 23/17 24/6 27/19 29/23 32/17 51/2 55/11 55/13 55/13 55/16 63/20 65/13 70/15 75/13 75/15 77/13
**revisions [1]** 29/14
**reward [1]** 14/5
**richly [2]** 68/14 78/21
**richly-deserved [1]** 78/21
**ridiculous [2]** 6/22 50/4
**Riggs [4]** 2/11 26/3 57/24 58/3
**rights [3]** 24/22 24/23 45/25
**RMR [1]** 1/20
**Road [1]** 1/14
**Roeder [1]** 1/14
**ROGER [1]** 1/10
**role [2]** 3/6 78/23
**room [2]** 7/13 38/21
**rooms [1]** 6/22
**root [2]** 34/7 34/10
**round [1]** 61/17
**routine [1]** 52/18
**routinely [2]** 9/10 59/12
**Rozelle [1]** 56/5
**RSA [2]** 28/17 57/13
**ruled [1]** 67/6
**ruling [1]** 81/13
**RWT [3]** 1/3 2/3 82/9
**RWT-16-2653 [3]** 1/3 2/3 82/9

**sacral [1]** 61/14
**sandbagging [6]** 12/5 12/13 42/17 42/18 51/3 55/12
**Sara [1]** 69/14
**satisfy [1]** 23/14
**saved [1]** 15/25
**schedule [7]** 36/1 37/5 37/17 37/22 62/4 62/5 77/22
**scheduled [4]** 37/8 37/10 37/10 37/21
**scheme [3]** 29/4 29/8 58/19
**school [1]** 14/15
**scintilla [1]** 66/1
**scope [3]** 3/7 8/2 26/13
**score [1]** 30/21
**scores [6]** 30/18 30/19 30/19 30/22 30/22 30/23
**scorned [1]** 54/10
**SCOTT [2]** 1/13 2/7
**se [1]** 19/12
**seal [1]** 58/7
**seasoned [1]** 6/7
**second [7]** 11/22 15/7 37/18 63/8 66/9 67/15 77/12
**secret [1]** 42/25
**sedentary [15]** 8/5 8/21 34/19 35/1 39/21 41/24 42/1 42/4 49/11 49/13 49/14 61/16 62/13 63/12 74/9
**seek [2]** 46/20 75/22
**seeking [2]** 43/24 48/21
**seeks [1]** 76/9
**select [1]** 50/12
**selected [1]** 9/20
**selection [1]** 36/13
**selective [5]** 4/2 10/12 13/10 22/4 49/12
**sense [2]** 24/17 30/23
**senseless [1]** 47/16
**sensibility [1]** 25/11
**September [5]** 54/24 54/25 55/1 55/5 64/6
**September 8th [3]** 54/24 54/25 55/5
**serious [1]** 30/1
**serve [1]** 47/25
**served [1]** 48/1
**service [1]** 47/23
**services [2]** 59/1 79/9
**settlement [3]** 28/11 28/13 28/15
**seven [2]** 66/18 77/24
**seventh [1]** 76/1

**S**

severity [1]  18/11
sham [1]  77/8
shape [1]  36/22
Shaw [1]  70/5
Shea [1]  1/13
SHEELA [4]  1/3 2/3 57/23 82/8
Shellie [1]  61/20
shoot [1]  21/17
short [23]  12/14 23/20 24/17 26/6 27/2 27/3 27/5 32/25 33/18 39/17 43/16 45/21 46/17 48/15 51/5 57/2 59/3 59/6 59/11 60/21 63/18 64/13 80/1
short-term [19]  24/17 26/6 27/2 27/3 27/5 32/25 33/18 39/17 43/16 45/21 46/17 48/15 51/5 59/3 59/6 59/11 60/21 63/18 80/1
shorthand [2]  82/6 82/13
Shostak [10]  19/2 19/3 31/7 31/17 32/3 63/1 73/1 73/10 73/12 73/20
Shostak's [4]  29/22 30/1 32/6 69/5
shoulder [1]  57/2
shown [2]  13/2 54/2
sickness [4]  59/7 59/18 60/3 60/7
side [10]  4/24 15/24 25/13 30/16 34/22 54/21 56/25 68/23 69/1 69/7
sign [1]  15/2
signs [1]  13/11
Silver [1]  1/15
similarity [1]  72/4
simple [1]  80/21
Sinclair [1]  25/21
single [3]  19/20 48/10 60/16
sixth [2]  75/2 77/22
skills [2]  4/1 7/17
slowing [1]  24/4
small [1]  67/13
so-called [1]  78/4
solely [1]  68/10
sorts [1]  39/6
sought [2]  70/23 72/21
sound [1]  43/15
source [1]  19/20
sources [1]  19/23
South [1]  1/17
SOUTHERN [1]  1/2
special [4]  21/4 49/5 65/5 70/19
specialist [3]  60/25 61/20 61/21

specialists [4]  38/3 69/21 73/19 77/20
specialty [1]  35/19
specific [7]  2/22 39/15 39/15 59/15 59/15 67/1 73/4
speculation [1]  19/4
Spica [6]  20/10 20/23 29/24 30/17 32/10 63/21
spine [1]  34/11
spoke [1]  72/7
spondylosis [1]  61/14
sprain [1]  60/20
Spring [1]  1/15
squarely [1]  44/21
squatting [1]  18/5
stand [1]  41/14
standard [24]  3/10 3/14 6/17 6/19 20/4 23/6 23/8 23/10 23/13 25/9 26/15 26/16 26/17 65/5 65/8 65/18 65/19 66/18 68/14 68/16 73/12 75/13 76/2 78/25
standards [4]  3/21 14/6 65/3 66/4
standing [14]  7/24 18/4 25/2 35/3 39/23 42/5 42/7 61/8 61/23 62/14 62/20 62/22 63/3 63/13
stands [1]  4/21
starters [1]  27/16
starting [1]  38/10
state [5]  5/1 5/3 7/4 11/15 52/1
stated [7]  7/18 17/12 17/14 19/3 21/14 50/25 52/14
statement [4]  53/10 61/4 61/12 62/2
statements [4]  13/12 69/17 69/18 73/3
states [10]  1/1 1/11 1/21 3/20 5/7 8/21 22/10 25/5 60/5 82/4
statutory [12]  42/10 42/16 43/17 43/24 43/24 44/11 44/15 44/19 48/5 79/21 80/5 81/4
STD [8]  43/21 44/2 44/8 44/13 54/21 55/3 62/17 80/22
stemming [1]  3/19
stenography [1]  1/24
step [9]  9/20 13/21 13/21 24/10 24/12 52/18 52/18 73/24 74/11
Stephan [2]  52/11 54/4
steps [9]  3/22 12/1 27/11 27/12 27/14 28/24 77/1 77/11 79/3
steroid [2]  34/13 34/14
stick [1]  16/10
stock [9]  15/11 15/11 15/12 15/13 16/5 16/7 16/8 17/1 53/2
stopped [1]  12/25

stores [1]  66/5
Street [1]  1/17
strength [6]  33/3 33/5 33/9 33/19 33/22 34/3
stretching [1]  41/8
stricken [1]  11/21
string [1]  52/2
stripes [1]  52/13
strong [1]  78/11
structure [5]  15/8 15/10 16/4 16/19 53/2
studies [1]  9/13
study [2]  56/16 56/17
submit [1]  9/24
submitted [10]  13/3 15/9 32/25 60/21 61/11 62/16 62/23 64/12 72/24 72/25
submitting [1]  7/3
subscribed [1]  82/15
subscription [1]  51/15
substance [1]  20/3
substantial [11]  8/23 8/24 20/3 45/11 58/24 59/9 65/24 65/24 75/1 77/10 79/15
substantive [3]  32/5 66/17 75/4
Suffice [1]  60/17
sufficient [3]  66/3 68/12 70/13
suggest [1]  76/20
suggesting [2]  13/18 37/9
Suite [1]  1/14
summary [19]  2/16 8/3 10/18 23/21 23/21 26/4 45/8 45/9 46/4 58/5 58/8 58/10 58/14 58/21 65/1 65/3 67/3 79/17 79/18
Sup [1]  70/6
superior [1]  16/25
supervisor [8]  39/21 51/20 62/9 63/11 63/12 72/3 72/16 73/8
supplemented [1]  7/21
supplied [2]  8/18 46/19
support [10]  8/8 13/13 29/11 63/1 64/12 66/3 66/12 68/1 75/12 75/21
supported [13]  17/11 20/16 31/18 32/11 35/23 43/1 45/11 58/24 65/24 73/16 73/23 75/1 79/15
supporting [1]  17/8
supportive [1]  67/12
supposition [1]  16/12
Supreme [2]  3/19 27/10
surprising [1]  69/11
suspect [1]  78/24
system [3]  14/4 14/4 31/5
systemic [1]  28/21

# T

**table [1]** 61/17
**tap [1]** 6/25
**tape [1]** 82/14
**tar [1]** 76/10
**target [1]** 23/15
**tasks [2]** 39/14 59/14
**teach [1]** 48/18
**tear [2]** 17/25 50/3
**technique [4]** 13/1 13/4 13/5 13/23
**techniques [1]** 6/1
**telephone [1]** 40/23
**ten-minute [1]** 41/12
**term [37]** 2/12 12/14 12/15 24/17 24/19 24/20 24/22 26/3 26/6 26/6 27/2 27/3 27/5 27/7 32/25 33/18 39/17 43/16 45/21 46/17 48/15 48/16 51/5 51/6 57/25 59/3 59/4 59/6 59/11 59/17 60/4 60/21 63/18 63/19 64/14 64/18 80/1
**termed [1]** 49/11
**terms [9]** 28/5 28/6 41/3 41/4 42/2 42/17 44/4 56/22 60/18
**terrible [1]** 48/17
**test [6]** 7/6 20/16 30/13 30/14 56/16 73/14
**tested [2]** 18/2 30/6
**testimony [1]** 82/7
**text [1]** 80/16
**thank [11]** 2/19 3/16 25/23 25/24 26/1 45/12 54/12 54/14 54/15 57/19 81/14
**therapy [2]** 20/15 20/18
**thereafter [1]** 60/24
**thinking [1]** 21/18
**thorough [1]** 78/1
**thought [2]** 35/15 35/25
**thousands [1]** 6/9
**Thus [1]** 79/6
**tie [2]** 66/23 66/25
**tie-breaking [1]** 66/25
**time [30]** 5/21 11/6 11/6 11/10 13/7 15/5 22/24 23/1 33/18 35/1 39/7 43/6 52/3 52/12 52/19 54/15 57/3 57/12 57/12 57/17 59/23 60/1 60/1 62/4 62/4 64/9 74/10 74/21 78/1 80/3
**timely [4]** 43/19 43/23 44/8 54/21
**times [5]** 5/18 24/21 43/9 49/1 51/7
**tingling [1]** 33/23

**tired [1]** 23/1
**title [1]** 71/19
**Titles [9]** 8/1 39/25 40/7 40/11 40/13 51/11 51/12 62/11 71/20
**TITUS [1]** 1/10
**Tooth [9]** 17/20 21/8 21/10 21/21 31/3 32/15 33/2 49/22 61/5
**touch [1]** 6/24
**touches [1]** 37/24
**track [1]** 24/13
**transcript [3]** 1/10 1/24 82/12
**transfer [1]** 4/1
**transferable [1]** 7/17
**transforaminal [1]** 34/13
**transparently [1]** 68/4
**treat [1]** 50/9
**treated [1]** 34/14
**treating [11]** 12/23 27/25 27/25 31/14 31/15 31/18 33/12 56/23 70/16 71/2 77/19
**treatment [1]** 69/2
**trips [1]** 17/23
**troubles [1]** 60/17
**trust [1]** 11/3
**truth [3]** 19/24 51/23 51/24
**truthful [1]** 19/24
**twenty [1]** 7/20
**twenty-five [1]** 7/20
**twice [1]** 51/4
**twisting [1]** 61/9
**typical [1]** 80/13
**typically [1]** 47/12

# U

**ultimately [2]** 73/21 77/25
**unable [8]** 17/14 33/8 59/8 59/22 61/5 62/5 64/8 74/21
**unclear [1]** 35/15
**uncovered [1]** 76/10
**under the [1]** 15/20
**understanding [2]** 25/23 74/2
**undertake [1]** 58/16
**undertaken [1]** 20/14
**undertaking [1]** 3/21
**undertook [2]** 75/6 79/2
**unemployable [1]** 18/6
**unethical [3]** 19/9 19/11 19/12
**unfair [4]** 9/17 12/9 12/18 48/21
**UNITED [5]** 1/1 1/11 1/21 5/7 82/4
**unless [6]** 36/5 37/22 63/24 65/8 68/8 74/17
**unreasonable [7]** 23/10 23/12 23/13 36/14 68/20 70/8 71/19

**unreasonably [2]** 58/15 70/22
**unrestricted [1]** 67/8
**unsupported [1]** 78/19
**UNUM [94]**
**UNUM's [16]** 12/7 12/21 12/23 26/8 28/15 28/20 28/23 36/8 37/17 38/23 39/5 39/10 39/19 45/9 57/7 71/11
**upheld [2]** 72/23 73/17
**upholding [2]** 63/17 64/18
**upper [6]** 33/4 33/10 33/19 34/3 35/9 35/12
**Upton [1]** 25/20
**us [4]** 2/23 15/25 20/6 37/11

# V

**vague [1]** 5/7
**valid [1]** 73/14
**validity [5]** 19/13 30/9 30/12 32/4 73/13
**vanishing [3]** 27/11 76/25 79/7
**verified [1]** 41/11
**versus [13]** 2/3 7/5 9/3 20/13 37/25 38/1 44/22 56/5 66/5 69/14 70/5 76/18 82/8
**vertebrae [1]** 17/18
**Victor [1]** 33/13
**video [2]** 37/19 37/23
**videographer [1]** 38/22
**videotape [5]** 4/11 37/13 38/9 64/3 67/8
**videotaped [1]** 63/25
**videotaping [6]** 6/21 9/4 9/12 9/13 64/2 74/18
**violated [3]** 4/5 19/5 75/21
**violates [1]** 80/3
**violations [2]** 25/8 52/4
**virtual [1]** 76/7
**visual [1]** 30/7
**vocational [20]** 4/4 11/12 25/1 27/18 27/19 39/10 39/19 40/1 40/2 40/5 40/8 40/10 42/3 60/9 62/6 63/8 63/9 71/18 73/2 77/13
**voluminous [1]** 78/6
**voyage [1]** 80/23

# W

**waived [1]** 10/9
**wake [1]** 79/3
**Wal [1]** 66/5
**Wal-Mart [1]** 66/5
**walk [2]** 41/5 61/6
**walking [15]** 7/24 8/7 18/4 35/4 39/23 41/5 42/5 61/9 61/24 62/14 62/20 62/22 63/3 63/14

# W

**walking... [1]** 72/12
**Warmwood [1]** 61/20
**warpath [1]** 76/7
**warrant [4]** 34/18 44/10 74/3
74/5
**watch [2]** 4/11 5/20
**weakness [3]** 35/22 35/23 61/7
**weekly [1]** 2/14
**weighed [1]** 76/15
**weight [4]** 20/12 28/24 70/9
70/19
**well-documented [1]** 78/21
**well-reasoned [1]** 79/13
**Westlaw [1]** 51/15
**whatsoever [2]** 6/5 11/18
**whereof [1]** 82/15
**who's [1]** 34/5
**wide [1]** 3/7
**widened [1]** 26/14
**wider [1]** 3/9
**will either [1]** 6/20
**William [2]** 19/1 22/8
**willing [3]** 37/2 39/8 41/13
**win [1]** 53/20
**wind [1]** 3/2
**wind-up [1]** 3/2
**window [1]** 26/13
**without imposing [1]** 36/3
**witnessed [1]** 4/18
**wonderful [1]** 20/20
**workstations [1]** 41/14
**world [1]** 78/16
**worst [1]** 53/6
**worthy [2]** 16/22 67/22

# Y

**Y-O-U [1]** 17/12
**Yokel [1]** 17/16

# Z

**Zimmerman [7]** 18/20 29/24
32/10 63/21 68/25 73/9 73/11
**Zimmerman's [2]** 19/2 19/25